SUSMAN GODFREY L.L.P.
Marc M. Seltzer (54534)
Krysta Kauble Pachman (280951)
Jordan Rux (338984)
1900 Avenue of the Stars
Los Angeles, CA 90067
Tel.: (310) 789-3100
mseltzer@susmangodfrey.com
kpachman@susmangodfrey.com
jrux@susmangodfrey.com

ENTWISTLE & CAPPUCCI LLP
Vincent R. Cappucci
(*Pro Hac Vice Forthcoming*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com

*Counsel for Plaintiff and the Proposed Class*

*[Additional counsel listed on signature page]*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| ALTSHARES EVENT-DRIVEN ETF, on Behalf of Itself and All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    vs.<br><br>ENDEAVOR GROUP HOLDINGS, INC., ARIEL EMANUEL, PATRICK WHITESELL, MARK SHAPIRO, EGON DURBAN, URSULA BURNS, FAWN WEAVER, STEPHEN EVANS, JACQUELINE RESES, and SILVER LAKE GROUP, L.L.C.,<br><br>                Defendants. | Case No. 2:26-cv-526<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

I.  NATURE OF THE ACTION..................................................................2

II.  JURISDICTION AND VENUE............................................................12

III.  PARTIES..........................................................................................12

    A.  Plaintiff........................................................................................12

    B.  Defendants....................................................................................13

    C.  Relevant Non-Parties....................................................................19

IV.  OVERVIEW OF THE FRAUD............................................................20

    A.  Endeavor is Formed and Controlled by Emanuel, Whitesell and Silver Lake.......................................................................20

    B.  The TRA Provides Significant Tax Benefits to the Officer Defendants...............................................................................22

    C.  Endeavor Acquires OpenBet and Forms TKO..............................23

    D.  The Executive Committee Begins a Strategic Review With Silver Lake.........................................................................24

    E.  The Officer Defendants Negotiate Enormous Compensation Packages Before the Formation of a Special Committee.................26

    F.  Endeavor Belatedly Forms a Special Committee...........................28

    G.  Centerview is Retained Despite its Conflicts................................30

    H.  Emanuel, Durban and Silver Lake Pressure the Special Committee to Approve the Merger on an Accelerated Timeline.......32

    I.  The Merger Agreement Expressly Provided for the Post-Signing Sale of Endeavor Assets............................................41

    J.  Endeavor Files An Information Statement That Fails to Account for the OpenBet and Sports Assets Sales and A Massive Increase in TKO's Stock Price.....................................42

    K.  The Rollover Agreements and TRA are Amended and Substantial Tax Savings are Diverted Away from Unaffiliated Shareholders..................................................46

    L.  The Merger Closes.......................................................................51

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT....................51

A.   Defendants Falsely Asserted the Merger Was Fair ............................. 52

B.   Defendants Misstated the Value of the Officer Defendants' Equity Rollovers .................................................................. 61

C.   Defendants Failed to Disclose That OpenBet Was Undervalued ....... 62

D.   Defendants Failed to Disclose That the TRA Amendment Diverted Significant Value From Unaffiliated Shareholders ............. 65

E.   Defendants Failed to Disclose the Pressure Campaign By Emanuel and Silver Lake to Force a Merger Recommendation By the Special Committee ................................................................ 66

F.   Defendants Failed to Disclose Centerview's Significant Conflicts of Interest............................................................................ 71

VI.    ALLEGATIONS OF SCIENTER ................................................................ 73

VII.   APPLICATION OF PRESUMPTION OF RELIANCE.............................. 75

VIII.  LOSS CAUSATION ................................................................................... 76

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE.................................................. 78

X.     CLASS ACTION ALLEGATIONS ............................................................ 79

XI.    CLAIMS FOR RELIEF .............................................................................. 81

       COUNT I For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5(a)-(c) Against All Defendants ................................................ 81

       COUNT II For Violation of §13(e) of the Exchange Act and SEC Rule 13e-3 Against Endeavor, Silver Lake, Emanuel, and Whitesell .......... 83

       COUNT III For Violation of §20(a) of the Exchange Act  Against Silver Lake and the Individual Defendants .................................... 84

XII.   PRAYER FOR RELIEF.............................................................................. 85

JURY DEMAND.................................................................................................. 87

Plaintiff AltShares Event-Driven ETF ("Plaintiff"), by and through its undersigned counsel, brings this action ("Action") on behalf of itself and a class of investors (the "Class") who sold shares of Class A common stock of Endeavor Group Holdings, Inc. ("Endeavor" or the "Company") from January 15, 2025, through March 24, 2025 (excluding those who exchanged their Endeavor Class A common stock for Merger Consideration (defined below)), and were damaged as a result of Defendants' wrongdoing alleged herein (the "Class Period"). This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

The subject claims are brought under Sections 10(b), 13(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78m(e), and 78t(a), Securities and Exchange Commission ("SEC") Rules 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c), and Rule 13e-3, 17 C.F.R. § 240.13e-3 against (i) Endeavor, (ii) Endeavor's Chief Executive Officer ("CEO") and member of the Endeavor board of directors (the "Board"), Ariel Emanuel, (iii) Executive Chairman of Endeavor, Patrick Whitesell, (iv) Endeavor's President and Chief Operating Officer, Mark Shapiro, (v) Endeavor Board members Egon Durban, Fawn Weaver, and Stephen Evans, (vi) Endeavor Board and special committee members Ursula Burns and Jacqueline Reses (the "Special Committee"), and (vii) Silver Lake Group, L.L.C., together with its affiliates ("Silver Lake"), (collectively, "Defendants").

Plaintiff's claims are based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of its undersigned counsel. This investigation included, but was not limited to, a review and analysis of:

(i)    Endeavor's public filings with the SEC;

(ii)    Defendants' public statements concerning the Merger made during the Class Period, including the Company's information statement on the Merger filed with the SEC pursuant to Section 14(c) of the Exchange Act and distributed to Endeavor shareholders on January 15, 2025 (the "Information Statement");

(iii)    Company press releases, reports and postings concerning the Merger on the websites for Endeavor and Silver Lake;

(iv)    Media reports concerning Endeavor, Silver Lake and the Merger;

(v)    Data reflecting the price of Endeavor's Class A common stock;

(vi)    The filings in the case captioned *In re Endeavor Group Holdings, Inc. Stockholders' Litigation*, C.A. No. 2025-0663-LWW (Del. Ch.), including the unredacted complaints filed in the case that were obtained pursuant to Delaware Chancery Court Rule 5.1; and

(vii)    Additional material and data concerning Endeavor and the other Defendants.

Plaintiff's investigation is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support exists for the allegations in this complaint (the "Complaint") after a reasonable opportunity for discovery is permitted.

## I.    NATURE OF THE ACTION

1.    This securities class action involves a take-private merger (the "Merger") in which the unaffiliated public shareholders of Endeavor Class A common stock were told by Defendants that the Merger and the $27.50 per share in merger consideration (the "Merger Consideration") was "*fair to and in the best interests*"[1] of public shareholders. Defendants knew or recklessly disregarded that this claim was false and misleading based on facts that were not disclosed. These

---

[1] All emphasis herein is added unless otherwise noted.

1    omitted material facts demonstrated that the Merger Consideration significantly

2    understated the fair value of the Company and the Endeavor stock public

3    shareholders owned, determined in accordance with well accepted objective

4    standards of fairness. Plaintiff and other Class members were injured when they

5    sold their shares at artificially deflated prices into the open market and forfeited

6    their appraisal rights during the Class Period.

7        2.    The case concerns a unified scheme that was orchestrated by Silver

8    Lake and Endeavor insiders to depress minority bargaining power and the value

9    realizable by the unaffiliated public shareholders, while insiders captured future

10   upside through rollovers and separate benefits. Defendants orchestrated this

11   scheme by, among other things: (i) rejecting a "majority of the minority" vote on

12   the Merger and closing by controller written consent; (ii) locking-in a $27.50 cash-

13   out Merger Consideration without any collar or contingent value right and offering

14   only a *de minimis* dividend to shareholders that they shared with themselves; and

15   (iii) disseminating a misleading Information Statement on January 15, 2025 that

16   spoke in present tense about "fairness" and "best interests" to unaffiliated

17   shareholders while relying on Centerview Partners, LLC's ("Centerview") fairness

18   opinion ("Fairness Opinion") with analysis frozen "as of" March 2024 and omitting

19   material contemporaneous information needed to render those assertions not

20   misleading.

21       3.    Based on Centerview's blended analyses, it produced two per-share

22   price values for Endeavor: (i) $22.44 - $30.89 (based on the comparables approach)

23   and (ii) $27.58 - $36.23 (based on a discounted cash flow ("DCF") analysis). The

24   $27.50 per share in Merger Consideration was below the low end of Centerview's

25   DCF range and reflected the fact that the Merger was timed to take advantage of a

26   temporary trough in the market price of Endeavor's stock that Silver Lake knew

27   about due to their insider directors at the Company. Nevertheless, both the Fairness

28

Opinion and Defendant's statements in the Information Statement touted the fairness of the Merger Consideration.  Defendants' fairness representations in the Information Statement were anchored to Centerview's April 2, 2024 Fairness Opinion, which was based on March 28, 2024 financial data, *i.e.*, data that *was over nine months old* at the time the Information Statement was mailed to shareholders.

4.      Defendants did not, and could not, believe these fairness representations were true based on objective metrics and criteria for judging fair price.      Regulation M-A (17 C.F.R. § 229.1014) lays out objective metrics for evaluating the fairness of a going private transaction as does the applicable case law.  Specifically, the factors that are important in determining the fairness of a transaction include whether the consideration offered to unaffiliated security holders constitutes fair value in relation to: (i) *Current market prices*; (ii) Historical market prices; (iii) Net book value; (iv) Going concern value; (v) Liquidation value; (vi) Purchase prices paid by the filing person in any subject securities during the past two years; (vii) Any report, opinion, or appraisal from an outside party that is materially related to the transaction, including, but not limited to: *Any report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates*; and (viii) Firm *offers of which the subject company or affiliate is aware made by any unaffiliated person*, other than the filing persons, during the past two years for: (A) The merger or consolidation of the subject company with or into another company, or vice versa; (B) *The sale or other transfer of all or any substantial part of the assets of the subject company*; or (C) A purchase of the subject company's securities that would enable the holder to exercise control of the subject company.

5.      A fairness opinion, regardless of who is uttering it, is not a matter of pure subjective opinion.  It must reflect the application of objective valuation

metrics.  And here the objective metrics demonstrate that the Merger Consideration was unfair.  Defendants knew that their claims about the fairness of the transaction were untrue and that the Merger Consideration was, in fact, unfair, because they knew objective facts that demonstrated its unfairness and that those facts had not been disclosed.  Defendants further knew that Centerview's Fairness Opinion, which they touted to investors, was false and misleading for the same reasons.

6.  *First*, Defendants failed to address Endeavor's dramatic increase in value in the post-Merger signing period. Defendants presented public shareholders with stale financial information about Endeavor's most valuable asset, its majority ownership stake in TKO Group Holdings, Inc. ("TKO"), a publicly traded affiliate of Endeavor.  Endeavor's own valuation framework, disclosed to shareholders, split equity value into "Ex-TKO" (all businesses other than the TKO stake) and "Owned TKO" (Endeavor's ~51% economic interest in TKO).  Yet Defendants failed to require or apply objective price-protection devices key to TKO and omitted explanations about how intervening developments affected the fairness analysis. The failure to update their statements and these half-truths and omissions, which failed to account for the current market prices of TKO, violated Rule 13e-3 and Rule 10b-5 and formed part of a deceptive scheme to acquire public shares on unfair terms.

7.  Since the date of the Fairness Opinion, TKO had experienced a dramatic increase in its market price and Endeavor had therefore increased in value as well.  Specifically, TKO's stock price increased 79% from where it was trading when the Fairness Opinion was issued to the Merger close on March 24, 2025. TKO's stock price also rose significantly between the date of Fairness Opinion and the date of the Information Statement.  As of the day prior to the April 2, 2024 Fairness Opinion, TKO's publicly traded stock price was $86.18 per share.  By the time the Information Statement was filed on January 15, 2025, TKO's stock price

had dramatically increased to $143.91.  This stock price surge made Endeavor's majority holding in TKO worth approximately $9.5 billion at the time of the Information Statement— ███████████████████████████████████ ██████████████████.

8.     By the time the Merger closed on March 24, 2025, TKO's stock price rose to $152.91 per share and Endeavor's TKO stake[2] was worth approximately *$13.3 billion*— ███████████████████████████████ ██████████████████.  This information and how it affected the fairness of the Merger Consideration was not disclosed to shareholders in the Information Statement nor in Defendants' other Class Period statements.  Nor did the Information Statement contain relevant context so that shareholders could accurately interpret Centerview's outdated financial analysis of TKO.

9.     Defendants also failed to provide a refreshed sensitivity analysis to the value assumptions regarding TKO.  The April 2024 Centerview fairness analysis set forth in the Information Statement shows the comparable companies used and the DCF parameters.  But the Information Statement failed to provide an updated sensitivity analysis showing how current day TKO prices and multiples (and the October 2024 Sports Asset sale) would change Endeavor's "Owned TKO" value and the total implied value to unaffiliated shareholders.

10.     Defendants should have, but failed to, disclose:  (i) where TKO's stock and enterprise value stood on the mailing date of the January 2025 Information Statement versus the April 2, 2024 Fairness Opinion; and (ii) how these changes materially increased the implied value of Endeavor's "Owned TKO" assets and the implied per-share value range for Endeavor.  Defendants also should have

---

[2] As discussed below, Endeavor's majority stake in TKO further increased in the post-Merger signing, pre-closing period.

1  considered those factors while determining whether the Merger was fair to
2  shareholders.

3      11.    The fact that other assets of Endeavor were quickly sold at values far
4  exceeding the values attributed to them in the original Fairness Opinion would have
5  made it impossible to say the Merger Consideration was fair.  In support of their
6  valuation of the Company, Defendants relied on Centerview's *2.56 billion* implied
7  valuation of three Endeavor businesses (*i.e.*, Professional Bull Riders, On Location,
8  and IMG Media) (the "Sports Assets").  Yet soon after the Endeavor-Silver Lake
9  merger agreement (the "Merger Agreement" or "Agreement") was signed and
10 pursuant to an express asset sale provision in the Agreement, Defendants negotiated
11 and ultimately agreed on October 23, 2024 to sell the Sports Assets to TKO for
12 *3.25 billion*.  Endeavor shareholders were never informed that the Sports Assets
13 were sold to TKO ███████████████████████████████████████
14 ████████████████████████████████████████████████████████
15 ████████████.

16     12.    Defendants further omitted how the Sports Assets sale (i) changed
17 TKO's earnings mix and value (and thus the "Owned TKO" component of
18 Endeavor's value); (ii) how it changed Endeavor's "ex-TKO" cash flows and
19 valuation; and (iii) what the combined effect was on Endeavor's implied per-share
20 value ranges relative to the $27.50 per share in Merger Consideration.

21     13.    Additionally, none of Defendants' Class Period statements explained
22 what the absence of a cost collar or true-up meant after TKO's post-Fairness
23 Opinion stock price appreciation and the October 2024 Sports Assets sale to TKO.
24 Nor does the Information Statement disclose a bridge from Endeavor's newly
25 reported results to Company valuation.  The Information Statement incorporates by
26 reference certain of Endeavor's 2024 SEC filings but fails to provide any bridge
27 that translates those later financial results into updated valuation inputs or per-share

28

---

CLASS ACTION COMPLAINT
7

1    implications for Endeavor (especially in light of the two-part framework used by
2    Centerview that valued both "Endeavor ex-TKO" and "Owned TKO").

3        14.    The stated Merger "premium" measures were also never recalculated
4    as of the Information Statement date.  Defendants touted in the Information
5    Statement that public shareholder Merger Consideration (*i.e.*, $27.50 per share plus
6    $0.24 in dividends) was a "premium" compared to levels measured on or about
7    March 28, 2024.  Yet Defendants failed to disclose the same set of comparisons
8    January 15, 2025 when the Information Statement was mailed to shareholders,
9    when shareholders actually had to decide whether to sell their shares or seek
10   appraisal of their Endeavor common stock.

11       15.    Defendants selectively updated other financial and process
12   information throughout late 2024 without ever providing contemporaneous and
13   decision-useful information needed to make their assertions about the fairness of
14   the Merger and Merger Consideration in the Information Statement not misleading
15   as of January 15, 2025.

16       16.    *Second,* Defendants also made misrepresentations on another asset sale
17   in the post-Merger signing, pre-closing period involving Endeavor's sports gaming
18   business, OpenBet.  To expedite the sale of this business before the Merger closed,
19   Defendants agreed to a $450 million management buyout of OpenBet by Defendant
20   Emanuel on November 11, 2024.  Concealed from minority shareholders was the
21   material fact that Centerview and the Company implicitly valued OpenBet at *$306*
22   *million*—█████████████████████████████████████████████
23   ████████████    These  third-party  bid  amounts,  ████████████████████
24   respectively, were never disclosed to unaffiliated shareholders.  Additionally,
25   Defendants failed to disclose that they internally valued OpenBet at approximately
26   *$150 million less* than Emanuel's $450 million purchase price.

27
28

17. *Third,* Defendants further concealed the true value of the equity rollover interests held by Endeavor's CEO, Ari Emanuel, and its Executive Chairman, Patrick Whitesell.  Both Emanuel and Whitesell held substantial equity and voting interests in Endeavor through their significant ownership of Endeavor Class A, Class X and Class Y common stock, as well as common units in Endeavor Operating Company, LLC ("Endeavor OpCo"), the operating subsidiary of Endeavor.

18. Before the appointment of a special committee of the Endeavor Board to protect the interests of minority shareholders in connection with Silver Lake's acquisition, Defendants Emanuel, Whitesell and Shapiro negotiated enormously lucrative compensation and control packages with Silver Lake.  This included agreements with Silver Lake that allowed Emanuel, Whitesell and Shapiro to rollover certain of their Endeavor OpCo units into the new Company ("New Endeavor"), and separate side letter agreements that provided them with substantial additional compensation and continued leadership of New Endeavor.

19. Days prior to Merger closing, Defendants Emanuel and Whitesell amended their respective rollover agreements to allow them to rollover additional Endeavor OpCo units in the Merger (which was not disclosed until the day the Merger closed).  By the time Emanuel and Whitesell amended their rollover agreements, ███████████████████████████████████████████████████████████████████████████████████████████████████.

20. *Fourth*, additional facts were not disclosed that show the Special Committee lacked true independence.  In describing the background of the Merger and the negotiations that led to the transaction, Defendants entirely omitted the material fact that ████████████████████████████████████████████████████████████████████████████████████—*after only four days of negotiation over the course of Easter*

1   *Weekend*.  Unaffiliated shareholders were never informed about this coercion of the

2   Special Committee to quickly agree on the most material component of the

3   transaction to unaffiliated shareholders—the per share price for their Endeavor

4   stock.

5       21.   *Fifth,* Defendants also failed to disclose that additional value was

6   diverted from unaffiliated shareholders through an eleventh-hour amendment to a

7   Tax Receivable Agreement (the "TRA") that was in place prior to Endeavor's 2021

8   IPO.  Certain pre-IPO investors, including Defendants Emanuel, Whitesell, Shapiro

9   and Silver Lake were parties to the TRA, which entitled them to 85% of any future

10  tax savings realized by Endeavor in a given tax year.

11      22.   In an effort to further enrich Defendants Emanuel, Whitesell and

12  Shapiro, the TRA was amended the day before the March 24, 2025 Merger closing

13  date to include all of their non-rolled over units in Endeavor OpCo.  Centerview

14  valued the tax savings payable to Emanuel, Whitesell, Shapiro, Silver Lake and the

15  other TRA parties to be approximately ███████████████████  By

16  amending the TRA to include non-rolled over Endeavor OpCo units held by the

17  TRA parties, Defendants ensured all of this value would be received by the TRA

18  parties and not unaffiliated shareholders.  Defendants did not disclose the economic

19  impact of that change for unaffiliated shareholders.

20      23.   *Finally,* Defendants also failed to disclose Centerview's significant

21  conflicts of interest that undermined its ability to issue an independent Fairness

22  Opinion.  Centerview belatedly disclosed to the Special Committee its concurrent

23  engagement by Mubadala Capital, an affiliate of which provided $200 million in

24  preferred equity financing to Silver Lake on the Merger.  Minority shareholders

25  were unaware that Centerview first disclosed this conflict to the Company and

26  Special Committee over six weeks *after* Centerview issued its Fairness Opinion on

27  the Merger.  Accordingly, and unbeknownst to minority shareholders, the Special

28

Committee was entirely unaware of Centerview's conflicted relationship with Mubadala Capital when the Fairness Opinion was issued and the Special Committee voted to recommend the Merger to shareholders.

24.    Defendants further omitted Centerview's recent engagements on transactions involving Silver Lake, such as a 2023 retention by Vertex, Inc. in connection with Silver Lake's $500 million preferred stock investment in Vertex, and a 2021 engagement by Silver Lake portfolio company, ServiceMax, Inc.   A senior member of Centerview's deal team also had a "longstanding professional and social relationship" with Defendant Jacqueline Reses of the Special Committee that was never disclosed to shareholders.

25.    The omission of these highly material objective facts, which Defendants knew or recklessly disregarded, made their assertion that the Merger was "fair to" and "in the best interests of" unaffiliated shareholders both false and misleading.   Furthermore, Defendants did not believe the Merger Consideration was fair to the public shareholders of Endeavor's class A stock.

26.    Defendants knew that the Fairness Opinion was based on inaccurate information about the value of the Company.   They had an obligation to file an up-to-date Fairness Opinion and update their Merger fairness statements when they knew or recklessly disregarded that as of the issuance of the Information Statement shareholders were being denied at least ▮▮▮▮▮ in value under the Merger ▮▮ ▮▮▮▮▮ from Endeavor's increased TKO stake + ▮▮▮▮▮ from the higher purchase price for the Sports Assets + ▮▮▮▮▮▮▮▮▮▮ That number would later ▮▮▮ ▮▮▮▮▮ by the time the Merger closed.   Unaffiliated shareholders were never provided with an accurate fairness evaluation from the Company or Centerview.

27.    In sum, Defendants failed to require any "bring-down" or supplemental fairness analysis of the Merger.   Defendants knew that the objective

1  facts meant that the Merger was not "fair" or in the "best interest" of the class A
2  shareholders at the time the Fairness Opinion and Information Statement were
3  issued and that subsequent developments only further demonstrated why the Merger
4  Consideration was unfair.

5      28.    Plaintiff and the Class suffered compensatory damages.  Additionally,
6  had Plaintiff and the Class not been induced to sell at deflated prices they could
7  have secured the fair value of their shares through appraisal.

8  **II.    JURISDICTION AND VENUE**

9      29.    The claims asserted herein arise under Sections 10(b), 13(e) and 20(a)
10  of the Exchange Act, and SEC Rule 10b-5 and Rule 13e-3.  This Court has
11  jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331
12  and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13     30.    Venue is proper in this District pursuant to Section 27 of the Exchange
14  Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  At all relevant times, Endeavor
15  was headquartered in this District, and many of the acts and conduct that constitute
16  the violations of law complained of herein occurred in this District, including the
17  dissemination of false and misleading statements in and from this District during
18  the Class Period.

19     31.    In connection with the acts alleged in this Complaint, Defendants,
20  directly or indirectly, used the means and instrumentalities of interstate commerce,
21  including, but not limited to, the mails, interstate telephone communications, and
22  the facilities of the national securities markets.

23  **III.   PARTIES**

24      **A.    Plaintiff**

25     32.    Plaintiff AltShares Event-Driven ETF is an investment fund advised
26  by its investment advisor Water Island Capital, LLC, a New York domiciled SEC
27  registered entity.

28

33.     As set forth in the attached certification, Plaintiff beneficially owned and sold Endeavor common stock during the Class Period and suffered damages as a result of the Defendants' violations of the federal securities laws alleged herein.

**B.     Defendants**

**1.  Endeavor**

34.     Defendant Endeavor is a Delaware corporation with its principal executive offices located at 9601 Wilshire Boulevard, Beverly Hills, California. Endeavor is a global sports and entertainment conglomerate that includes sports properties such as the Ultimate Fighting Championship ("UFC") and World Wrestling Entertainment, LLC ("WWE"), live event properties, and agencies representing sports, entertainment and fashion talent.

35.     At the time of the Merger, Endeavor was controlled by Silver Lake, and Defendants Emanuel and Whitesell, who collectively held a majority of the total voting power of the Company.  During the Class Period, Endeavor's Class A common stock was listed and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "EDR".  Endeavor continues to exist as a subsidiary of Silver Lake.  By order of the Executive Committee, Endeavor issued the Information Statement during the Class Period that contained certain of the materially false and misleading statements and omissions of material fact alleged herein.  Endeavor also filed with the SEC the Forms 8-K and press releases containing the material misstatements and omissions alleged herein.

**2.  Silver Lake**

36.  Silver Lake Group, L.L.C. (previously defined as "Silver Lake") is a Delaware LLC headquartered in Menlo Park, California.  Through its affiliated entities, Silver Lake owned over 74% of Endeavor's voting power as of September 2024 through its substantial ownership of Endeavor Class A, Class X and Class Y stock.  Silver Lake appointed Defendants Durban and Evans to the Endeavor Board

and Executive Committee. Silver Lake also signed and jointly filed the Schedule 13E-3 transaction statement on the Merger with Endeavor and Defendants Emanuel and Whitesell.

### 3. The Officer Defendants

#### a. Ariel Emanuel

37. Defendant Ariel Emanuel ("Emanuel") was the CEO of Endeavor since 2017. Emanuel also served as a director of the Company and a member of the Board's Executive Committee at the time of the Merger. He is currently a director of New Endeavor and the Executive Chairman of WME Group, a subsidiary of New Endeavor. Emanuel is also the CEO and Executive Chairman of TKO Group Holdings, Inc. (previously defined as "TKO"), a publicly traded sports and entertainment company that is majority owned and controlled by Endeavor.

38. Prior to the Merger closing, Defendant Emanuel and his affiliated trust beneficially owned (i) 39,531,090 shares of Endeavor Class A common stock, (ii) 37,699,843 shares of Endeavor Class X stock, and (iii) 37,699,843 shares of Endeavor Class Y stock. Through these significant holdings, Emanuel had 16.6% of the voting power in Endeavor at the time of the Merger. Emanuel also owned common units in Endeavor OpCo, the operating subsidiary of Endeavor (the "OpCo Membership Interests"), and profits units in Endeavor OpCo (the "OpCo Profits Units") at the time of the Merger, which gave him significant additional equity ownership in Endeavor. Emanuel received approximately $173.8 million under the Merger through the exchange of his Endeavor Class A common stock for Merger Consideration.

39. Defendant Emanuel is also party to an agreement executed at the time of the Merger (the "Emanuel Rollover Agreement") that allowed him to rollover certain of his OpCo Membership Interests and OpCo Profits Units into New Endeavor. Under the Emanuel Rollover Agreement, and an amendment to that

agreement executed two days before the Merger closed, Defendant Emanuel rolled over OpCo Membership Interests and OpCo Profits Units with a stated value of $290.27 million.

40.    In addition, Emanuel is party to a letter agreement with Endeavor and Silver Lake that was executed on April 2, 2024, when the Merger Agreement was signed (the "Emanuel Letter Agreement").    The Emanuel Letter Agreement provided Defendant Emanuel with significant additional personal benefits and compensation under the Merger.    Among other benefits, this included his appointment as CEO and board member of New Endeavor, new equity awards in the post-Merger Company or Endeavor OpCo, and a $25 million bonus in connection with the post-Merger sale or disposition of Endeavor's businesses (other than TKO and Endeavor affiliate, William Morris Endeavor Entertainment, LLC ("WME")).

41.    In connection with the Merger, Defendant Emanuel also executed an agreement at Merger close that ensured he would receive significant additional tax savings payments under a Tax Receivable Agreement (previously defined as the "TRA") in place prior to Endeavor's 2021 IPO.  *See infra* IV.K.

42.    All told, Defendant Emanuel reaped enormous personal compensation under the Merger, including his lucrative side deals memorialized in the Emanuel Rollover Agreement, Emanuel Letter Agreement, and the TRA amendment that was not shared by unaffiliated Endeavor shareholders.

### b.    Patrick Whitesell

43.    Defendant Patrick Whitesell ("Whitesell") was Executive Chairman of Endeavor from 2017 through the closing of the Merger and served as an Endeavor Board member since 2009.  Whitesell and Emanuel were Co-CEOs of Endeavor from 2014 through Emanuel's appointment as Endeavor's CEO in 2017.  Whitesell

was also a member of the Endeavor Board and Executive Committee at the time of the Merger.

44.    Prior to the Merger closing, Whitesell and his affiliated trust beneficially owned (i) 36,547,591 shares of Endeavor Class A common stock, (ii) 36,474,794 Endeavor Class X shares, and (iii) 36,474,794 Endeavor Class Y shares. These collective holdings gave Whitesell approximately 16% of the total Endeavor shareholder voting power at the time of the Merger.  Defendant Whitesell also had substantial holdings of OpCo Membership Interests and OpCo Profits Units, which gave him additional equity ownership in Endeavor at the time of the Merger. Whitesell received approximately $100 million under the Merger through the exchange of his Endeavor Class A common stock for Merger Consideration.

45.    Defendant Whitesell is also party to an agreement that allowed him to rollover a substantial portion of his equity holdings in Endeavor at the time of the Merger (the "Whitesell Rollover Agreement").  Under the Whitesell Rollover Agreement, and an amendment to that agreement executed just prior to the Merger closing, Defendant Whitesell rolled over OpCo Membership Interests and OpCo Profits Units with a stated value of $265.7 million.

46.    Like Defendant Emanuel, Defendant Whitesell is party to a letter agreement with Endeavor and Silver Lake that was executed on April 2, 2024 (the "Whitesell Letter Agreement").  The Whitesell Letter Agreement gave Defendant Whitesell significant additional personal benefits and compensation under the Merger.  Among other benefits, this included his appointment as a director of New Endeavor, receipt of lucrative royalty payments from the talent agency business of Endeavor affiliate, WME, and a significant equity investment from Silver Lake in a new media and entertainment business Whitesell planned to form.

47.     Defendant Whitesell also benefitted from the pre-closing amendment to the TRA that entitled him to additional payments for future tax savings realized by Endeavor.

### c.     Mark Shapiro

48.     Defendant Mark Shapiro ("Shapiro") was Endeavor's President and Chief Operating Officer ("COO") from April 2023 through the Merger's closing. Shapiro is also President and COO of TKO and became a TKO director in September 2023.

49.     Prior to the Merger closing, Shapiro beneficially owned (i) 1,548,258 shares of Endeavor Class A common stock, and (ii) 88,764 shares of Endeavor Class X stock.  As part of the Merger, Shapiro rolled over Endeavor equity interests with a stated value of $37.1 million under a separate rollover agreement with Silver Lake (the "Shapiro Rollover Agreement").

50.     Under the Merger, Endeavor, Endeavor OpCo and Silver Lake executed amendments to Defendant Shapiro's employment agreement that provided him with lucrative additional benefits.  Among other benefits, this included his appointment as President of New Endeavor, an annual base salary of $7 million, and a $15 million bonus for each year that he works as New Endeavor's President. Shapiro was also entitled to receive up to $100 million in bonuses tied to the sale or disposition of Endeavor's businesses (other than TKO and WME) executed after the Merger Agreement was signed.

51.     Like Emanuel and Whitesell, Defendant Shapiro also benefitted from the pre-closing amendment to the TRA that entitled him to additional payments for future tax savings realized by Endeavor.

52.     Collectively, Defendants Emanuel, Whitesell and Shapiro are defined herein as the "Officer Defendants."

### 4.  The Board Defendants

#### a.    Egon Durban

53.    Defendant Durban was Chairman of the Endeavor Board at the time of the Merger, a position he held since 2014.  Durban was one of Silver Lake's designees to the Endeavor Board and also served on Endeavor's Executive Committee at the time of the Merger.  Durban has been Co-CEO of Silver Lake since 2019 and is one of its founding principals.

#### b.    Stephen Evans

54.    Defendant Evans was a member of the Endeavor Board at the time of the Merger, a position he held since 2014. Evans also served on Endeavor's Executive Committee at the time of the Merger.  Defendant Evans is a managing director of Silver Lake and was a Silver Lake designee to the Endeavor Board.

#### c.    Fawn Weaver

55.    Defendant Weaver was an Endeavor Board member from 2021 until the Merger closed and served as a member of the Board's Audit Committee. Weaver is also a client of WME in connection with her work as an author.

### 5.  The Special Committee Defendants

#### a.    Ursula Burns

56.    Defendant Burns was an Endeavor Board member from 2021 until the Merger closed.  Burns was appointed to the Endeavor Special Committee when it was formed in February 2024.

#### d.    Jacqueline Reses

57.    Defendant Reses was an Endeavor Board member from 2021 until the Merger closed and served as Chair of the Board's Audit Committee.  Defendant Reses was appointed to the Endeavor Special Committee when it was formed in February 2024.

58.    Defendants Burns and Reses are defined herein as the "Special Committee Defendants." Defendants Emanuel, Whitesell, Durban, Evans, Weaver, Reses and Burns are defined herein as the "Board Defendants." Collectively, the Officer Defendants, Board Defendants and Special Committee Defendants are defined herein as the "Individual Defendants."

### C.    Relevant Non-Parties

59.    Endeavor Operating Company, LLC (previously defined as "Endeavor OpCo") is a Delaware LLC formed in 2013 and was a holding company for Endeavor's various operating subsidiaries at the time of the Merger, including the UFC. Endeavor OpCo is an indirect subsidiary of Endeavor and the Company's principal asset is its ownership interest in Endeavor OpCo. During the Class Period, Endeavor OpCo was controlled by Silver Lake and Defendants Emanuel and Whitesell.

60.    TKO Group Holdings, Inc. (previously defined as "TKO") is a publicly traded Delaware corporation headquartered in New York City. Endeavor owned approximately 61% of TKO's common stock at the time of the Merger close, and the remaining 39% traded publicly on the NYSE under ticker symbol "TKO". TKO was formed through the September 2023 merger of WWE with Endeavor's UFC assets. In February 2025, Endeavor acquired substantial additional TKO equity through Endeavor's sale of the Sports Assets to TKO in exchange for 26.1 million common units of TKO Operating Company, LLC ("TKO OpCo"), valued at $3.25 billion. *See infra* IV.J.

61.    Centerview Partners LLC (previously defined as "Centerview") is a Delaware Limited Liability Company headquartered in New York City with additional offices in San Francisco, California. Centerview served as the financial advisor to the Special Committee and issued the Fairness Opinion on the Merger.

1    **IV.    OVERVIEW OF THE FRAUD**

2        **A.    Endeavor is Formed and Controlled by Emanuel, Whitesell and**

3            **Silver Lake**

4        62.    Defendant Emanuel co-founded the Endeavor Talent Agency

5    ("Endeavor Talent") in 1995, which represented a growing roster of clients in

6    television.  Defendant Whitesell joined Endeavor Talent in 2001 as the company

7    grew to represent actors and directors in the feature film industry.  Endeavor Talent

8    and William Morris Agency, Inc. merged in 2009 to form William Morris Endeavor

9    Entertainment, LLC (previously defined as "WME").  Defendants Emanuel and

10   Whitesell became Co-CEOs of WME thereafter.

11       63.    In 2012, Silver Lake made its first investment in what would become

12   Endeavor by acquiring a 31.25% stake in WME for $250 million.  Through this

13   initial investment, Silver Lake was able to appoint Defendant Durban to WME's

14   executive committee, together with Defendants Emanuel and Whitesell.  Emanuel,

15   Whitesell and Durban controlled WME through this executive committee.

16       64.    Endeavor continued to expand its holdings in the media, sports, and

17   fashion sectors.  In 2014, WME and Silver Lake acquired IMG Worldwide

18   Holdings, Inc. ("IMG"), a holding company with global assets in sports,

19   entertainment and fashion.  Endeavor OpCo was formed in connection with the

20   acquisition of IMG.  Endeavor OpCo held the assets and business units of WME

21   and IMG.

22       65.    Endeavor conducted an IPO in 2021 and its Class A common stock

23   began trading on the NYSE.  Through the IPO, Endeavor issued 21.3 million shares

24   of Class A common stock at $24 per share to raise $511.2 million for the Company.

25   Endeavor also issued Class X and Class Y common stock in the IPO, neither of

26   which are publicly traded.  Endeavor's Class X and Y common stock have no

27

28

1  economic rights but are entitled to 1 vote (Class X) and 20 votes (Class Y) per share
2  on Company matters that required shareholder votes.

3      66.    After the IPO closed, Silver Lake, Emanuel, and Whitesell controlled
4  Endeavor through their combined ownership of approximately 89.5% of the voting
5  power of Endeavor's Class A, Class X, and Class Y common stock.

6      67.    Endeavor was organized in an "Up-C" corporate structure following
7  the IPO, which combined the publicly traded Endeavor with Endeavor OpCo as its
8  operating subsidiary.  Endeavor OpCo was Endeavor's principal corporate asset and
9  controlled the Company's numerous operating subsidiaries.  The Up-C corporate
10 structure resulted in a complex set of Endeavor entities that issued equity interests
11 other than Endeavor common stock.  These Endeavor equity interests included
12 OpCo Membership Interests and OpCo Profits Units, a substantial portion of which
13 were also held by Silver Lake, Emanuel, Whitesell, Shapiro and other Endeavor
14 executives.  Endeavor (and its public shareholders) own 72% of Endeavor OpCo
15 through the Company's various holdings.

16     68.    Following Endeavor's IPO, Defendants Emanuel and Whitesell were
17 entitled to nominate two directors to Endeavor's Board and they nominated
18 themselves.  Silver Lake was also given the right to nominate two directors and it
19 nominated Defendants Durban and Evans to the Board.  In addition, Silver Lake
20 was empowered to appoint Durban and Evans to the Executive Committee of
21 Endeavor's Board.  Defendants Emanuel and Whitesell appointed themselves as the
22 other two members of the four-member Executive Committee.

23     69.    Under the Endeavor Charter in place at the time of the Merger, major
24 corporate transactions such as mergers and acquisitions of Company assets required
25 approval of the full, four-member Executive Committee as the "Governing Body"
26 of Endeavor.  Through their substantial equity ownership and membership on the

27
28

Board and Executive Committee, Defendants Emanuel, Whitesell, Durban and Evans controlled Endeavor at the time of the Merger.

**B.    The TRA Provides Significant Tax Benefits to the Officer Defendants**

70.    As part of Endeavor's IPO, a Tax Receivable Agreement (previously defined as the "TRA") was executed on April 28, 2021 with certain individuals and entities that held equity interests in Endeavor prior to the IPO.    Numerous individuals and entities, including Silver Lake and Defendants Emanuel, Whitesell, and Shapiro were parties to the TRA.

71.    The TRA entitled its beneficiaries to cash payments based on any federal, state or local tax savings realized by Endeavor in a given year.    Endeavor's tax savings are based on increases, or step-ups, in the value assigned to the net assets of Endeavor OpCo.    This step-up in tax basis allowed Endeavor to claim a lower tax rate for any value appreciation in Endeavor OpCo assets over time, or conversely, higher tax deductions for the depreciation of Endeavor OpCo assets over time.    Such tax savings were then passed on to Endeavor (including Endeavor Class A shareholders by extension) and the TRA parties.

72.    Under the TRA, Endeavor was required to pay the Officer Defendants, Silver Lake and the other parties to the TRA, 85% of the tax savings Endeavor realized in a given taxable year.    Endeavor and its shareholders retained the remaining 15% of those tax benefits.

73.    The potential amounts payable to the TRA parties are significant.    At the time of the IPO, Endeavor estimated that annual tax savings payments to the TRA parties would range between $104.3 million to $201.3 million per year through 2036.    This would total $2.324 billion in tax savings payments to the TRA parties through 2036.

### C.    Endeavor Acquires OpenBet and Forms TKO

74.    Endeavor continued its business expansion after the IPO.    On September 30, 2022, Endeavor closed on its $800 million acquisition of OpenBet, a content, platform, and service provider to the lucrative sports betting industry. OpenBet's customer base includes DraftKings, FanDuel, SkyBet and others in the global online gaming market.    Endeavor's OpenBet acquisition complemented its pre-existing ownership of IMG Arena, a company that delivers livestreaming video and data feeds of sporting events to global sportsbooks.    Together, OpenBet and IMG Arena formed Endeavor's Sports Data & Technology ("SD&T") operating segment.

75.    Endeavor's growth through acquisition continued in 2023.    On April 3, 2023, Endeavor and WWE announced an agreement to form TKO, a new, publicly listed company consisting of the UFC and WWE enterprises.    Upon the September 2023 closing of the transaction that created TKO, Endeavor held a 51% controlling interest in TKO, and the existing WWE shareholders, including WWE Executive Chairman, Vince McMahon, held a 49% interest in the new company.

76.    Defendant Emanuel was named CEO of TKO, while he continued his role as CEO of Endeavor.    Under the TKO transaction, Defendant Shapiro was also appointed as President and COO of TKO.    Both Emanuel and Shapiro were also appointed to the TKO board of directors.

77.    At the time the Endeavor-Silver Lake Merger Agreement was signed, Centerview valued Endeavor's majority stake in TKO at approximately $5.6 billion, and its TKO stake accounted for the majority of Endeavor's overall value.    As detailed further below, TKO's stock price experienced a significant surge between the time the Merger was signed in April 2024 and the time it closed in March 2025, which substantially increased the value of Endeavor's TKO holding.    This post-signing increase in Endeavor's most valuable asset was never reflected or accounted

1  for in Centerview's Fairness Opinion or in Defendants' statements to public
2  shareholders during the Class Period.

3  **D.    The Executive Committee Begins a Strategic Review With Silver**
4  **Lake**

5  78.    Defendants timed the take-private acquisition to a temporary trough
6  driven by transient factors—including industry strikes and market dislocations—
7  and pegged purported premiums to an atypical five-day "unaffected" period
8  capturing an all-time low.

9  79.    On July 11, 2023, the Executive Committee called a meeting with
10 Defendant Shapiro, other members of Company management, and attorneys at
11 Latham & Watkins LLP, outside counsel to the Company, to discuss a strategic
12 review of Endeavor's wide-ranging business assets.  The strategic review was led
13 and managed by the Executive Committee from the outset.

14 80.    At this meeting, the Executive Committee directed Company
15 management to prepare "Strategic Review Workstreams," that included an analysis
16 of the growth potential for Endeavor's business units on a standalone basis, as well
17 as potential alternatives to unlock stockholder value across each business unit (*i.e.*,
18 separate asset sales or a merger transaction).

19 81.    Endeavor later asked Silver Lake if it was willing to assign certain of
20 its employees to assist with the work involved in developing the Strategic Review
21 Workstreams demanded by Defendants Emanuel, Whitesell, Durban, and Evans.
22 Silver Lake provided three of its employees to assist with this process from July
23 2023 through October 2023, during which time they were privy to the intricate
24 operational and financial details of Endeavor's sprawling business lines.

25 82.    On October 23, 2023, the Executive Committee decided, without input
26 from the full Board, to announce that Endeavor was evaluating strategic alternatives
27 for the Company.  On October 25, 2023, Endeavor filed an SEC Form 8-K and press

28

release announcing the commencement of a "formal review to evaluate strategic alternatives for the Company." The press release made no mention of the fact that the Executive Committee and Silver Lake had already been conducting an exhaustive review of the current and projected financial performance of Endeavor's core business units for months.

83.    Recognizing its overall significance to Endeavor's value and financial performance, the press release further noted that "the Company will not consider the sale or disposition of the Company's interest in TKO Group Holdings, Inc." as part of the strategic review.

84.    Silver Lake announced on the same day that it was "currently working toward making a proposal to take Endeavor private." The press release did not disclose that Silver Lake had already effectively conducted extensive due diligence on Endeavor during the prior three months and was well-positioned to leverage this inside knowledge about the Company in the forthcoming merger negotiations. Silver Lake knew far more than the public markets about the Company in all respects, including the near- and long-term prospects of its most important asset: its controlling stake of TKO. In particular, Silver Lake and the Officer Defendants knew Endeavor was worth far more than the value implied by its share price, which was held down by a conglomerate discount (that could be eliminated through asset sales), a controlled company discount, and other temporary overhangs that would soon dissipate. Thus, Silver Lake was able to exploit its informational advantage to time its acquisition at a trough in the Company's market valuation.

85.    Silver Lake stated that it was not interested in selling its significant equity ownership in Endeavor to any third-party, or entertaining bids for Endeavor assets, thereby foreclosing a true strategic review of any alternative transaction other than a "take-private" of Endeavor by Silver Lake.

**E.     The Officer Defendants Negotiate Enormous Compensation Packages Before the Formation of a Special Committee**

86.    Instead of first forming a special committee following the Endeavor and Silver Lake announcements, the parties prioritized the negotiation of employment agreements with New Endeavor for Defendants Emanuel, Whitesell and Shapiro, as well as the rollover of their Endeavor equity into the post-Merger company.  Such discussions also occurred before any negotiation on price terms for the Merger.

87.    Throughout November and December 2023, Silver Lake, Emanuel, Whitesell, Shapiro, and their respective outside legal counsel discussed and negotiated their post-transaction employment agreements and equity rollovers. These negotiations were conducted outside the presence of the full Board and without the existence of a special committee to protect the interests of unaffiliated Endeavor shareholders.

88.    Although their employment and Rollover Agreements were not executed until the Merger was signed in April 2024, Silver Lake, Emanuel, Whitesell and Shapiro effectively agreed to all core terms by December 2023. These Officer Defendants and Silver Lake prepared term sheets reflecting their post-Merger employment and rollover arrangements.  As detailed further below, Defendants Emanuel, Whitesell and Shapiro ultimately rolled over a substantial portion of their Endeavor equity into New Endeavor.  Unaffiliated shareholders were never given the opportunity to rollover their Class A shares.

89.    The Officer Defendants also negotiated side letter agreements with Silver Lake, which further enriched them and ensured their ongoing leadership and control over New Endeavor.  The Emanuel Letter Agreement provided for his appointment as CEO and Board member of New Endeavor, and his appointment as Executive Chairman of WME.  Among other compensation, Emanuel also received

1  lucrative equity awards in New Endeavor, as well as quarterly royalty payments

2  from the net cash profits of WME's agency representation business.

3       90.    The Whitesell Letter Agreement appointed him as a director of New

4  Endeavor, and the opportunity to be appointed Chairman of WME's governing

5  body at the request of Endeavor or Silver Lake.  It further provided him with

6  substantial personal compensation, including a prorated portion of his $5.7 million

7  annual bonus for 2023, as well as the right to royalty and commission payments

8  from certain of WME's net profits.  Under the Whitesell Letter Agreement, he was

9  also entitled to receive a $250 million equity investment from Silver Lake in a new

10 media and entertainment business Whitesell was planning to found.

11      91.    Defendant Shapiro's employment agreement was also amended under

12 the Merger to appoint him as President of New Endeavor for four years (the

13 "Amended Shapiro Employment Agreement").    Among other personal

14 compensation, Shapiro received a base salary increase to $7 million, a guaranteed

15 annual bonus of $15 million for each year he serves as President of New Endeavor,

16 a $15 million transaction bonus in connection with consummation of the Merger,

17 and receipt of 1% of the issued and outstanding equity interests in New Endeavor.

18      92.    As detailed further below, the Officer Defendants also received

19 significant additional compensation through an amendment to the TRA that was

20 executed just prior to the Merger closing in March 2025.  *See infra* IV.K.

21 Defendants Emanuel and Shapiro were also entitled to bonuses ranging from $25

22 to $100 million tied to the sale or disposition of Endeavor's businesses (other than

23 TKO and WME) executed after the Merger Agreement was signed (the "Asset Sales

24 Bonuses").

25      93.    Collectively, these lucrative side deals further incentivized the Officer

26 Defendants to push for a quick negotiation and agreement on Merger terms.

27

28

1    **F.    Endeavor Belatedly Forms a Special Committee**

2    94.    Despite Silver Lake's clearly stated intention in October 2023 to take

3    Endeavor private, the Executive Committee delayed for months the formation of a

4    special committee to evaluate and negotiate a transaction on behalf of unaffiliated

5    Endeavor shareholders.

6    95.    On February 23, 2024, the Executive Committee (*i.e.*, Defendants

7    Emanuel, Whitesell, Durban, and Evans) finally adopted resolutions to form the

8    Special Committee consisting of Defendants Reses and Burns. The formation of

9    the Special Committee occurred almost four months *after* Endeavor announced a

10   "formal review" of "strategic alternatives" for the Company and Silver Lake

11   announced its clear intention to take Endeavor private.

12   96.    The resolutions establishing the Special Committee restricted the

13   Committee's ability even to communicate with third parties that expressed interest

14   in the Company or alternative transactions, let alone solicit or entertain competing

15   proposals for all or parts of the Company's assets. The authorizing resolutions

16   stated, expressly, that:



24   97.    These constraints were imposed while Silver Lake publicly signaled

25   that it would not sell to a third party or entertain bids for Endeavor's assets, thereby

26   foreclosing alternatives and reinforcing the futility of outreach. The effect was to

27   preclude any go-shop, any market check, or even basic third-party engagement,

28

1  while Defendants continued to describe the Committee as "independent" and to

2  present its recommendation as the product of a robust process.

3      98.    The Special Committee's authority itself was only negotiated up to a

4  bare right to say "no," and even that limited right was secured at the insistence of

5  the Special Committee's counsel (Cravath) against ███████████████████

6  ███████████████████████████.  The Committee was not authorized

7  to run, and did not run, any process to identify, solicit, or evaluate alternative

8  transactions; nor did it obtain or insist on any "majority-of-the-minority" vote, price

9  collar, contingent value right, or other market-facing protections consistent with an

10 arm's-length process.    Instead, Defendants rushed the Committee through a

11 four-day, holiday-compressed negotiation to agree to price by April 2, 2024, under

12 repeated threats that delay would cause "significant disruption" and other purported

13 risks, while refusing a majority-of-the-minority condition and declining basic price

14 protection devices.

15     99.    On February 26, 2024, the term sheets memorializing the material

16 elements of the Officer Defendants' enormous Merger-related compensation

17 packages were sent to the Special Committee's outside counsel at Cravath Swaine

18 & Moore LLP.  As noted above, those term sheets had been negotiated with Silver

19 Lake over the course of the prior several months, and without input from the Special

20 Committee or any accounting for the interests of minority shareholders.

21     Silver Lake and Endeavor management met on March 4, 2024, to discuss

22 Endeavor's final financial projections (the "Final Projections") that were used to

23 justify the ultimate Merger Consideration offered by Endeavor.  A "Variance

24 Analysis" reflecting the difference between the Final Projections and earlier

25 original projections was also discussed at this meeting.  The Final Projections were

26 materially lower than the original projections, reflecting $1.2 billion less revenue

27 from 2024 through 2028, and $498 million less in adjusted EBITDA for the same

28

period.  Following this meeting, the Executive Committee approved the Final Projections and they were provided, together with the Variance Analysis, to the Special Committee and Centerview █████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

100.   The Special Committee had its first meeting on March 8, 2024—over four months *after* Silver Lake announced its clear intention to acquire Endeavor. This first Special Committee meeting also occurred at least two months *after* the core terms of the Officer Defendants' lucrative compensation packages and employment agreements had been determined.  Endeavor's lower Final Projections were also approved by the Executive Committee without any input from the Special Committee.  Accordingly, all of the fundamental elements of the Merger had effectively been decided before the Special Committee ever even met.

### G.    Centerview is Retained Despite its Conflicts

101.   On March 12, 2024, the Special Committee retained Centerview as its financial advisor on the Merger.  Centerview's retention presented significant conflicts of interest given its extensive business engagements with Silver Lake and its portfolio companies.

102.   Defendants omitted from the Information Statement prior Centerview retentions involving Silver Lake.  Specifically, in December 2023, Centerview was

engaged as a financial advisor to the technology company Vertex, Inc. on a $500 million preferred stock investment by Silver Lake. Silver Lake's investment provided the financing for Vertex's acquisition of e-invoicing company, Pagero Group AB, and the placement of a Silver Lake designee to the Vertex board of directors.

103. In 2021, Centerview acted as the financial advisor to Silver Lake portfolio company ServiceMax, Inc. on its $148 million acquisition of LiquidFrameworks, a cloud-based software company. Centerview also served as a financial advisor to software company CornerStone OnDemand, Inc. in connection with Silver Lake's $300 million Cornerstone investment in 2017. Silver Lake appointed one of its managing directors to the Cornerstone board as part of this financing. None of these prior Centerview engagements involving Silver Lake were disclosed in the Information Statement or Defendants' other Class Period statements.

104. While it was charged with assessing the overall fairness of the Merger Consideration, Centerview also concurrently provided financial advisory services to an affiliate of Mubadala Capital, Abu Dhabi's sovereign wealth fund. In turn, Mubadala affiliate Thirty Fifth Investment Company L.L.C. ("Thirty Fifth") committed $200 million in preferred equity financing for the Merger. In exchange for this investment, Thirty Fifth received preferred equity interests in New Endeavor. Centerview expected to receive over $7 million in fees under this concurrent engagement with Mubadala. Centerview belatedly disclosed this conflict to the Special Committee over six weeks *after* Centerview issued its Fairness Opinion on the Merger. Unaffiliated shareholders were never informed of this belated Centerview conflict disclosure to the Special Committee.

105. Centerview also had longstanding, yet undisclosed, business and personal relationships with Defendant Reses of the Special Committee.

Specifically, Centerview informed the Special Committee that "Todd Davison, a senior member of the [Centerview] deal team, has a longstanding professional and social relationship with [Special Committee member Reses]."  Unaffiliated Endeavor shareholders were unaware of this Centerview conflict and the likely influence it had on Defendant Reses' evaluation of the Merger and Centerview's Fairness Opinion.

106.  Defendant Emanuel's brother, Rahm Emanuel, also served as a consultant and senior advisor to Centerview from 2019 to 2021, and spearheaded Centerview's presence in Chicago.  Information about this conflict was omitted from Defendants' Class Period SEC filings, including the Information Statement sent to unaffiliated Endeavor shareholders.

**H.    Emanuel, Durban and Silver Lake Pressure the Special Committee to Approve the Merger on an Accelerated Timeline**

107.  Silver Lake and insider directors orchestrated and executed an unrelenting pressure campaign during the Special Committee's deliberations, including repeated direct calls to Special Committee members and their banker during Special Committee meetings, coupled with artificial, expiring offers over Easter weekend.  These tactics deprived the Special Committee of any meaningful opportunity to conduct diligence or engage alternatives and further underscore that the Special Committee's authority was illusory. Internally, the Special Committee recognized that ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ confirming that its substantive negotiating power was curtailed from the outset.

108.  During its first meeting on March 8, 2024, the Special Committee discussed ████████████████████████████████████████ ███████████. Silver Lake dictated an April 1 deadline (Easter Monday), which

served to accelerate price negotiations to the benefit of Silver Lake and the Officer Defendants.

109.    The March 8 Special Committee meeting minutes revealed that ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████    The minutes further stated that ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████

110.    This stated rationale was disingenuous given that Silver Lake had already publicly announced its clear intention to take Endeavor private months earlier on October 25, 2023.  Moreover, a mere one week before the March 8 Special Committee meeting, Defendants Emanuel and Whitesell had already amended their respective SEC Schedule 13D filings to disclose that they were "engaging in, and intend to continue engaging in, communications, discussions and negotiations with the Silver Lake Entities regarding each of their potential support for a Take-private[.]"

111.    After exchanging drafts of the Merger Agreement with Silver Lake, the Special Committee met on March 21 and 25, 2024.  Following the March 25 meeting, Defendants Emanuel and Durban heightened their undisclosed pressure campaign to force the Special Committee to make a quick recommendation for a Silver Lake acquisition.  Both did so despite the fact that Silver Lake had yet to make a per-share price proposal for Endeavor.

112.    The Special Committee met with Centerview representatives on March 29, 2024 (Good Friday) at 5:00 p.m.  At this meeting, the Special Committee discussed Silver Lake's proposal to address ███████████████████████████████

1   ████████████████████████████████████. The Special

2   Committee noted that the closing of the Merger ██████████████

3   ████████████████████████████████████████████████

4   ████████. In order to press for an expedited Merger approval, and as detailed

5   further below, Emanuel and Endeavor ultimately agreed to a management buyout

6   of OpenBet and IMG Arena by Emanuel who already owned the gaming licenses.

7   *See infra* IV.J.

8       113.    To put further pressure on the Special Committee, Defendant Durban

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ███████████.███████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ██████████████████████████████████████████.

15      114.   Reflecting the fact that Silver Lake was pressing an imminent price

16  offer, the Special Committee met again on March 29 (Good Friday) at 10:00 p.m.

17  During this meeting, Centerview presented its analysis of Endeavor's standalone

18  value ██████████████████████████████. Centerview's DCF

19  analysis showed a standalone value range of $27.60 to $36.25 per Endeavor share—

20  a range well above the final Merger Consideration of $27.50 per share.

21      115.  Having already locked in the key components of the Officer

22  Defendants' Merger-related compensation packages, Silver Lake made its first

23  price offer on the evening of March 29.  Just before midnight on March 29, Silver

24  Lake offered $24.50 per share for Endeavor (the "March 29 Proposal").  Notably,

25  and undisclosed in the Information Statement or Defendants' other Class Period

26  statements, Silver Lake further pressured the Special Committee by telling them it

27

28

wanted to "*quickly come to an agreement*" and that its "offer *will expire* by its terms at 11:59 PM Pacific Time, Sunday March 31, 2024," which was *Easter Sunday*.

116.    The Special Committee met the following morning on Saturday March 30, 2024, to discuss Silver Lake's March 29 Offer.    Centerview representatives presented at this meeting and informed the Special ███████ ████████████████████████████████████████████████████████ $24.50 per share was a "5% discount to [the] current [Endeavor] trading price of $25.73."

117.    The Special Committee instructed Centerview to reject the March 29 Proposal and counter with a proposal for $31.50 per share.  In response, Silver Lake sent a revised counterproposal of $25.75 per share, which it insisted was above Endeavor's purported fair value of ███████████ based on Silver Lake's separate DCF analysis (the "March 30 Proposal").

## Premia in Select Precedent Minority "Squeeze Out" Transactions

| | | | | | Initial Bid Premium to | | Initial to | Final Bid Premium to | |
| | | | % of | Implied | | | | | |
| | | | Equity | Enterprise | Unaff. | 30-Day | Final Bid | Unaff. | 30-Day |
| Date | Target | Acquiror | Owned | Value | Price[2] | VWAP[3] | % Increase | Price[4] | VWAP[3] |
|---|---|---|---|---|---|---|---|---|---|
| Feb-24 | Agiliti | THL Partners | 72% | $2.5 | 22%[5] | 19%[5] | 11%[5] | 30% | 37% |
| Feb-24 | HireRight | General Atlantic & Stone Point | 75% | 1.7 | 27% | 30% | 13% | 43% | 47% |
| Aug-23 | SciPlay | Light & Wonder | 83% | 2.5 | 29% | 17% | 15% | 47% | 34% |
| Dec-22 | Weber | BDT Capital | 72% | 3.7 | 24% | (4%) | 29% | 60% | 24% |
| Jun-22 | Convey Health | TPG Capital | 75% | 1.1 | 66% | 46% | 17% | 143% | 99% |
| Nov-20 | Urovant Sciences | Sumitovant Bio | 72% | 0.7 | 55% | 46% | 30% | 96% | 92% |
| Aug-20 | Akcea Thera. | Ionis Pharma | 76% | 1.5 | 42% | 33% | 13% | 59% | 56% |
| Aug-20 | Hudson | Dufry AG | 57% | 1.1 | 24% | 12% | 23% | 50% | 64% |
| Feb-20 | AVX | KYOCERA | 72% | 2.9 | 30% | 26% | 12% | 45% | 40% |
| Jun-18 | Foundation Medicine | Roche | 57% | 5.3 | 30% | 49% | 3% | 29% | 47% |
| Nov-16 | Synutra | Investor Group | 64% | 0.8 | 54% | 26% | 2% | 58% | 29% |
| Sep-16 | Federal-Mogul | Icahn | 82% | 2.1 | 41% | 61% | 43% | 101% | 130% |
| Mar-16 | Crown Media | Hallmark | 90% | 4.4 | 2% | 13% | 0% | 2%[6] | 13% |
| Sep-13 | Cornerstone Thera. | Chiesi Farmaceutici | 58% | 0.3 | 22% | 20% | 45% | 78% | 74% |
| Mar-13 | Sauer-Danfoss | Danfoss | 76% | 2.6 | 24% | 24% | 19% | 49% | 48% |
| **25th Percentile** | | | 68% | | 24% | 18% | 11% | 44% | 36% |
| **Median** | | | 72% | | 29% | 26% | 15% | 50% | 47% |
| **75th Percentile** | | | 76% | | 41% | 39% | 26% | 69% | 69% |

Selected Precedent Minority "Squeeze Out" Transactions[1]



119.   Consistent with its pressure campaign, Silver Lake also told the Special Committee on March 30 that it required an agreement ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████.   The Special Committee nonetheless decided at its March 30 meeting to reject Silver Lake's March 30 Proposal.

120.   The Special Committee met again at 9:00 a.m. the following morning, Easter Sunday, once again reflecting the unreasonable time crunch imposed by Silver Lake.   At the March 31 meeting, the Special Committee instructed Centerview to convey a counteroffer of $30.50 per share.

121.   Blair Effron of Centerview communicated this counteroffer to Defendant Durban later on March 31.   Continuing his pressure on the Special Committee, Durban told Effron ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Durban's

statement was communicated to the Special Committee later in the morning of March 31.

122.    Durban's timing message was reiterated by Silver Lake's Chief Legal Officer, Karen King, in an email sent to the Special Committee members on the afternoon of March 31.  King's email emphasized that ███████████████████ ██████████████████████████████████████████████.

123.    In response to Silver Lake's pressure tactics, the Special Committee met again later that day.  Both Reses and Burns recounted separate calls they each received from Defendants Emanuel and Shapiro ████████████████████ ██████████████████████.    The Special Committee instructed Centerview to counter with a price of $29 to $29.50 per share.

124.    The Special Committee picked up their discussion at 2:15 p.m. that same afternoon of March 31.  ████████████████████████████████ ███████████████████████████████████████████████████ ██████████████  In an effort to double-team the Special Committee and its financial advisors, ███████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████.

125.    Defendant Reses ████████████████████████████████ ███████████████████████████████████.    Defendant Emanuel ████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████.    The Special Committee interpreted ████████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████.

126.   The Special Committee met again at 5:40 p.m. on March 31.  At the meeting, Centerview's Effron informed the Special Committee about ██████████ ████████████████████████████████████ Durban warned that Silver Lake supposedly did not have authority to go above a $27.50 per share purchase price ████████████████████████████████.  To further turn the screws on the Special Committee, Durban once again warned that "████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████

127.   The Special Committee met in the morning on April 1, 2024.  Further demonstrating Silver Lake's pressure campaign, Special Committee members ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████.

128.   In response, the Special Committee expressed ████████ ████████████████████████████████. The minutes from this April 1 meeting reflect that ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █

129.   Specifically, and as stated in their meeting minutes, the Special Committee was worried about ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ The Special Committee was also concerned that if they did not agree on a Merger price under

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ███████████████████████  As detailed below, these risks and their impact on

5 the Special Committee's decision to approve the Merger on a compressed timeline

6 was never disclosed to minority shareholders.

7     130.   The Special Committee and Silver Lake continued to negotiate on a

8 Merger price throughout the day on April 1, 2024.  Later on April 1, Silver Lake

9 submitted a supposedly "best and final" offer to acquire Endeavor for $27.50 per

10 share (the "April 1 Proposal"), plus a commitment by Endeavor to pay quarterly

11 dividends between the signing of the Merger Agreement and closing in a per-share

12 amount of $0.06.  Silver Lake notably refused to condition the Merger on a vote by

13 the "majority of the minority" shareholders—a stance the Special Committee

14 ultimately agreed to.  Nor did Defendants require any Merger price protections,

15 such as a cost collar or a contingent value right.

16     131.   The Special Committee reconvened at 6:10 p.m. to discuss Silver

17 Lake's professed "best and final" April 1 Proposal.  Finally bowing to the pressure,

18 the Special Committee agreed on April 2 to accept Silver Lake's $27.50 per share

19 Merger Consideration and to recommend the Merger to the Executive Committee.

20 Defendants never disclosed the coercive tactics used by Silver Lake and Emanuel

21 to force a Special Committee approval by April 2, 2024.

22     132.   The Merger Agreement and related transaction documents were

23 executed later on April 2, 2024.  Silver Lake delivered a written consent approving

24 the Merger Agreement and related transaction documents to Endeavor that same

25 day.

26     133.   Also on April 2, 2024, Centerview issued its Fairness Opinion on the

27 Merger, which included "*the other transactions contemplated by the [Merger]*

28

CLASS ACTION COMPLAINT

1  *Agreement*."  The Fairness Opinion stated "that the [Merger] Consideration to be

2  paid to the holders of Shares (other than Excluded Shares) pursuant to the [Merger]

3  Agreement is *fair, from a financial point of view*, to such holders."  As detailed

4  further below, Centerview's fairness analysis implicitly valued the Sports Assets at

5  *$2.56 billion*[3] and implicitly valued OpenBet at *$306 million*.[4]  At the time of

6  signing, Centerview's DCF analysis valued Endeavor's majority state in TKO (its

7  largest asset) at a midpoint of *$5.6 billion*.

8      134.  Silver Lake and Defendant Durban also filed an amendment to their

9  Schedule 13D on April 2, reflecting their acquisition of all remaining equity in

10  Endeavor through the Merger.

11      135.  The compressed timetable, refusal to condition the transaction on a

12  "majority-of-the-minority" vote, and absence of any price-protection devices were

13  accompanied by the Special Committee's agreement not to pursue or entertain

14  competing proposals.  Silver Lake had already declared it would not sell to a third

15  party or entertain bids for Endeavor's assets, eliminating viable alternatives.

16  Having disabled any potential market check or go-shop, Defendants nonetheless

17  presented the Special Committee as "independent" and the process as fair, omitting

18  that the Special Committee's mandate and conduct excluded even basic outreach to

19  potential bidders for all or parts of the enterprise.

---

[3] ████████████████████████████████████████████████████████████████████ e
████████████████████████████████████████████████████████████████████████
h business's respective segment to that
business's 2024 projected adjusted EBITDA yields a combined $2.56 billion
implied value for the Sports Assets.

[4] According to the Final Projections, OpenBet would have ███████████████
adjusted EBITDA.  Applying the 6x midpoint of Centerview ██████████████ r
the applicable Sports Data & Technology sector implies that the Merger ascribed a
$306 million value to OpenBet.

I.    **The Merger Agreement Expressly Provided for the Post-Signing Sale of Endeavor Assets**

136.    As a fundamental component of the Merger, Silver Lake negotiated for the ability to have Endeavor sell-off its business assets, except for TKO and WME's agency representation business, in the period after the Merger Agreement was signed. Specifically, Section 7.16 of the Merger Agreement, titled "<u>Asset Sales</u>" (emphasis in original) provided that:

> At [Silver Lake's] request, [Endeavor] agree[s] to, and to cause the [Endeavor] Subsidiaries and their and the [Endeavor] Subsidiaries' respective Representatives to, *use their reasonable best efforts to facilitate, negotiate and consummate the sale, transfer, divestiture or other disposition* (each, a "Company Sale") of such [Endeavor] Subsidiaries, business organizations, divisions, business units or assets of [Endeavor] or the [Endeavor] Subsidiaries (whether by a sale of equity interests or assets, merger or otherwise), in each case as identified by [Silver Lake] from time to time (but excluding (i) TKO and any of its Subsidiaries and (ii) the agency representation business of [WME] and its Subsidiaries).

The provision further required that any such post-Merger Endeavor asset sale would be "conditioned upon consummation of the Merger[] . . ." The inclusion of these express terms in the Merger Agreement plainly demonstrated that Defendants planned to sell Endeavor businesses in the post-Merger signing period and considered such sales to be a key component of the Merger itself. Accordingly, such post-Merger signing asset sales necessarily should have been accounted for in any fairness evaluation of the Merger.

137.    The Merger's supporting agreements further demonstrated that the post-signing sale of Endeavor business assets was expressly contemplated as part of the overall transaction negotiated between Defendants and Silver Lake. As noted above, Section 3 of the Emanuel Letter Agreement, titled "Asset Sale Bonus" (emphasis in original), provided that Defendant Emanuel would receive a *$25*

1  *million* bonus for "the sale or disposition (in one or a series of transactions) of all
2  of, or all except a de minimis portion of, [Endeavor's operating businesses]," other
3  than TKO and WME, in the post-Merger signing period.

4      138.  Similarly, Section 3.7 of the Amended Shapiro Employment
5  Agreement provided Defendant Shapiro with escalating bonuses based on the
6  consideration Endeavor received for post-Merger signing asset sales.  All told,
7  Shapiro was entitled to receive up to *$100 million* in bonuses for post-signing asset
8  sales with a cumulative consideration amount equal or exceeding $6.1 billion.

9      139.  These enormous Asset Sales Bonuses tied to the sale of Endeavor
10 businesses clearly incentivized Defendants Emanuel and Shapiro to execute as
11 many asset sales as possible in the post-Merger signing period.  While Emanuel and
12 Shapiro ultimately waived these Asset Sales Bonuses at Merger closing, their
13 inclusion in the core Merger documents reflects that such asset sales were expressly
14 contemplated as part of the overall Merger and necessarily should have been
15 incorporated into and accounted for in Defendants' fairness statements concerning
16 the transaction.  Defendants failed to do so in connection with the post-signing sale
17 of the Sports Assets and OpenBet, as detailed further below.

18     **J.**    **Endeavor Files An Information Statement That Fails to Account**
19          **for the OpenBet and Sports Assets Sales and A Massive Increase**
20          **in TKO's Stock Price**

21     140.  On January 15, 2025, Defendants filed the Information Statement and
22 Schedule 13E-3 materials that (a) reiterated present-tense assertions that the
23 Transaction "is fair" and "in the best interests" of unaffiliates shareholders; (b)
24 summarized Centerview's Fairness Opinion "as of" April 2, 2024, expressly based
25 on market data as of March 28, 2024; and (c) selectively updated other financial
26 and process information through late 2024, without providing contemporaneous
27 context to make the fairness assertions not misleading at the time of dissemination.

28

141.   Having chosen to speak in present tense about fairness and best interests at dissemination, Defendants had a duty to avoid half-truths by including material contemporaneous facts based on fairness.  Defendants breached that duty by omitting (a) a simple, decision-useful sensitivity translating changes in TKO valuation inputs (multiples, DCF assumptions) into Endeavor per-share value under the disclosed framework; (b) a forthright explanation for the absence of any price-protection mechanism (collar/CVR) despite explicit TKO sensitivity, and why the token $0.24 dividend was adequate; (c) a candid discussion of alternatives foregone (*e.g.*, TKO monetization paths) and how Defendants' structural choices affected fairness; and (d) the implications of intervening developments for TKO's valuation environment between March/April 2024 and January 15, 2025, necessary to adequately inform the public shareholders whether the $27.50 price remained fair as of January 15, 2025.

142.   As one example, Silver Lake requested that Endeavor sell its Sports Assets (*i.e.*, Professional Bull Riders, On Location, and IMG Media) to TKO pursuant to the "Asset Sales" provision of the Merger Agreement.  On October 23, 2024, Endeavor sold the Sports Assets to TKO for $3.25 billion in TKO equity. Specifically, through the sale of the Sports Assets, Endeavor received 26,139,590 TKO common units (*i.e.*, units in the TKO subsidiary, TKO Operating Company, LLC) having an aggregate market value of $3.25 billion ($124.33 per unit) at the time.  Under this transaction, Endeavor also subscribed to an equivalent number of shares of TKO Class B common stock, which had voting rights but no economic rights in TKO.  The Sports Asset sale closed on February 28, 2025.

143.   Defendants failed to inform shareholders in the Information Statement, or elsewhere, that the $3.25 billion acquisition price for Endeavor's Sports Assets was $690 million higher than Centerview's $2.56 billion implied valuation of those assets.   This material omission contradicted Defendants' Class Period Merger

fairness statements, which did not account for Endeavor's higher valuation as reflected in the Sports Asset sale.

144.   In addition to failing to disclose the discrepancy between Centerview's valuation of those assets versus the acquisition price, Defendants failed to disclose how the transaction changed the valuation of Endeavor based on Endeavor's two bucket structure.  When the transaction was effectuated, these assets were removed from the ex-TKO bucket and moved into the TKO bucket.  Defendants continued to use the Centerview Fairness Opinion to support their claims about the fairness of the transaction even though this transaction materially altered the stated basis of the Centerview opinion.

145.   Endeavor's primary asset, its majority stake in TKO, also dramatically increased in value after Centerview issued its Fairness Opinion on April 2, 2024. As of the day prior to the Fairness Opinion, TKO's publicly traded stock price was $86.18 per share.  By the time the Merger closed, TKO's share price had ballooned to $152.91 per share and Endeavor's TKO stake alone[5] was worth approximately $13.3 billion—over *7 billion more* than Centerview's DCF valuation of the TKO shares at Merger signing—even before accounting for a premium reflecting Endeavor's control of TKO.  Defendants did not provide an updated valuation reflecting TKO's changed enterprise value, updated comparables, or a bridge to translate the earlier financial results to an updated valuation.

146.   Consistent with the above Merger provisions and at Silver Lake's request, Endeavor began exploring the sale of OpenBet and IMG Arena as soon as the Merger Agreement was signed.  Both companies comprised Endeavor's SD&T business segment and engaged in the online sports betting industry.

---

[5] Endeavor's majority ownership stake in TKO had increased since the signing of the Merger Agreement because of the Sports Asset transaction, the purchase of TKO interests from WWE founder Vince McMahon and open-market purchases by Endeavor.

147.    In late April 2024, Silver Lake requested that Endeavor explore a sale of its OpenBet and IMG Arena businesses, pursuant to the "Asset Sales" provision of the Merger Agreement.  In early May 2024, Endeavor engaged with 41 potential bidders for OpenBet and/or IMG Arena through the Company's financial advisors. Of the 41 potential bidders that were contacted, 19 executed confidentiality agreements with Endeavor to allow for transaction discussions.  In June 2024, Endeavor received OpenBet acquisition offers from two of these bidders.  Endeavor management held discussions with these bidders from June to October 2024.

148.    Unbeknownst to Endeavor's unaffiliated shareholders, the two unidentified OpenBet bidders offered ███████████████████████████████ ████████████████████.  Their respective bid amounts were not disclosed in the Information Statement or in other public statements by Defendants.

149.    Silver Lake, Emanuel, and Whitesell wanted Endeavor to complete its sale of OpenBet and IMG Arena prior to the expected close of the Merger in March 2025.  To expedite the sale, Endeavor management decided that "the only path to potentially closing a sale of the [SD&T] segment [*i.e.*, OpenBet and IMG Arena] by March 2025 is a sale to [Emanuel]."

150.    On November 11, 2024, Endeavor and Emanuel executed a transaction agreement for Emanuel to acquire OpenBet and IMG Arena (the "OB/Arena Transaction Agreement").  As consideration, the agreement provided that Emanuel would pay (i) $100 million in cash, and (ii) would execute an unsecured promissory note with a make-whole value of $350 million, equating to a total purchase price of $450 million.  This was done at Silver Lake's request and pursuant to Section 7.16 of the Merger Agreement.

151. Under the OB/Arena Transaction Agreement, Emanuel and IMG Arena were expected to consummate a secondary sale of IMG to a third-party in a separate transaction.  This in fact occurred when IMG Arena was sold to Sportradar

Group AG in March 2025. *As a result, the stated $450 million purchase price was, in reality, for Emanuel's acquisition of OpenBet only*.

152. As Silver Lake demanded, the OpenBet transaction closed on March 24, 2025—the same day the Endeavor-Silver Lake Merger closed. Defendants did not disclose in the Information Statement, or elsewhere, that Silver Lake's rush to sell Endeavor's gaming assets before the Merger closed, resulted in Emanuel's buyout of OpenBet for approximately *$144 million more* than Defendants' $306 million internal valuation of that same business.

153. Nor did Defendants disclose that Emanuel's buyout was approximately ███████████████████████████████████ (*i.e.*, $450 million paid by Emanuel █████████████████████████████████████████████ ██████████.

154. This discrepancy was not disclosed in the Information Statement. Nor did Defendants describe in the Information Statement how the removal of this business from the ex-TKO bucket changed the basis of Centerview's valuation.

**K.     The Rollover Agreements and TRA are Amended and Substantial Tax Savings are Diverted Away from Unaffiliated Shareholders**

155. On March 18 and March 22, 2025, respectively, Defendants Whitesell and Emanuel executed amendments to their Rollover Agreements allowing them to rollover additional Endeavor equity into the new venture. Defendants Emanuel, Whitesell and Shapiro ultimately rolled over a substantial portion of their Endeavor equity into New Endeavor. As set forth below, the massive rollover of their respective Endeavor OpCo Membership Interests and OpCo Profits Units were valued at hundreds of millions of dollars even when pegged to Merger Consideration:

| Shareholder | Stated Value[6] of Rolled Over Equity |
|---|---|
| Ari Emanuel (Endeavor CEO) | Rolled Over OpCo Membership Interests: 9,106,781 <br><br> Rolled Over OpCo Profits Units: 7,234,407 <br><br> <u>Total Stated Value of Rolled Over Equity</u>: $290.27 million |
| Patrick Whitesell (Endeavor Executive Chairman) | Rolled Over OpCo Membership Interests: 8,214,055 <br><br> Rolled Over OpCo Profits Units: 7,234,407 <br><br> <u>Total Stated Value of Rolled Over Equity</u>: $265.7 million |
| Mark Shapiro (President & COO) | Rolled Over OpCo Membership Interests: 1,352,290 <br><br> Rolled Over OpCo Profits Units: 0 <br><br> <u>Total Stated Value of Rolled Over Equity</u>: $37.1 million |
| TOTAL STATED VALUE | $593.07 million |

156.   Due to the dramatic increase in the value of Endeavor's TKO stock and the post-Merger signing asset sales, the true value of these rollovers was significantly higher than the Merger Consideration they were valued at in the Information Statement and Schedule 13E-3 transaction statement.   The Officer Defendants' decision to rollover more of their Endeavor equity reflected an acknowledgment that the Merger Consideration was inadequate.   Indeed, Defendants Emanuel and Whitesell only cashed out $173.8 million and $100

---

[6] All disclosed values equal the $27.50 per share Merger Consideration minus the per share hurdle price of each share times the number of shares.  The actual value of the rolled over Endeavor equity was significantly higher as discussed in Section V.C.

1    million in Endeavor stock, respectively, under the Merger and rolled over the
2    balance of their equity interests into New Endeavor.

3        157.    In addition, on March 23, 2025, Endeavor, Silver Lake, and the Officer
4    Defendants executed an amendment to the TRA to ensure that their transfer or sale
5    of Endeavor OpCo equity for cash, *i.e.*, Merger Consideration, or transfers of their
6    rollover units after Merger closing would be treated as covered exchanges under the
7    TRA.  This change qualified these and other TRA parties to an 85% share of tax
8    benefits realized by Endeavor in a given tax year for the newly covered Endeavor
9    OpCo equity exchanges.

10        158.    As noted above, the TRA executed in 2021 entitled its beneficiaries
11    (including the Officer Defendants and Silver Lake) to cash payments based on any
12    federal, state or local tax savings realized by Endeavor in a given year.  The TRA
13    required Endeavor to pay the TRA parties, including Emanuel, Whitesell, Shapiro
14    and Silver Lake, 85% of the tax savings Endeavor realized each year.  Endeavor
15    and its shareholders retained the remaining 15% of those tax benefits.

16        159.    At the time of the IPO, Endeavor acknowledged that future TRA
17    payments owed to the TRA parties would be significant.  In its IPO prospectus,
18    Endeavor "estimate[d] that payments to [the TRA beneficiaries] under the [TRA]
19    would aggregate to approximately *$2,324.2 million* over the next 15 years, and for
20    yearly payments over that time to range between approximately $104.3 million to
21    $201.3 million per year, based on the [IPO] price of $24.00."[7]

22        160.  The Merger Agreement contained a provision concerning the
23    redemption and exchange of Endeavor OpCo equity for Merger Consideration.
24    Section 3.03(a), titled "Conversion of OpCo Membership Interest," provided that:

25

26    _____
27    [7] Endeavor's 2024 10-K, dated February 27, 2025 (1 month before Merger closed),
      further stated that "[a]s of December 31, 2024, we had a TRA liability of ***$881.5***
      ***million*** recorded for all exchanges that have occurred as of this date."
28

> Each common unit of OpCo issued and outstanding immediately prior to the [Merger] (each an "OpCo Membership Interest" . . .), other than any . . . Rollover [OpCo] Units, shall be cancelled and shall cease to exist and shall be converted automatically into the right to receive $27.50 in cash per [OpCo Unit] . . .

Section 3.03(b) of the Merger Agreement contained a similar provision for the conversion of OpCo Profits Units for cash under the Merger.

161.    Endeavor OpCo units that were not rolled over and instead received Merger Consideration carried no entitlement to future tax-savings payments under the TRA.  Defendants Emanuel and Whitesell did not roll over all of their Endeavor OpCo units in the Merger, which put their receipt of future TRA payments for this non-rolled over Endeavor equity at risk.  Accordingly, the Letter Agreements for Defendants Emanuel and Whitesell were amended to ensure they retained future payments under the TRA for all of their Endeavor OpCo units that were not rolled over.

162.    Specifically, the Emanuel and Whitesell Letter Agreements contained provisions stating that:

> With respect to your Equity Interests in [Endeavor OpCo] that are not designated as Rollover Interests pursuant to the terms of the Rollover Agreement, the parties hereto agree that your disposition of such Equity Interests in Endeavor OpCo pursuant to the Merger Agreement shall be treated as a sale by you to [Endeavor] for cash.  The transaction described in the immediately preceding sentence *shall be treated as triggering economic entitlements for tax benefits in accordance with Section 7.17 of the Company Disclosure Lette*r.

163.    The referenced Company Disclosure Letter was not disclosed to unaffiliated Endeavor shareholders.  It contained a provision that further committed the Merger parties to execute a TRA amendment to ensure TRA payments would continue for the non-rolled over Endeavor OpCo units held by Emanuel, Whitesell and the other parties to the TRA, as follows:

> Promptly after the date hereof, *the parties will cooperate and use reasonable best efforts to amend the Tax Receivable Agreement . . .* to provide that transfers of equity interests in OpCo by the TRA Parties (as such term is used in the Tax Receivable Agreement) to the Company   for cash undertaken in connection with the [Merger] Agreement or transfers of Rollover Units after the Closing *will be treated as covered exchanges giving rise to entitlements under the Tax Receivable Agreement . . . .*

The Information Statement included a similar representation.

164.   On March 23, 2025, the day prior to the Merger closing, the TRA was amended to lock-in these TRA payments for the Officer Defendants and the other TRA parties.   Specifically, the TRA amendment expanded the definition of Endeavor OpCo unit exchanges that are covered by the TRA to include: ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████ The TRA amendment also included ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████

165.   Undisclosed to Endeavor's minority shareholders was the fact that the TRA amendment diverted significant value away from them and into the hands of the Officer Defendants and other TRA parties.

166.   Centerview's final DCF analysis concluded that the discounted present value of the future TRA payments owed to Endeavor (*i.e.*, 15%) was between $0.31 to $0.33 per share.  This equated to an aggregate amount of $104 million to $110 million in discounted present value under Centerview's analysis.

167.   Based on this Centerview DCF, the remaining 85% of the tax savings payable to the Officer Defendants, Silver Lake and the other TRA parties was worth

███████████████████████████████████████████████████████████

1   ██████████. By including ████████████████████████████████████

2   ████████████████████████, the TRA amendment ensured that all of these

3   amounts would go to the Officer Defendants, Silver Lake and other TRA parties—

4   not to unaffiliated Endeavor shareholders.

5        168.   Endeavor shareholders were never informed that they were being

6   deprived of this value, all of which was diverted to the Officer Defendants, Silver

7   Lake and the other TRA parties under the 11th-hour TRA amendment.

8        **L.    The Merger Closes**

9        169.   Following Endeavor's post-signing asset sales and last-minute

10  amendment to the TRA and Rollover Agreements, the Merger closed on March 24,

11  2025.   The Special Committee was disbanded at the close, and Defendants Burns

12  and Reses resigned from the Endeavor Board together with Defendant Weaver.

13  Defendants Emanuel, Durban and Evans remained on the board of New Endeavor,

14  and Defendant Shapiro was also appointed to the new board.   Under their respective

15  Rollover Agreements, the Officer Defendants also exercised their enormous

16  Endeavor equity rollovers into New Endeavor.

17       170.   Each share of Endeavor Class A common stock was cancelled and

18  converted into the right to receive $27.50 in Merger Consideration.   Other than the

19  OpCo Membership Interests and OpCo Profits Units that were rolled over, such

20  unitholders were also given the right to receive Merger Consideration.

21  **V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING**

22  **STATEMENTS AND OMISSIONS OF MATERIAL FACT**

23       171.   Throughout the Class Period, Defendants issued or caused to be issued

24  public statements that were materially false or misleading and omitted material facts

25  as detailed below in violation of Sections 10(b), 13(e), and 20(a) of the Exchange

26  Act and Rules 10b-5 and 13e-3 promulgated thereunder.

27

28

**A.     Defendants Falsely Asserted the Merger Was Fair**

172.    In a section titled "Recommendation of the Executive Committee; Reasons for the Mergers" the Information Statement represented to shareholders that:

> At a meeting of the Executive Committee held on April 2, 2024, the Executive Committee, acting upon the recommendation of the Special Committee, considered and evaluated the Merger Agreement and the Transactions contemplated thereby, including the Mergers, and unanimously:
>
> - determined that the Merger Agreement and the Transactions, including the Mergers, *are fair and in the best interests of*, the Company, its stockholders, including the *Unaffiliated Stockholders . . .*;
>
> - approved and *declared the Merger Agreement and the Transactions advisable . . .*

Information Statement at 64.

173.    The same section further advised shareholders that the Executive Committee's approval of the Merger was based in part on:

> the Executive Committee's view that the $27.50 per share of Class A Common Stock in cash payable in the Merger[] was *more favorable to all of the Company's stockholders* on a risk-adjusted basis *than the potential value that might result from other alternatives reasonably available to the Company, based upon the extensive knowledge of the members of the Executive Committee of the Company's business, assets, financial condition and results of operations*, its competitive position and historical and projected financial performance, and the belief that the Transactions represented an attractive and comparatively certain value for all of the Company's stockholders relative to the risk-adjusted prospects for the Company on a standalone basis.

*Id.* at 65.

174.   The Information Statement further asserted that Defendants Emanuel and Whitesell "*believe that the Mergers (which are the Rule 13e-3 transactions for which a Schedule 13E-3 Transaction Statement will be filed with the SEC) are fair to the Unaffiliated Stockholders*" (*id*. at 102).

175.   The Information Statement advised shareholders that the impetus for the Merger timing was a "risk that additional negotiations could cause Silver Lake to abandon the negotiations and the Potential Transaction altogether" because "the Reporting Persons had stated that they would make public disclosures on Schedule 13D/A the following day," (*id.* at 60), and "the expected timeline for receipt of required regulatory and/or antitrust approvals" which meant that "none of the Potential Gaming Counterparties were likely to be able to complete a Gaming Contract Sale prior to the Outside Date (if at all)," (*id.* at 63).  It further disclosed that the Special Committee had assessed "other potential disruptions to the Company's operations, employees, clients and other stakeholders and the potential impact of financial results and stock price that could result from a failure to announce the Transactions on a timely basis or at all," (*id.* at 69).

176.   The Information Statement also advised shareholders that Centerview's Fairness Opinion found that the Merger Consideration was "fair, from a financial point of view" to shareholders (*id.* at C-4, p. 4).

177.   Defendants knew these statements were false and misleading, and Defendants knew the Fairness Opinion was false and misleading based on what they knew about the Company, including its assets and future prospects, both at the time the Fairness Opinion was issued and later based on subsequent events.  Defendants used the Fairness Opinion anyway months after it had been issued to support their claim that the Merger Consideration was fair.

178.   Defendants' fairness statements are actionable because:  (a) Defendants did not actually hold the belief that the transaction was fair and in the

best interests of unaffiliated shareholders; (b) the statements contained embedded false facts (*e.g.*, that the fairness analysis accounted for the transaction contemplated by the agreement, including asset sales); and (c) Defendants omitted material facts about intervening developments and conflicts necessary to make their opinion statements not misleading.

179.   Further, Silver Lake timed the Merger to exploit its informational advantage and a trough in the Company's market valuation.  Silver Lake knew far more than the public markets about the Company in all respects, including the near and long-term prospects of TKO.  In particular, Silver Lake and the Officer Defendants knew the Company was worth far more than the value implied by its share price, which was held down by a conglomerate discount (that could be eliminated through asset sales), a controlled company discount, and other temporary overhangs that would soon dissipate.

180.  Centerview's Fairness Opinion also reflected the unfairness of the transaction as it relied on a DCF which supported valuations far higher than the Merger Consideration.  The DCF valued Endeavor shares between $27.58 and $36.23, with a $31.91 midpoint (or 16% higher than the Merger Consideration public stockholders received).  The $27.50 Merger Consideration was below even the low end of Centerview's range.

181.   The DCF used an elevated discount rate range that biased the equity value downward. Given the Company's materially improved prospects and in light of the post-Merger agreement developments—including the marked appreciation of TKO and the value-accretive sales of major assets—maintaining a stale, "as of" March 28, 2024 discount rate range as of January 15, 2025 overstated risk and depressed the stated value.

182.   Additionally, while presenting the Fairness Opinion to the Special Committee, Centerview informed the Special Committee that the Merger

1  Consideration was below every analyst price target, which ranged from $28.00 to
2  $36.00.

3       183.   These statements were further materially false and misleading because
4  between the April 2, 2024 Executive Committee meeting approving the Merger and
5  the filing of the Information Statement on January 15, 2025, the underlying
6  financials of the Company had significantly changed.

7       *First*, a significant post-Merger signing increase in the stock price of TKO,
8  the Company's largest and most valuable asset, demonstrated that the Merger
9  Consideration was inadequate. ███████████████████████████
10 ██████████████████████████████████████████████
11 ██████████████████████████████████████████████
12 ████████████████████████

13      184.   When the Merger was signed on April 2, 2024, Centerview's DCF
14 analysis valued Endeavor's TKO holdings at a midpoint of $5.6 billion. But this
15 valuation was quickly superseded by a post-signing rise in TKO's stock price.
16 TKO's publicly traded stock price was $86.18 per share on April 1, 2024. By the
17 time Defendants filed the Information Statement on January 15, 2025, TKO's stock
18 price had dramatically increased to $143.91, meaning Endeavor's TKO stake was
19 worth approximately *$9.5 billion*—████████████ *than Centerview's valuation*
20 *of Endeavor's TKO shares at Merger signing*.

21      185.   Indeed, by the time the Merger closed on March 24, 2025, TKO's stock
22 price had skyrocketed to $152.91 per share and Endeavor's TKO stake alone[8] was
23 worth approximately *$13.3 billion—over $7 billion more* than Centerview's DCF
24 valuation of the TKO shares at Merger signing.

25
26 [8] As discussed above, Endeavor's TKO stake had increased since signing because
27 of the Sports Asset transaction, the purchase of TKO interests from WWE founder
   Vince McMahon and open-market purchases. By the time the Merger closed,
28 Endeavor owned 61% of TKO.

186.   In connection with Defendants' disclosures about the TKO valuation, Defendants omitted:  (i) a sensitivity analysis translating changes in TKO valuation inputs (*i.e.*, multiples and DCF assumptions) into an Endeavor per-share value; (ii) a forthright explanation for the absence of a price protection mechanism (like a cost collar or contingent value right) despite the TKO sensitivity and an explanation for why a $0.24 dividend was adequate; (iii) a candid discussion of foregone alternatives and how Defendants' structural choices affected the fairness of the Merger; and (iv) the implications of intervening developments for TKO's valuation between the date the Fairness Opinion was issued and the date the Information Statement was disseminated in light of Endeavor's explicit "Owned TKO" valuation.  These obligations of the Defendants continued until the date the Merger closed.

187.   *Second*, as noted above, shortly after signing the Merger Agreement, Silver Lake requested that Endeavor sell its Sports Assets and its entire SD&T division (consisting of IMG Arena and OpenBet) pursuant to rights it had reserved for itself under the express provisions of the Merger Agreement.

188.   The Company and Centerview had implicitly valued the Sports Assets at $2.56 billion.  Yet, Endeavor set ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮just two months after the Merger Agreement was signed.   These June 2024 projections forecast ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Moreover, in October 2024, Endeavor sold the Sports Assets to TKO for $3.25 billion in stock ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when the Merger Agreement was signed.

189.   Similarly, as of the signing of the Merger Agreement, the Company and Centerview implicitly valued OpenBet at $306 million, but in the following

1  months the market revealed that this asset was worth approximately 30-45% more.

2  In fact, in June 2024, two bidders offered to acquire OpenBet ███████████

3  ████████████.  Defendants never disclosed these superior bid amounts for

4  OpenBet.  Nor did they disclose that Emanuel ultimately bought OpenBet for

5  approximately $144 million more than Centerview and Defendants' implicit

6  valuation of that business (*i.e.*, Emanuel's $450 million purchase price vs. the $306

7  implicit value of OpenBet).

8      190.  Together, the Sports Assets and OpenBet sales revealed approximately

9  ████████████████████████████████████████████████████

10  of Company value that had not been accounted for when the Information Statement

11  was filed or when the Merger closed.

12      191.  Defendants further failed to disclose that Silver Lake had a preexisting

13  plan to sell off the separate non-core assets of Endeavor at prices substantially

14  higher than the values attributed to them in the Fairness Opinion. Silver Lake

15  thereby appropriated the value of the assets from shareholders.

16      192.  Between the two asset sales and the exponential increase in value of

17  TKO in the post-signing period, Defendants knew or recklessly disregarded they

18  were relying on data that undervalued Endeavor's assets by ███████ when the

19  Information Statement was filed (*i.e.,* approximately ████████████████

20  ████████████████████████████████).

21      193.  Despite this knowledge, Defendants falsely represented in the

22  Information Statement sent to unaffiliated shareholders that as of April 2, 2024, the

23  Merger was "*fair and in the best interests of, the Company [and] its stockholders*;"

24  the Merger was "*advisable*;" and the Merger Consideration "was *more favorable* to

25  all of the Company's stockholders on a risk-adjusted basis than the potential value

26  that might result from other alternatives reasonably available to the Company."

27  These statements were never updated or corrected to address the material facts

28

1  above, which plainly demonstrated that Endeavor's value was higher than the
2  amount stated in the Fairness Opinion.

3  194.  Similarly, Defendants' statements regarding Centerview's Fairness
4  Opinion were materially false and misleading.  Specifically, the Information
5  Statement represented that on April 2, 2024, Centerview issued the Fairness
6  Opinion reflecting its conclusion that "the [Merger] Consideration to be paid to the
7  holders of Shares (other than Excluded Shares) pursuant to the [Merger] Agreement
8  *is fair, from a financial point of view,* to such holders."

9  195.  This statement was materially false and misleading because, as
10  discussed above, Centerview's fairness analysis implicitly valued the Sports Assets
11  at just $2.56 billion, yet in October 2024, Endeavor sold the Sports Assets to TKO
12  for $3.25 billion in stock.  Centerview's fairness analysis also implicitly valued
13  OpenBet at $306 million, yet months later two bidders each offered to buy the asset
14  for ███████████, and Emanuel eventually bought OpenBet for $450 million.
15  Together, the Sports Assets and OpenBet sales revealed severe undervaluation
16  errors in Centerview's Fairness Opinion of approximately ██████████.

17  196.  Given the express provisions of the Merger Agreement, Centerview's
18  fairness analysis necessarily should have included an evaluation of all post-signing
19  asset sales by Endeavor.  In fact, Centerview's Fairness Opinion expressly stated
20  that it was opining on the Merger Agreement, which included "*the other*
21  *transactions contemplated by the Agreement.*"  By definition, this included any
22  post-signing asset sales by Endeavor.  But Defendants failed to get an updated
23  fairness assessment from Centerview that would have reflected Endeavor's
24  undervaluation as demonstrated by such sales.

25  197.  Centerview's sum-of-the-parts presentation ultimately aggregated the
26  Company's non-TKO businesses into an "Ex-TKO" figure, which obscured
27  potentially higher standalone values for distinct segments when combined into a

28

1  single Ex-TKO output. ████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████  Defendants' repeated assertions of "fairness," framed as

5  opinions, were misleading under *Omnicare* because Defendants did not actually

6  hold those beliefs, the opinions implied untrue embedded facts about the scope and

7  currency of Centerview's analysis, and Defendants omitted material facts—

8  post-signing asset sales, TKO's revaluation, and advisor conflicts—necessary to

9  prevent their opinions from misleading reasonable investors.

10      198.   Defendants considered the post-signing sale of Endeavor businesses to

11  be a key component of the Merger itself.  Specifically, section 7.16 of the Merger

12  Agreement expressly provided for Endeavor's sale of all its business assets, except

13  for TKO and WME's agency representation business.  And soon after the Merger

14  Agreement was signed, Defendants arranged for the multi-billion-dollar sales of

15  OpenBet and the Sports Assets in related-party transactions with Emanuel and

16  TKO.

17      199.   Defendants did not believe the Merger was "fair, from a financial point

18  of view" to unaffiliated shareholders given the material omission of these sales from

19  Centerview's Fairness Opinion.  As noted above, these asset sales demonstrated a

20  significant undervaluation of both Endeavor and the Merger Consideration offered

21  to such shareholders.  Defendants' failure to incorporate the asset sales—or even to

22  disclose their effect—rendered their Merger fairness statements materially false and

23  misleading.

24      200.   Rule 13e-3 of the Exchange Act requires an issuer to update its

25  disclosures regarding a take-private transaction whenever there is a material

26  development or change in circumstances regarding the transaction, especially

27  concerning the financial fairness of the transaction.  *See* 17 C.F.R. § 240.13e-3(d)

28

("The issuer or affiliate engaging in a Rule 13e-3 transaction must file with the Commission: . . . (2) An amendment to Schedule 13E-3 reporting promptly any material changes in the information set forth in the schedule previously filed.").

201. Under the extreme circumstances of the Merger—where the Company's largest asset (TKO), which accounted for the majority of its value, had almost doubled in price between Merger signing and closing, and multiple large asset sales suggested severe undervaluation errors in the original Fairness Opinions—Defendants were required by Rule 13e-3 to promptly amend their Schedule 13E-3 and related disclosures to reflect material developments bearing on fairness, but failed to do so.

202. Accepted valuation methods such as discounted cash flow and trading comparables, properly applied, reinforced that the $27.50 cash-out was unfair, including as of dissemination. Centerview's own DCF range exceeded the consideration and its selected multiples and discount rates were stale and biased to depress value. Defendants' failure to conform their fairness representations to these objective criteria—and to update as material changes arose—rendered those statements misleading under Rule 13e-3 and Rule 10b-5.

203. Nevertheless, Defendants filed Centerview's April 2, 2024 Fairness Opinion without any updates or explanation that it was outdated both (i) as an exhibit to the Schedule 13E-3 transaction statement first filed with the SEC on August 5, 2024 (and reattached to each of five subsequent Class Period amendments to the Schedule 13E-3 filed on September 23, 2024; October 11, 2024; December 20, 2024; January 15, 2025; and March 24, 2025) and (ii) as an annex to Endeavor's Information Statement filed with the SEC on *January 15, 2025*—well after the two asset sales had been announced and after the Company had year-end 2024 financial results and market data for TKO proving that Endeavor's valuation assumptions were erroneous.

204. Defendants filed the Information Statement knowing that the assumptions underlying the attached Fairness Opinion were inaccurate.

205. Defendants also failed to correct or update the Schedule 13E-3 transaction statement as they were required to do. The lack of an updated "bring-down" Fairness Opinion to reflect Endeavor's increased valuation renders Defendants' fairness statements about the Merger materially false and misleading in violation of SEC Rule 13e-3, as well as Section 10(b) of the Exchange Act.

## B. Defendants Misstated the Value of the Officer Defendants' Equity Rollovers

206. Defendants failed to adequately disclose the Officer Defendants' earnings under the Merger by misleadingly valuing their Endeavor equity rollover positions at Merger Consideration when those positions were significantly more valuable.

207. The Fifth Amendment to the Schedule 13E-3 transaction statement, which was filed by Defendants the day the Merger closed on March 24, 2025, indicated that the Whitesell Rollover Agreement was amended on March 18, 2025 to include the following total rollover interests:

**ROLLOVER INTERESTS**

| Entity | Rollover Interests[2] | Corresponding Value |
|---|---|---|
| Endeavor Executive HoldCo, LLC | 8,214,055 Common Units | $ 225,886,512.50 |
| Endeavor Executive II HoldCo, LLC | 1,274,518 Profits Units (hurdle $16.54) | $ 13,968,717.28 |
| OpCo | 5,959,889 Profits Units (hurdle $23.16) | $ 25,865,918.26 |

1    Capitalized terms used herein but not defined herein shall have the meanings ascribed to them in the Agreement.
2    As of the date of delivery of this Exhibit A, pursuant to Section 1.1 of the Agreement, Patrick Whitesell owns the interests that will constitute such Rollover Interests either directly or indirectly through Endeavor Executive Holdco, LLC or Endeavor Executive II Holdco, LLC.

208. The Fifth Amendment to the Schedule 13E-3 transaction statement further represented that the Emanuel Rollover Agreement was amended on March 22, 2025 to include the following total rollover interests:

| Entity | Rollover Interests | Corresponding Value |
|---|---|---|
| OpCo | 9,106,781 OpCo Membership Interests | $ 250,436,477.50 |
| OpCo | 5,959,889 OpCo Profits Units (hurdle $23.16) | $ 25,865,918.26 |
| OpCo | 1,274,518 OpCo Profits Units (hurdle $16.54) | $ 13,968,717.28 |

209.   The Information Statement also represented that Defendant Shapiro held the following rollover interest in the transaction:

> a number of equity interests in [Endeavor] OpCo and/or in the Company held by him and his permitted transferees that are outstanding and vested Shares without any restrictions on such Shares, OpCo Membership Interest or OpCo Profits Unit with a value equal to $37,187,970 (based on the applicable Merger Consideration).

Information Statement at 167.

210.   These disclosures were materially false and misleading because the stated values of the Officer Defendants' rolled over equity represented $27.50 per rolled over Endeavor OpCo unit (*i.e.*, Merger Consideration) minus the hurdle price of each unit times the number of units rolled over.  As noted above, given the dramatic increase in Endeavor's value as reflected in the exponential increase in its market price of its TKO stake and the post-Merger signing sale of the Sports Assets and OpenBet, the real value of the Officer Defendants' rollover units was significantly higher than the Merger Consideration they were valued at in the Information Statement and Schedule 13E-3 transaction statement.

211.   By the time the Information Statement was issued, the Officer Defendants' rolled over Endeavor OpCo units were worth ███████ they were valued at under Centerview's Fairness Opinion, adjusting for the asset sales and TKO's increased stock price only.  By the time the Officer Defendants amended their Rollover Agreements, their rolled over Endeavor OpCo units were worth ██████████ Defendants represented at Merger closing, adjusting only for the same inputs.

### C.    Defendants Failed to Disclose That OpenBet Was Undervalued

212.   Defendants wholly omitted that after the Merger was signed, two undisclosed bidders offered ████████████████ for OpenBet than the implicit valuation of that asset by Centerview and Defendants.  Nor did they

1  disclose that OpenBet was ultimately sold to Emanuel for approximately *$144*

2  *million* more than the implicit valuation of that Company by Centerview and

3  Defendants at Merger signing.

4      213.   As noted above, the Merger Agreement gave Silver Lake the power to

5  request the sale of all Endeavor business assets (other than TKO and WME) in the

6  post-Merger signing period.  *See supra* IV.I.  Once the Merger Agreement was

7  executed, Silver Lake requested a sale of the two core businesses in Endeavor's

8  SD&T operating segment (*i.e.*, OpenBet and IMG Arena).  This was part of Silver

9  Lake's effort to quickly monetize valuable assets in Endeavor's portfolio before the

10  Merger closed.

11     214.   From May to October 2024, Endeavor engaged with numerous

12  potential bidders for OpenBet and IMG Arena.  Thirteen potential bidders emerged

13  from this process and were sent letters outlining the future steps for submitting

14  acquisition offers for OpenBet and IMG Arena.

15     215.   Two undisclosed bidders subsequently made actual offers to acquire

16  OpenBet and IMG.  The identity of these two other bidders, and the fact that they

17  offered ███████████████████████████, was omitted

18  from Defendants' November 11, 2024 Form 8-K announcing the OpenBet sale.  The

19  Form 8-K only stated that "[p]ursuant to the [OB/Arena Transaction Agreement],

20  [Emanuel] will acquire all outstanding equity interests in the Companies for

21  consideration valued at approximately $450 million. . . ."

22     216.   The Information Statement made further reference to the undisclosed

23  OpenBet bidders, as follows:

> Starting on June 18, 2024, 13 of the Initial Potential Bidders for the
> Gaming Assets were sent process letters.  Subsequently, Company
> management . . . *separately received offers for the acquisition of
> OpenBet from two other Initial Potential Bidders* . . .

Information Statement at 63. This statement was materially misleading because it omitted the material fact that ████████████████████████████████████ ████ respectively—nearly ███████████████ than Defendants and Centerview valued that asset.

217. Defendants viewed a sale of OpenBet to these bidders to be unfeasible given the delay caused by regulatory and antitrust approvals required for ownership of this business. Accordingly, in November 2024, Defendants decided to pursue a management buyout of OpenBet by Defendant Emanuel. Defendants misleadingly omitted from the Information Statement that Emanuel ultimately agreed to pay *$144 more* for OpenBet than the implicit value they assigned to that business at Merger signing. In this regard, Defendants stated as follows:

> On November 11, 2024, at Silver Lake's request and pursuant to Section 7.16 of the Merger Agreement, [Endeavor] entered into a transaction agreement . . . with [Emanuel] and a member of OpenBet management, pursuant to which, among other things [Emanuel] agreed to acquire OpenBet and IMG Arena from [Endeavor] in exchange for consideration of approximately *$450 million* (subject to certain adjustments), consisting of (i) a $100 million cash payment and (ii) an unsecured promissory note with a make-whole value of *approximately $350 million* upon the occurrence of certain events . . .

*Id.* at 63–64.

218. The OpenBet transaction closed on March 24, 2025, the same day the Merger closed. Yet, unaffiliated shareholders were never informed that Defendant Emanuel acquired OpenBet for approximately *$144 million more* than the $306 million implicit value of OpenBet assigned by Centerview and Defendants at Merger signing.

**D.     Defendants Failed to Disclose That the TRA Amendment Diverted Significant Value From Unaffiliated Shareholders**

219.    Defendants made materially false statements and omissions of material fact concerning the TRA amendment and its diversion of value away from unaffiliated shareholders.

220.    Defendants' April 2, 2024 Form 8-K announcing the Merger attached copies of the Emanuel and Whitesell Letter Agreements, both of which contained the substantially same provision that purported to describe the TRA benefits for non-rolled over Endeavor OpCo equity as follows:

> With respect to your Equity Interests in [Endeavor OpCo] that are not designated as Rollover Interests pursuant to the terms of the Rollover Agreement, the parties hereto [*i.e.*, Endeavor, Silver Lake and Emanuel/Whitesell] agree that your disposition of such Equity Interests in [Endeavor OpCo] pursuant to the Merger Agreement shall be treated as a sale by you to [Endeavor] for cash.  The transaction described in the immediately preceding sentence *shall be treated as triggering economic entitlements for tax benefits* in accordance with Section 7.17 of the Company Disclosure Letter.

221.    In a section of the Information Statement titled "Other Covenants and Agreements," Defendants stated that:

> the Parent Entities [Silver Lake] and the Company Entities [Endeavor] agree:
>
> to cooperate and use their respective reasonable best efforts to *amend the Tax Receivable Agreement* to ensure that the legal form of the Transactions does not adversely affect the benefits that would otherwise be received by the TRA Parties under the Tax Receivable Agreement.

Information Statement at 157.

222.    This statement omitted the material fact that Centerview determined such an amendment to the TRA would result in significant tax savings payments to the Officer Defendants, Silver Lake and the other TRA parties.

223.   Specifically, Centerview's April 2, 2024 DCF analysis found that the TRA parties' 85% interest in the Company's tax savings was worth $1.76 to $1.87 per share of Endeavor Class A stock, or *$590 to $623 million* in the aggregate.  By agreeing to the TRA amendment that retained all of those tax benefits for the Officer Defendants, Silver Lake and the other TRA parties, Defendants diverted all of this future value away from unaffiliated shareholders.

224.   Unaffiliated shareholders were never informed that the last-minute TRA amendment deprived them of all this future value and instead put it into the hands of the Officer Defendants, Silver Lake and the other TRA parties.

**E.    Defendants Failed to Disclose the Pressure Campaign By Emanuel and Silver Lake to Force a Merger Recommendation By the Special Committee**

225.   The Information Statement's description of the Special Committee as "independent" was materially misleading because it omitted the structural and practical constraints that prevented the Committee from conducting a market check, soliciting or entertaining alternative proposals, or even communicating with interested third parties.  At the same time, Silver Lake had publicly foreclosed any third-party sale, ensuring there were no viable alternatives for the Committee to pursue.

226.   The Information Statement also omitted the sustained pressure campaign by Silver Lake and insiders that compressed negotiations into a four-day window over Easter weekend with expiring offers, direct calls to Committee members and Centerview during meetings, and threats of "significant disruption" if price was not agreed by April 2.  These undisclosed facts rendered false or misleading the characterization of the Committee as independent and the process as fair to unaffiliated shareholders.

227. The Information Statement's description of the Special Committee's first meeting on March 8, 2024, was devoid of any facts indicating that ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████

228. Defendants' description of the Special Committee's March 8 meeting simply stated that:

> On March 8, 2024, the Special Committee convened a meeting via videoconference with representatives of Centerview and Cravath in attendance . . . The representatives of Centerview provided the Special Committee with an overview of Centerview's preliminary findings with respect to the Company. The representatives of Centerview also discussed certain financial information and performance metrics of the Company and provided an overview of certain key outstanding questions *and a potential overall transaction timeline*.

Information Statement at 56.

229. This statement was misleading because it concealed that Silver Lake imposed an aggressive transaction timeline to meet its purported need to file an amended Schedule 13D disclosing its impending offer to acquire Endeavor. As reflected in the minutes for the March 8 meeting, the Special Committee ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Endeavor's minority shareholders were unaware that Silver Lake was pressing the Special Committee for a quick agreement on a Merger price, which gave the Special Committee no meaningful time to negotiate this key term for the benefit of such shareholders.

230. The Information Statement's description of the parties' negotiations on March 29, 2024 was also misleading. In describing the Special Committee's first meeting on March 29, Defendants stated that:

> On March 29, 2024, the Special Committee met via videoconference with representatives of Centerview and Cravath to discuss the status of negotiations and key terms of the Merger Agreement, *including Silver Lake's proposal regarding regulatory approvals necessary to close the Transactions and potential alternative approaches*.

Information Statement at 58.

231. Nowhere in such description was it disclosed that ███████ ████████████████████████ the March 29 Special Committee meeting ██ ████████████████████████████████████████████████████ ███████████████████████████████████████████████. Nor was it disclosed that on this call, ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ over the upcoming Easter Weekend.

232. Silver Lake's ongoing pressure to get Special Committee approval on the Merger Consideration was also omitted from Defendants' description of Silver Lake's March 29 Offer. The Information Statement described the March 29 Offer as follows:

> Later on March 29, 2024, Silver Lake submitted a proposal to the Company to acquire 100% of the outstanding equity interests of the Company (other than equity interests to be rolled over by Silver Lake or Company management), at a price per share of $24.50 payable in cash (the "March 29 Proposal") . . .

*Id.* at 59.

233. This statement was misleading because it entirely omitted that Silver Lake's March 29 Offer was ████████████████████████████████████

1   ████████. Specifically, Silver Lake expressly told the Special Committee that it

2   wanted to ██████████████████████████████████████████████████████

3   ███████████████████████████████████████████ Endeavor's

4   unaffiliated shareholders were never informed that Silver Lake was imposing an

5   artificial time crunch on the Special Committee.

6        234.   The same is true with respect to Defendants' description of Silver

7   Lake's subsequent March 30 Proposal that was sent to the Special Committee after

8   it rejected the March 29 Proposal.   The Information Statement provided the

9   following generic description of Silver Lake's March 30 Proposal:

> Later on March 30, 2024, Silver Lake submitted a revised proposal to the Company to acquire 100% of the outstanding equity interests of the Company (other than equity interests to be rolled over by Silver Lake or Company management), increasing the proposed price per share from $24.50 to $25.75 in cash (the "March 30 Proposal").

14   *Id.*

15        235.   This description was misleading because it failed to disclose that Silver

16   Lake ██████████████████████████████████████████████████████

17   ████████████████████████. Not disclosed to unaffiliated shareholders was

18   the fact that Silver Lake told the Special Committee it ████████████████████

19   ████████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████ for

21   the Merger and Merger parties.

22        236.   The Information Statement purported to describe the ongoing

23   negotiations between Silver Lake, the Special Committee, and Centerview on

24   March 31, 2024, including the Special Committee's $30.50 per share counteroffer

25   on that date, as follows:

> Subsequently, representatives of Centerview presented the Special Committee's counterproposal to Mr. Durban, who responded by indicating that he had conferred with Silver Lake's proposed preferred equity and other financing sources and believed that Silver Lake could

increase its proposed purchase price-per share from $25.75 (as reflected in the March 30 Proposal) to $27.00.

237.    This statement was misleading as it omitted that Defendant Durban further pressured Centerview's Blair Effron in connection with these competing proposals by stating ███████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████

238.    This supposed urgency to agree on Merger Consideration was reiterated in a March 31 email to the Special Committee from Silver Lake's Chief Legal Officer, Karen King.  In the email, ████████████████████
████████████████████████████████████████████████████
████████████████████████████. None of these facts were disclosed in the Merger press release, Information Statement or Defendants' other public statements concerning the Merger.

239.    The pressure campaign by Silver Lake and Emanuel had its intended effect on the Special Committee, yet Defendants continued to mask the Special Committee's stated rationale for agreeing on the critical price term on a compressed schedule over Easter Weekend.  In this regard, the Information Statement asserts that during the Special Committee's final deliberations on April 1, 2024, Committee members were concerned about the "*risk that additional negotiations could cause Silver Lake to abandon the negotiations and the [Merger] altogether.*"

240.    Not disclosed was the Special Committee's real concern, as stated in its April 1 meeting minutes.  Specifically, the undisclosed strong-arm tactics
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

1    ████████  This concern by the Special Committee, which was never disclosed

2    to public shareholders, forced it to agree to the Merger Consideration under an

3    unreasonably accelerated time schedule.

4    **F.    Defendants Failed to Disclose Centerview's Significant Conflicts**

5        **of Interest**

6        241.    During the Class Period, Defendants failed to disclose material facts

7    demonstrating that Centerview had conflicts of interest regarding the Merger and

8    the parties thereto.

9        242.    The Information Statement omitted material facts regarding

10   Centerview's conflicts of interest that rendered Defendants' statements about

11   Centerview's independence misleading.

12       243.    *First,* the Information Statement and Centerview's April 2, 2024

13   Fairness Opinion misleadingly disclosed Centerview's prior engagements with

14   Silver Lake.  Specifically, Defendants stated that:

> In the two years prior to the date of its written opinion, Centerview had
> not been engaged to provide financial advisory or other services to
> [Silver Lake] or Silver Lake Technology Management, L.L.C.
> ("Sponsor"), . . . or any other filing persons . . . affiliated with [Silver
> Lake] or Sponsor, and Centerview did not receive any compensation
> from [Silver Lake] or Sponsor or any of such respective filing persons
> during such period.  In the two years prior to the date of its written
> opinion, Centerview was engaged to provide financial advisory
> services unrelated to the Company to a portfolio company of Sponsor
> in connection with certain strategic matters, and it received less than
> $3 million in compensation for such services.

Information Statement at 81 and Annex C at C-2.

24       244.    This statement gave the misleading impression that Centerview had no

25   real business interests with Silver Lake between April 2022 and April 2024.    But

26   this omitted that Centerview was engaged in ongoing efforts to solicit business from

27   Silver Lake during that period.  In this regard, Centerview informed Defendants

28

that, since January 1, 2022, Centerview had been "*soliciting business from Silver Lake* and/or its portfolio companies and companies in which it holds . . . venture capital or similar investments." Such business solicitations no doubt incentivized Centerview to maintain and improve its overall relationships with Silver Lake so that Centerview could ensure future business with Silver Lake and its portfolio companies.

245. This statement was further misleading because it did not disclose that in 2023 Centerview served as a financial advisor to Vertex, Inc. concerning a $500 million preferred stock investment by Silver Lake.

246. *Second*, the Information Statement made materially misleading partial disclosures about the *timing* of when Centerview informed the Special Committee about its concurrent engagement with an undisclosed affiliate of Mubadala Capital, Abu Dhabi's sovereign wealth fund. As noted above, another Mubadala affiliate, Thirty Fifth Investment Co., provided $200 million in preferred equity financing to Silver Lake on the Merger. In exchange, Thirty Fifth received preferred equity interests in New Endeavor. Centerview, in turn, was expected to receive approximately $7.25 million in compensation from its concurrent engagement with the other Mubadala affiliate.

247. The Information Statement purports to disclose Centerview's relationship with Mubadala and that Centerview provided "supplemental" relationship disclosures on May 16, 2024 after the Merger Agreement was signed. Specifically, Defendants represented that "On May 16, 2024, representatives of Centerview provided to the Special Committee (via Cravath) supplemental written disclosures of its relationships with the Original Preferred Equity Investors [including Thirty Fifth Investment Co.] and certain of their affiliates." But the Information Statement omitted that May 16, 2024 was the *first time* this Mubadala conflict was disclosed to the Special Committee. The Special Committee did not

receive information about the Mubadala-related conflict prior to issuing its Fairness Opinion on April 2, 2024 or before signing.

248. This belated disclosure to the Special Committee is evidenced in the Special Committee's July 30, 2024 meeting minutes, which state that



.]

249. Accordingly, Defendants failed to disclose that the Special Committee was entirely unaware of Centerview's conflicted engagement with Mubadala and Thirty Fifth Investment Co. when it accepted and relied on Centerview's Fairness Opinion supporting the Merger.

250. *Finally,* by artificially limiting the Information Statement's purported disclosure of Centerview's conflicts of interest to two years prior to the issuance of the Fairness Opinion (*i.e.,* starting on April 2, 2022), the Information Statement omitted other material conflicts held by Centerview. The Information Statement omitted that Centerview earned millions of dollars in fees in 2021 advising Silver Lake portfolio company ServiceMax, Inc. The Information Statement further failed to disclose that Rahm Emanuel (Ari Emanuel's brother) served as a Consultant and Senior Advisor to Centerview from 2019 to 2021. Similarly, the Information Statement did not disclose that in 2017, Centerview served as a financial advisor to Cornerstone OnDemand concerning Silver Lake's $300 investment in Cornerstone.

## VI.  ALLEGATIONS OF SCIENTER

251. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein. Endeavor, the Officer Defendants, Board Defendants,

and Special Committee Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Endeavor during the Class Period and detailed in Section V above were materially false and misleading. These Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

252.   Defendants participated in the fraudulent scheme alleged herein by virtue of their knowledge of information reflecting the true state of affairs regarding Endeavor and the process leading to the Merger, their control over, receipt and/or modification of Endeavor's materially misleading statements and omissions of material fact, and/or their senior positions with the Company, which made them privy to confidential information concerning Endeavor and the Merger which contradicted Defendants' statements during the Class Period.

253.   In their roles as directors and officers of the Company during the Class Period, the Officer Defendants, Board Defendants and Special Committee Defendants directly participated in the management of Endeavor's operations and, because of their senior positions at Endeavor, were involved in the drafting, reviewing, publishing and/or disseminating the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Endeavor's SEC filings, press releases and Information Statement issued to unaffiliated shareholders in connection with the Merger. Additionally, the Officer Defendants' desire to increase the size of their rollovers as set forth in Defendants' Schedule 13E-3 Amendment No. 5 demonstrates their recognition that the cash consideration offered to public shareholders was unfair.

255. Further, Defendants' scienter is supported by their failure to include procedural protections for unaffiliated shareholders, including (i) Defendants' agreement to forego a "majority of the minority" vote on the Merger, (ii) their deliberate rejection of price protection devices (*i.e.,* a collar or contingent value right) despite known TKO sensitivity; (iii) the acceptance of only token dividends for Company shareholders; (iv) the constraints on any alternatives Defendants considered to the transaction; (v) the Officer Defendants' rollovers and side benefits; and (vi) Defendants' present-tense fairness assertions at the dissemination of the Information Statement paired with omissions of material contemporaneous facts contradicting such assertions.

256. Endeavor acted with scienter because the scienter of the Officer Defendants, Board Defendants and Special Committee Defendants is imputed to the Company. Each of those Defendants spoke on behalf of and controlled the false and misleading materials disseminated to unaffiliated shareholders concerning the Merger.

## VII. APPLICATION OF PRESUMPTION OF RELIANCE

257. At all relevant times, the market for Endeavor Class A common stock was efficient for the following reasons, among others:

a) Endeavor Class A common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) According to Endeavor's Form 10-K for the fiscal year ended December 31, 2024, Endeavor had more than 325 million shares of Class A common

stock outstanding as of January 31, 2025 that were eligible for trading on the NYSE;

c)   As a regulated issuer, Endeavor filed periodic public reports with the SEC;

d)   Endeavor regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

e)   Unexpected material news about Endeavor was rapidly reflected in and incorporated into the price for Endeavor Class A common stock during the Class Period.

258.   As a result of the foregoing, the market for Endeavor common stock promptly digested current information regarding Endeavor and the Merger from publicly available sources and reflected such information in the price of Endeavor common stock.  Under these circumstances, all sellers of Endeavor common stock during the Class Period suffered similar injury through their sales of Endeavor common stock at artificially deflated prices, and a presumption of reliance applies.

259.   A presumption of reliance is also appropriate in this Action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in primary part, on Defendants' omissions of material facts.

## VIII.  LOSS CAUSATION

260.   During the Class Period, as detailed herein, Defendants made false and misleading statements, engaged in a scheme to deceive the market and a course of conduct that concealed the higher value of Endeavor's shares and operated to artificially depress the market price of Endeavor Class A common stock.  By masking material valuation information and fairness defects, Defendants induced public shareholders to divest at the market price rather than preserve and exercise

their appraisal rights, thereby depriving them of the opportunity to obtain the fair value of their shares through a statutory appraisal remedy.

261.  Class A shareholders who sold their shares in the open market were entitled to rely on the integrity of the market and the price set by the market as an accurate measure of the stock's value.  The market price, however, was artificially depressed due to the false and misleading statements made by the Defendants about the Company and the fairness of the Merger Consideration.   Selling shareholders suffered a loss by selling their shares at deflated prices (*i.e.,* less than they were worth) because (i) the market price at which they sold was less than what the price would have been in the absence of the misstatements and omissions and (ii) they lost the right to seek appraisal and obtain a greater value for their shares.

262.  Plaintiff and the Class suffered economic loss proximately caused by Defendants' misconduct.  But for Defendants' materially misleading statements and omissions, plaintiff and the Class would have preserved and exercised their appraisal rights and obtained higher value in appraisal; instead, they sold at prices rendered artificially low by Defendants' misrepresentations, thereby forfeiting appraisal and the higher recovery it would have yielded.   The Information Statements and Schedule 13-E were essential links in accomplishing the Merger. The economic harm was a foreseeable consequence of Defendants' concealment of material valuation information bearing on the decision whether to sell or preserve appraisal rights, and that concealed risk materialized when Class members sold their shares for less than they would have received in appraisal.  Defendants' material misstatements and omissions of material fact caused Plaintiff and the Class to forfeit their right to seek appraisal of the fair value of their Endeavor common stock under Section 262 of the Delaware General Corporation Law and they were damaged thereby.

263.   In the alternative, Plaintiff and the Class suffered economic loss based upon Defendant's scheme to deceive investors.  Defendants' materially false and misleading statements and omissions of material facts operated as a fraud or deceit on Plaintiffs and the Class, and induced Plaintiffs and the Class to sell Endeavor shares at prices that were below the actual value of those securities, including by selling their shares into the Merger for the inadequate Merger Consideration. Plaintiffs and the Class suffered economic harm as a result of their sales of Endeavor common stock during the Class Period.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

264.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Complaint.  To the extent certain statements alleged to be materially false or misleading may be characterized as forward-looking, the statutory safe harbor does not apply to statements made in connection with the Merger as a take-private transaction.  *See* 15 U.S.C. § 78u-5(b)(1)(e).

265.  In any event, the statements alleged to be materially false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

266.   To the extent the statutory safe harbor applies to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made,

1  each of these Defendants had actual knowledge or recklessly disregarded that the

2  particular forward-looking statement was materially false or misleading.

3  Defendants are liable for the statements pled because, at the time each of those

4  statements was made, Defendants knew or recklessly disregarded the statement was

5  false, and the statement was authorized and/or approved by the Individual

6  Defendants who knew or recklessly disregarded that such statement was false when

7  made.

8  **X.    CLASS ACTION ALLEGATIONS**

9       267.   Plaintiff brings this action as a class action pursuant to Federal Rule of

10  Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all sellers of

11  Endeavor Class A common stock from January 15, 2025 through March 24, 2025

12  (the "Class"). Excluded from the Class are Defendants, the officers and directors

13  of Endeavor, at all relevant times, members of their immediate families, and their

14  legal representatives, heirs, successors or assigns, and any entity in which

15  Defendants have or had a controlling interest.

16       268.   The members of the Class are so numerous that joinder of all members

17  is impracticable. Throughout the Class Period, Endeavor Class A common stock

18  was actively traded on the NYSE. While the exact number of Class members is

19  unknown to Plaintiff at this time and can only be ascertained through appropriate

20  discovery, Plaintiff believes there could be hundreds or thousands of members in

21  the proposed Class. Record owners and members of the Class may be identified

22  from records maintained by Endeavor or its transfer agent or the depository bank

23  for the Class A stock and may be notified of the pendency of this Action by mail,

24  using the form of notice similar to that customarily used in securities class actions.

25       269.   Plaintiff's claims are typical of the claims of the members of the Class

26  as all members of the Class are similarly affected by Defendants' materially false

27

28

and misleading statements, omissions of material facts, and conduct in violation of federal law that is asserted herein.

270. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

271. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) Whether the Exchange Act was violated by Defendants as alleged herein;

b) Whether statements made by Defendants misrepresented material facts about the Merger as well as the business, operations and valuation of Endeavor;

c) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

d) Whether the price of Endeavor common stock was artificially deflated during the Class Period;

e) Whether Defendants' material misstatements and omissions of material fact caused members of the Class to sustain damages; and

f) The extent of damages sustained by Class members and the proper measure of damages.

272. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

CLASS ACTION COMPLAINT

XI.    **CLAIMS FOR RELIEF**

<u>**COUNT I**</u>

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5(a)-(c)**

**Against All Defendants**

273.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

274.    This Count is asserted on behalf of all members of the Class against Endeavor, Silver Lake, the Officer Defendants, Board Defendants, and Special Committee Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5(a)-(c).

275.    During the Class Period, Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class Members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to sell Endeavor Class A common stock at artificially deflated prices into the open market and forfeited their appraisal rights during the Class Period.

276.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of Endeavor Class A common stock in an effort to maintain artificially deflated market prices for Endeavor Class A common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

277.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to disseminate the misleading

statements and conceal material information about the Company, its operations and prospects, as well as material information concerning the Merger.

278. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

279. In their roles as senior executives of Endeavor during the Class Period, the Officer Defendants directly participated in the management of Endeavor's operations and, because of their positions at Endeavor, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Endeavor's Class Period misstatements and omissions in connection with the Merger. The Information Statement was in fact signed by Defendant Emanuel as CEO of Endeavor and was issued by order of the Executive Committee.

280. Additionally, as members of the Board, Special Committee, and Executive Committee, each of these Individual Defendants were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements about the Merger during the Class Period and/or possessed the power and authority to approve and control the contents of Endeavor's Information Statement and other public statements concerning the Merger made during the Class Period. Each of these Individual Defendants authorized the dissemination of the Information Statement, the use of their names in the Information Statement, and were involved in the sale process leading up to the signing of the Merger Agreement. Thus, all Defendants knowingly and

1  substantially participated or acquiesced in the issuance or dissemination of those
2  statements as primary violators of the federal securities laws.

3      281.  Further, by failing to adequately update and amend the Information
4  Statement, Defendants violated Rule 13e-3 and, having chosen to speak in present
5  tense about "fairness" and "best interests" at dissemination, also violated Section
6  10(b) and Rule 10b-5 by making half-truths that omitted material contemporaneous
7  facts needed to render those statements not misleading at the time they were made.
8  These omissions and failures to update and amend render Defendants liable under
9  Section 13(e) and Rule 13e-3, and Section 10(b)/Rule 10b-5.

10      282.  Defendants' omissions and false and misleading statements issued
11  during the Class Period are material in that a reasonable Endeavor shareholder
12  would view a full and accurate disclosure as significantly altering the total mix of
13  information made available by Defendants and in other information reasonably
14  available to Endeavor shareholders.

15      283.  As a direct and proximate result of Defendants' wrongful conduct,
16  Plaintiff and the other members of the Class suffered damages in connection with
17  their respective sales of the Company's securities during the Class Period.

18      284.  By virtue of the foregoing, Defendants violated Section 10(b) of the
19  Exchange Act and Rule 10b-5 promulgated thereunder.

20  <u>**COUNT II**</u>

21  **For Violation of §13(e) of the Exchange Act and SEC Rule 13e-3**

22  **Against Endeavor, Silver Lake, Emanuel, and Whitesell**

23      285.  Plaintiff repeats and re-alleges each and every allegation contained
24  above as if fully set forth herein.

25      286.  This Count is asserted on behalf of all members of the Class against
26  Endeavor, Silver Lake, Emanuel, and Whitesell for violations of Section 13(e) of
27  the Exchange Act, 15 U.S.C. §78m(e).

28

CLASS ACTION COMPLAINT
83

287.   Defendants were required to file a Schedule 13E-3 transaction statement and disseminate materials that contained full, fair and non-misleading disclosure of all material facts regarding the fairness of the Merger to unaffiliated shareholders and to promptly amend their Schedule 13E-3 transaction statement for any material changes.

288.   Defendants violated Section 13(e) and Rule 13e-3 by disseminating a present-tense fairness narrative at the dissemination date of the Information Statement and transaction statement that omitted material contemporaneous facts necessary to make those statements not misleading in light of the circumstances, and by failing to promptly update and amend their Schedule 13E-3 transaction statement to reflect material changes bearing on fairness, valuation context, alternatives, and insider interests.

289.   Plaintiff and the Class were injured by these violations and are entitled to rescissory-like relief and damages.

## COUNT III

### For Violation of §20(a) of the Exchange Act

### Against Silver Lake and the Individual Defendants

290.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

291.   This Count is asserted on behalf of all members of the Class against Silver Lake and the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

292.   By reason of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of, direct control of, and/or supervisory involvement in Endeavor's day-to-day operations during the Class Period, the Officer Defendants had the power to, and did, control and influence the decision-making of the Company and the conduct of Endeavor's

business, including the wrongful conduct complained of herein. The Officer Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Plaintiff alleges to be materially false and misleading. Moreover, the Individual Defendants had a duty to disseminate accurate and truthful information regarding the Merger and Endeavor's valuation, and to correct any previously issued statements that had become untrue so that the market price of Endeavor securities would be based upon truthful and accurate information.

293. As a direct and proximate cause of the Individual Defendants' wrongful conduct as set forth herein, Plaintiff and other members of the Class suffered compensatory damages during the Class Period.

294. By virtue of their positions as controlling persons of Endeavor and as a result of their own aforementioned conduct, the Silver Lake and the Individual Defendants, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

## XII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a) Declaring this Action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and expert witness fees and other costs; and

d) Awarding such other relief as deemed appropriate by the Court.

DATED: January 16, 2026

By: /s/ *Marc M. Seltzer*

Marc M. Seltzer
Krysta Kauble Pachman
Jordan Rux
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067-6029
Tel: (310) 789-3100
Fax:  (310) 789-3150
mseltzer@susmangodfrey.com
kpachman@susmangodfrey.com
jrux@susmangodfrey.com

*Counsel for Plaintiff*

ENTWISTLE & CAPPUCCI LLP
Vincent R. Cappucci (*pro hac vice forthcoming*)
Robert N. Cappucci (*pro hac vice forthcoming*)
Jonathan H. Beemer (*pro hac vice forthcoming*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com

-and-

Andrew J. Entwistle (*pro hac vice forthcoming*)
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel.: (512) 710-5960
aentwistle@entwistle-law.com

*Counsel for Plaintiff*

1

**JURY DEMAND**

2          Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands trial by jury of all of the

3    claims asserted in this complaint so triable.

4     Dated: January 16, 2026                    Marc M. Seltzer

5                                                Krysta Kauble Pachman
                                                 Jordan Rux
6                                                SUSMAN GODFREY L.L.P.

7
                                                 Vincent R. Cappucci
8                                                ENTWISTLE & CAPPUCCI LLP

9
                                                 By:   /s/ *Marc M. Seltzer*
10                                                       Marc M. Seltzer

11                                               Counsel for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATION</u>

I, Jonathon Hickey, on behalf of Altshares Event-Driven ETF, ("Altshares"), hereby certify, as to the claims asserted under the federal securities laws in the Class Action Complaint (the "Complaint"), that:

1.      I am the Senior Managing Partner of Water Island Capital, LLC, the investment advisor to Altshares.  I have reviewed the Complaint in this action and have authorized its filing by our chosen counsel.

2.      Altshares did not purchase, hold, or sell the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.      Altshares is willing to serve as a Lead Plaintiff in this action and recognizes its duty as such to act on behalf of class members in monitoring and directing the action, and, if necessary, testifying at deposition and trial.

4.      Altshares will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

5.      Altshares has not served or sought to serve as a representative party for a class in any action filed under the federal securities laws within the three-year period prior to the date of this Certification except in: *In re Revance Therapeutics, Inc. Sec. Litig.*, No. 25-cv-00018-EJR (M.D. Tenn. Mar. 4, 2025); *In re EngageSmart, Inc. Sec. Litig.*, No. 24-cv-1083-SB (D. Del. Dec. 9, 2024); *In re Focus Financial Partners Inc. Sec. Litig.*, No. 23-cv-1466-MN (D. Del. Mar. 4, 2024); and *In re The Toronto-Dominion Bank/First Horizon Corp. Sec. Litig.*, No. 1:23-cv-02763-RMB/AMD (D.N.J. July 31, 2023).

6.      Altshares' transactions during the relevant period in Endeavor Group Holdings, Inc. securities that are the subject of this action are reflected in Schedule A hereto.

I declare under penalty of perjury that the foregoing is true and

correct. Executed this 29th day of December 2025.

_____
Altshares Event Driven-ETF
By:  Jonathon Hickey
Senior Managing Partner of Water Island Capital, LLC, investment advisor to Altshares Event Driven-ETF

**Schedule A**
**Transactions April 2, 2024 through March 24, 2025 (Close of Merger)**
**Endeavor Group Holdings, Inc. Common Stock (Ticker: EDR)**

| Fund | Transaction | Trade Date | Shares | Price |
|---|---|---|---|---|
| AltShares Event-Driven ETF | Purchase | 8/2/2024 | 2,000 | $27.25 |
| AltShares Event-Driven ETF | Purchase | 8/5/2024 | 500 | $27.10 |
| AltShares Event-Driven ETF | Sell | 1/23/2025 | 1,250 | $30.91 |
| AltShares Event-Driven ETF | Sell | 1/24/2025 | 1,250 | $31.15 |