SUSMAN GODFREY L.L.P.
Marc M. Seltzer (54534)
Krysta Kauble Pachman (280951)
Jordan Rux (338984)
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
mseltzer@susmangodfrey.com
kpachman@susmangodfrey.com
jrux@susmangodfrey.com

ENTWISTLE & CAPPUCCI LLP
Vincent R. Cappucci (*pro hac vice*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com

*Counsel for Plaintiff and the Proposed Class*

*[Additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| ALTSHARES EVENT-DRIVEN ETF, on Behalf of Itself and All Others Similarly Situated,<br>Plaintiff,<br>vs.<br>ENDEAVOR GROUP HOLDINGS, INC., ARIEL EMANUEL, PATRICK WHITESELL, MARK SHAPIRO, EGON DURBAN, URSULA BURNS, FAWN WEAVER, STEPHEN EVANS, JACQUELINE RESES, and SILVER LAKE GROUP, L.L.C.,<br>Defendants. | Case No. 2:26-cv-00526-RGK-KS<br><br>Hon. R. Gary Klausner<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED MARCH 3, 2026<br><br>**DEMAND FOR JURY TRIAL** |

TABLE OF CONTENTS

I. NATURE OF THE ACTION ..... 2
II. JURISDICTION AND VENUE ..... 12
III. PARTIES ..... 13
A. Plaintiff ..... 13
B. Defendants ..... 13
C. Relevant Non-Parties ..... 19
IV. OVERVIEW OF THE FRAUD ..... 20
A. Endeavor is Formed and Controlled by Emanuel, Whitesell and Silver Lake ..... 20
B. The TRA Provides Significant Tax Benefits to the Officer Defendants ..... 22
C. Endeavor Acquires OpenBet and Forms TKO ..... 23
D. The Executive Committee Begins a Strategic Review With Silver Lake ..... 24
E. The Officer Defendants Negotiate Enormous Compensation Packages Before the Formation of a Special Committee ..... 26
F. Endeavor Belatedly Forms a Special Committee ..... 28
G. Emanuel, Durban and Silver Lake Pressure the Special Committee to Approve the Merger on an Accelerated Timeline ..... 31
H. The Merger Agreement Expressly Provided for the Post-Signing Sale of Endeavor Assets ..... 39
I. Endeavor Files An Information Statement That Fails to Account for the OpenBet and Sports Assets Sales and A Massive Increase in TKO's Stock Price ..... 41
J. Defendants' Omissions Caused a Measurable Deflation in Endeavor's Stock Price ..... 45
K. The Rollover Agreements and TRA are Amended and Substantial Tax Savings are Diverted Away from Unaffiliated Shareholders ..... 48
L. The Merger Closes ..... 53
V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ..... 53

A. Defendants Falsely Asserted the Fairness and Value of the Merger ... 53

B. Defendants Concealed the Value of the Officer Defendants' Equity Rollovers ... 65

C. Defendants Failed to Disclose That OpenBet Was Undervalued ... 67

D. Defendants Failed to Disclose That the TRA Amendment Diverted Significant Value From Unaffiliated Shareholders ... 69

E. Defendants Failed to Disclose the Pressure Campaign By Emanuel and Silver Lake to Force a Merger Recommendation By the Special Committee ... 71

VI. ALLEGATIONS OF SCIENTER ... 77

VII. APPLICATION OF PRESUMPTION OF RELIANCE ... 79

VIII. LOSS CAUSATION ... 80

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ... 86

X. CLASS ACTION ALLEGATIONS ... 87

XI. CLAIMS FOR RELIEF ... 89

COUNT I For Violation of § 10(b) of the Exchange Act and SEC Rule 10b-5(a)-(c) Against All Defendants ... 89

COUNT II For Violation of § 20(a) of the Exchange Act Against Silver Lake and the Individual Defendants ... 91

XII. PRAYER FOR RELIEF ... 92

Plaintiff AltShares Event-Driven ETF ("Plaintiff"), by and through its undersigned counsel, brings this action ("Action") on behalf of itself and a class of investors (the "Class") who sold shares of Class A common stock of Endeavor Group Holdings, Inc. ("Endeavor" or the "Company") from January 15, 2025, through March 24, 2025 (excluding those who exchanged their Endeavor Class A common stock for Merger Consideration (defined below)), and were damaged as a result of Defendants' wrongdoing alleged herein (the "Class Period"). This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

The subject claims are brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Securities and Exchange Commission ("SEC") Rule 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c) against (i) Endeavor, (ii) Endeavor's Chief Executive Officer ("CEO") and member of the Endeavor board of directors (the "Board"), Ariel Emanuel, (iii) Executive Chairman Patrick Whitesell, (iv) President and Chief Operating Officer Mark Shapiro, (v) Board members Egon Durban, Fawn Weaver, and Stephen Evans, (vi) Board and special committee members Ursula Burns and Jacqueline Reses (the "Special Committee"), and (vii) Silver Lake Group, L.L.C., together with its affiliates ("Silver Lake") (collectively, "Defendants").

Plaintiff's claims are based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of its undersigned counsel. This investigation included, but was not limited to, a review and analysis of:

(i) Endeavor's public filings with the SEC;

(ii) Defendants' public statements concerning the Merger made during the Class Period, including the Company's information statement on the Merger filed

with the SEC pursuant to Section 14(c) of the Exchange Act and distributed to Endeavor shareholders on January 15, 2025 (the "Information Statement");

(iii) Company press releases, reports and postings concerning the Merger on the websites for Endeavor and Silver Lake;

(iv) Media reports concerning Endeavor, Silver Lake and the Merger;

(v) Data reflecting the price of Endeavor's Class A common stock;

(vi) The filings in the case captioned *In re Endeavor Group Holdings, Inc. Stockholders' Litigation*, C.A. No. 2025-0663-LWW (Del. Ch.), including the unredacted complaints filed in the case that were obtained pursuant to Delaware Chancery Court Rule 5.1; and

(vii) Additional material and data concerning Endeavor and the other Defendants.

Plaintiff's investigation is ongoing, and many of the relevant facts are known only by Defendants or are based on information exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support exists for the allegations in this amended complaint (the "First Amended Complaint") after a reasonable opportunity for discovery is permitted.

## I. NATURE OF THE ACTION

1. This securities class action involves a take-private merger (the "Merger") in which the unaffiliated public shareholders of Endeavor Class A common stock were told by Defendants that the Merger and the $27.50 per share in merger consideration (the "Merger Consideration") were "***fair to and in the best interests***"[1] of public shareholders. Defendants knew or recklessly disregarded that this claim was false and misleading because they did not believe that the Merger and Merger Consideration were fair and in the best interests of the public shareholders and because they knew they had omitted specific information showing

[1] All emphasis herein is added unless otherwise noted.

that the Merger Consideration did not represent the true fair value of Endeavor's assets and equity interests. Plaintiff and other Class members were injured when they sold their shares at market prices below the prices that would have prevailed had the omitted valuation and process facts been disclosed, and when those sales foreclosed the opportunity to retain their shares and demand appraisal. Plaintiff's actual sales at $30.91 and $31.15 were themselves below the concrete fair-value floor alleged below.

2. The case concerns a unified scheme orchestrated by Silver Lake and Endeavor insiders to depress minority bargaining power and the value realizable by unaffiliated public shareholders, while insiders captured additional upside through equity rollovers, asset transactions, and a Tax Receivable Agreement ("TRA") that provided the Officer Defendants with substantial tax benefits to the detriment of unaffiliated Endeavor shareholders. Defendants presented the $27.50 cash-out as the product of an independent process and a complete allocation of Endeavor's value, but disclosed only partial information about the equity rollovers (the "Rollover Statements"), the TRA (the "TRA Statements"), and the Special Committee's process for approving the Merger. Those omissions caused the market and selling shareholders to treat $27.50 as a reliable indicator of fair value even though the same common share-equivalent value was being transferred to insiders at materially higher levels and the disclosed valuation inputs understated the value of Endeavor's assets.

3. Based on Centerview's blended analyses, it produced two per-share price values for Endeavor: (i) $22.44 - $30.89 (based on the comparables approach) and (ii) $27.58 - $36.23 (based on a discounted cash flow ("DCF") analysis). The $27.50 per share in Merger Consideration was below the low end of Centerview's DCF range and reflected the fact that the Merger was timed to take advantage of a temporary trough in the market price of Endeavor's stock that Silver Lake knew

about due to its insider directors at the Company. Nevertheless, both the Fairness Opinion and Defendants' own statements in the Information Statement touted the fairness of the Merger Consideration. Defendants' own fairness representations made in the Information Statement cited to Centerview's April 2, 2024 Fairness Opinion, which was based on March 28, 2024 financial data, but were made ***over nine months after*** and spoke as of the time the Information Statement was mailed to shareholders. Defendants did not claim that their fairness opinion was based exclusively on Centerview's Fairness Opinion and that they were merely repeating it, although doing so was itself misleading to the public shareholders.

4. Defendants did not, and could not, believe these fairness representations were true based on objective metrics and criteria for judging fair price. Regulation M-A (17 C.F.R. § 229.1014) lays out objective metrics for evaluating the fairness of a going-private transaction as does the applicable case law. Specifically, the factors that are important in determining the fairness of a transaction include whether the consideration offered to unaffiliated security holders constitutes fair value in relation to: (i) *Current market prices*; (ii) Historical market prices; (iii) Net book value; (iv) Going concern value; (v) Liquidation value; (vi) Purchase prices paid by the filing person in any subject securities during the past two years; (vii) Any report, opinion, or appraisal from an outside party that is materially related to the transaction, including, but not limited to: Any report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates; and (viii) Firm offers of which the subject company or affiliate is aware is made by any unaffiliated person, other than the filing persons, during the past two years for: (A) The merger or consolidation of the subject company with or into another company, or vice versa; (B) *The sale or other transfer of all or any substantial part of the assets of*

*the subject company*; or (C) A purchase of the subject company's securities that would enable the holder to exercise control of the subject company.

5. A fairness opinion, regardless of who is uttering it, is not a matter of pure subjective opinion. It must reflect the application of objective valuation metrics. And here the objective metrics demonstrate that the Merger Consideration was unfair. Defendants knew that their claims about the fairness of the transaction were untrue and that the Merger Consideration was, in fact, unfair, because they knew objective facts that demonstrated its unfairness and that those facts had not been disclosed. Defendants further knew that citing Centerview's Fairness Opinion, which they touted to investors, was a deceptive act when they used it to claim that the Merger Consideration was fair for the same reasons, including that the foundation of Centerview's Fairness Opinion had been undermined by subsequent undisclosed facts and facts known to Centerview and Defendants at the time of Centerview's analysis that contradicted Centerview's opinion were deliberately suppressed.

6. Plaintiff does not assert as a standalone theory that Centerview's Fairness Opinion became actionable merely because time passed or because Defendants failed to obtain a "bring-down" opinion. Plaintiff alleges that Defendants continued to use the April 2, 2024 Fairness Opinion and related fairness conclusions in a January 15, 2025 disclosure while selectively updating other transaction information that omitted known material changes bearing on Endeavor's value, the allocation of consideration, and the independence of the negotiation process. This omitted information contradicted the claim that the proposed $27.50 per-share cash value of the Merger Consideration was fair, as well as the independence of the process for determining that cash value. Rule 13e-3, Schedule 13E-3, and Item 1014 of Regulation M-A provide relevant disclosure context because they require material fairness factors and material changes to be

presented to unaffiliated security holders; the same omissions independently support the Section 10(b) claims described below.

7. Since the date of the Fairness Opinion, TKO had experienced a dramatic increase in its market price and Endeavor had therefore increased in value as well. Specifically, TKO's stock price increased 77% from where it was trading when the Fairness Opinion was issued to the Merger close on March 24, 2025. TKO's stock price also rose significantly between the date of the Fairness Opinion and the date of the Information Statement. As of the day prior to the April 2, 2024 Fairness Opinion, TKO's publicly traded stock price was $86.18 per share. By the time the Information Statement was filed on January 15, 2025, TKO's stock price had dramatically increased to $143.91. This stock price surge made Endeavor's majority holding in TKO worth approximately $9.5 billion at the time of the Information [redacted]

8. By the time the Merger closed on March 24, 2025, TKO's stock price rose to $152.91 per share and Endeavor's TKO stake[2] was worth approximately ***$13.3 billion***—[redacted] This information and how it affected the fairness of the Merger Consideration was not disclosed to shareholders in the Information Statement nor in Defendants' other Class Period statements. Nor did the Information Statement contain relevant context so that shareholders could accurately interpret Centerview's outdated financial analysis of TKO.

9. Defendants also failed to provide a refreshed sensitivity analysis to the value assumptions regarding TKO. The April 2024 Centerview fairness analysis set forth in the Information Statement shows the comparable companies used and

[2] As discussed below, Endeavor's majority stake in TKO further increased in the post-Merger signing, pre-closing period.

the DCF parameters. But the Information Statement failed to provide an updated sensitivity analysis showing how current-day TKO prices and multiples (and the October 2024 Sports Assets sale) would change Endeavor's "Owned TKO" value and the total implied value to unaffiliated shareholders.

10. Defendants should have, but failed to, disclose: (i) where TKO's stock and enterprise value stood on the mailing date of the January 2025 Information Statement versus the April 2, 2024 Fairness Opinion; and (ii) how these changes materially increased the implied value of Endeavor's "Owned TKO" assets and the implied per-share value range for Endeavor. Defendants also should have considered those factors while determining whether the Merger was fair to shareholders.

11. The fact that other assets of Endeavor were quickly sold at values far exceeding the values attributed to them in the original Fairness Opinion would have made it impossible to say the Merger Consideration was fair. In support of their valuation of the Company, Defendants deceptively used Centerview's ***$2.56 billion*** implied valuation of three Endeavor businesses (*i.e.*, Professional Bull Riders, On Location, and IMG Media) (the "Sports Assets"). Yet soon after the Endeavor-Silver Lake merger agreement (the "Merger Agreement" or "Agreement") was signed and pursuant to an express asset sale provision in the Agreement, Defendants negotiated and ultimately agreed on October 23, 2024 to sell the Sports Assets to TKO for ***$3.25 billion***. Endeavor shareholders were never informed that the Sports Assets were sold to TKO [redacted]

12. Defendants further omitted how the Sports Assets sale (i) changed TKO's earnings mix and value (and thus the "Owned TKO" component of Endeavor's value); (ii) changed Endeavor's "ex-TKO" cash flows and valuation;

and (iii) affected Endeavor's implied per-share value ranges relative to the $27.50 per share in Merger Consideration.

13. Additionally, none of Defendants' Class Period statements explained what the absence of a cost collar or true-up meant after TKO's post-Fairness Opinion stock price appreciation and the October 2024 Sports Assets sale to TKO. Nor does the Information Statement disclose a bridge from Endeavor's newly reported results to Company valuation. The Information Statement incorporates by reference certain of Endeavor's 2024 SEC filings but fails to provide any bridge that translates those later financial results into updated valuation inputs or per-share implications for Endeavor (especially in light of the two-part framework used by Centerview that valued both "Endeavor ex-TKO" and "Owned TKO").

14. The stated Merger "premium" measures were also never recalculated as of the Information Statement date. Defendants touted in the Information Statement that public shareholder Merger Consideration (*i.e.*, $27.50 per share plus $0.24 in dividends) was a "premium" compared to levels measured on or about March 28, 2024. Yet Defendants failed to disclose the same set of comparisons on January 15, 2025 when the Information Statement was mailed to shareholders, and when shareholders actually had to decide whether to sell their shares or seek appraisal of their Endeavor common stock.

15. Defendants selectively updated other financial and process information throughout late 2024 without ever providing contemporaneous and decision-useful information needed to make their assertions about the fairness of the Merger and Merger Consideration in the Information Statement not misleading as of January 15, 2025.

16. The omission of these highly material objective facts, which Defendants knew or recklessly disregarded, made their assertion that the Merger was "fair to" and "in the best interests of" unaffiliated shareholders both false and

misleading. Furthermore, Defendants did not believe the Merger Consideration was fair to the public shareholders of Endeavor's Class A stock.

17. Defendants' representations were misleading not merely because Centerview did not issue a supplemental opinion, but because Defendants chose to repeat the fairness and valuation conclusions in a current shareholder disclosure after material developments had occurred, while omitting these material developments and the information needed to understand their effect. By January 15, 2025, the disclosed valuation framework was contradicted by at least [redacted] of TKO appreciation, [redacted] of incremental Sports Assets value, [redacted]. On a conservative common-equivalent basis, those amounts materially exceeded the $27.50 cash price and the $30.91 and $31.15 prices at which Plaintiff sold its Class A common stock.

18. Defendants' use of the stale Fairness Opinion to support their statements more than nine months later about the Rollover Statements, TRA Statements, Special Committee process, and the value delivered to unaffiliated shareholders, all while withholding material facts, was misleading. Defendants failed to require any "bring-down" or supplemental fairness analysis of the Merger. Defendants also knew objective facts that they knew meant that the Merger and Merger Consideration were not "fair" or in the "best interest" of the Class A shareholders at the time the Fairness Opinion and Information Statement were issued and that subsequent developments only further demonstrated why the Merger Consideration was unfair.

19. Defendants also made misrepresentations concerning another asset sale in the post-Merger signing, pre-closing period involving Endeavor's sports gaming business, OpenBet. To expedite the sale of this business before the Merger

closed, Defendants agreed to a $450 million management buyout of OpenBet by Defendant Emanuel on November 11, 2024. Concealed from minority shareholders was the material fact that Centerview and the Company implicitly valued OpenBet at ***$306 million***—[redacted] These third-party bid amounts, [redacted], respectively, were never disclosed to unaffiliated shareholders. Additionally, Defendants failed to disclose that they internally valued OpenBet at approximately ***$150 million less*** than Emanuel's $450 million purchase price.[3]

20. Defendants further concealed the true value of the equity rollover interests held by Endeavor's CEO, Ariel Emanuel, its Executive Chairman, Patrick Whitesell, and its Chief Operating Officer, Mark Shapiro. Both Emanuel and Whitesell held substantial equity and voting interests in Endeavor through their significant ownership of Endeavor Class A, Class X and Class Y common stock, as well as common units in Endeavor Operating Company, LLC ("Endeavor OpCo"), the operating subsidiary of Endeavor. Defendant Shapiro also had significant holdings in Endeavor Class A common stock and Endeavor OpCo units.

21. Before the appointment of a special committee of the Endeavor Board to protect the interests of minority shareholders in connection with Silver Lake's acquisition, Defendants Emanuel, Whitesell and Shapiro negotiated enormously lucrative compensation and control packages with Silver Lake. This included agreements with Silver Lake that allowed Emanuel, Whitesell and Shapiro to roll over certain of their Endeavor OpCo units into the new Company ("New Endeavor"), and separate side letter agreements that provided them with substantial additional compensation and continued leadership of New Endeavor.

[3] Plaintiff retains the allegations concerning the Defendants' statements and facts concerning OpenBet out of an abundance of caution to preserve all of its rights, including its right to seek appellate review of the Court's rulings in this case. Plaintiff further retains the related factual allegations because they relate to and support all of Plaintiff's claims.

22. Days prior to Merger closing, Defendants Emanuel and Whitesell amended their respective rollover agreements to allow them to roll over additional Endeavor OpCo units in the Merger (which was not disclosed until the day the Merger closed). By the time Emanuel and Whitesell amended their rollover agreements, [redacted]

23. Additional facts were not disclosed that show the Special Committee lacked true independence. In describing the background of the Merger and the negotiations that led to the transaction, Defendants entirely omitted the material fact that [redacted]—***after only four days of negotiation over the course of Easter Weekend***. Unaffiliated shareholders were never informed about this coercion of the Special Committee to quickly agree on the most material component of the transaction to unaffiliated shareholders—the per share price for their Endeavor stock.

24. Defendants also failed to disclose that additional value was diverted from unaffiliated shareholders through an eleventh-hour amendment to the TRA that was in place prior to Endeavor's 2021 IPO. Certain pre-IPO investors, including Defendants Emanuel, Whitesell, Shapiro and Silver Lake, were parties to the TRA, which entitled them to 85% of any future tax savings realized by Endeavor in a given tax year.

25. In an effort to further enrich Defendants Emanuel, Whitesell and Shapiro, the TRA was amended the day before the March 24, 2025 Merger closing date to include all of their non-rolled-over units in Endeavor OpCo. Centerview valued the tax savings payable to Emanuel, Whitesell, Shapiro, Silver Lake and the other TRA parties to be approximately [redacted]. By amending the TRA to include non-rolled-over Endeavor OpCo units held by the

TRA parties, Defendants ensured all of this value would be received by the TRA parties and not unaffiliated shareholders. Defendants did not disclose the economic impact of that change for unaffiliated shareholders.

26. Plaintiff and the Class suffered compensatory damages. Additionally, had Plaintiff and the Class not been induced to sell at deflated prices, they could have secured the fair value of their shares through appraisal. Plaintiff purchased Endeavor Class A shares after the Merger was announced, reviewed the Information Statement and the market price, and sold shares on January 23 and 24, 2025 for \$30.91 and \$31.15 per share. Had Defendants disclosed the omitted common-equivalent valuation and process facts, Plaintiff would not have sold at those prices and would have retained the shares and demanded appraisal or otherwise sold only at a price reflecting the higher value. The injury alleged is therefore the difference between the undistorted value of the shares and the prices actually received, together with the value of the appraisal opportunity forfeited by the sales—not the difference between Plaintiff's purchase and sale prices.

## II. JURISDICTION AND VENUE

27. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

28. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). At all relevant times, Endeavor was headquartered in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements in and from this District during the Class Period.

29. In connection with the acts alleged in this First Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiff

30. Plaintiff AltShares Event-Driven ETF is an investment fund advised by its investment advisor Water Island Capital, LLC, a New York domiciled SEC registered entity.

31. As set forth in the attached certification, Plaintiff beneficially owned and sold Endeavor common stock during the Class Period and suffered damages as a result of the Defendants' violations of the federal securities laws alleged herein.

### B. Defendants

#### 1. Endeavor

32. Defendant Endeavor is a Delaware corporation with its principal executive offices located at 9601 Wilshire Boulevard, Beverly Hills, California. Endeavor is a global sports and entertainment conglomerate that includes sports properties such as the Ultimate Fighting Championship ("UFC") and World Wrestling Entertainment, LLC ("WWE"), live event properties, and agencies representing sports, entertainment and fashion talent.

33. At the time of the Merger, Endeavor was controlled by Silver Lake, and Defendants Emanuel and Whitesell, who collectively held a majority of the total voting power of the Company. During the Class Period, Endeavor's Class A common stock was listed and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "EDR." Endeavor continues to exist as a subsidiary of Silver Lake. By order of the Executive Committee, Endeavor issued the Information Statement during the Class Period that contained certain of the

materially false and misleading statements and omissions of material fact alleged herein. Endeavor also filed with the SEC the Forms 8-K and press releases containing the material misstatements and omissions alleged herein.

**2. Silver Lake**

34. **Silver Lake Group, L.L.C.** (previously defined as "Silver Lake") is a Delaware LLC headquartered in Menlo Park, California. Through its affiliated entities, Silver Lake owned over 74% of Endeavor's voting power as of September 2024 through its substantial ownership of Endeavor Class A, Class X and Class Y stock. Silver Lake appointed Defendants Durban and Evans to the Endeavor Board and Executive Committee. Silver Lake also signed and jointly filed the Schedule 13E-3 transaction statement on the Merger with Endeavor and Defendants Emanuel and Whitesell.

**3. The Officer Defendants**

**a. Ariel Emanuel**

35. Defendant Ariel Emanuel ("Emanuel") was the CEO of Endeavor since 2017. Emanuel also served as a director of the Company and a member of the Board's Executive Committee at the time of the Merger. He is currently a director of New Endeavor and the Executive Chairman of WME Group, a subsidiary of New Endeavor. Emanuel is also the CEO and Executive Chairman of TKO Group Holdings, Inc. (previously defined as "TKO"), a publicly traded sports and entertainment company that is majority owned and controlled by Endeavor.

36. Prior to the Merger closing, Defendant Emanuel and his affiliated trust beneficially owned (i) 39,531,090 shares of Endeavor Class A common stock, (ii) 37,699,843 shares of Endeavor Class X stock, and (iii) 37,699,843 shares of Endeavor Class Y stock. Through these significant holdings, Emanuel had 16.6% of the voting power in Endeavor at the time of the Merger. Emanuel also owned common units in Endeavor OpCo, the operating subsidiary of Endeavor (the "OpCo

Membership Interests"), and profits units in Endeavor OpCo (the "OpCo Profits Units") at the time of the Merger, which gave him significant additional equity ownership in Endeavor. Emanuel received approximately $173.8 million under the Merger through the exchange of his Endeavor Class A common stock for Merger Consideration.

37. Defendant Emanuel is also party to an agreement executed at the time of the Merger (the "Emanuel Rollover Agreement") that allowed him to roll over certain of his OpCo Membership Interests and OpCo Profits Units into New Endeavor. Under the Emanuel Rollover Agreement, and an amendment to that agreement executed two days before the Merger closed, Defendant Emanuel rolled over OpCo Membership Interests and OpCo Profits Units with a stated value of $290.27 million.

38. In addition, Emanuel is party to a letter agreement with Endeavor and Silver Lake that was executed on April 2, 2024, when the Merger Agreement was signed (the "Emanuel Letter Agreement"). The Emanuel Letter Agreement provided Defendant Emanuel with significant additional personal benefits and compensation under the Merger. Among other benefits, this included his appointment as CEO and board member of New Endeavor, new equity awards in the post-Merger Company or Endeavor OpCo, and a $25 million bonus in connection with the post-Merger sale or disposition of Endeavor's businesses (other than TKO and Endeavor affiliate, William Morris Endeavor Entertainment, LLC ("WME")).

39. In connection with the Merger, Defendant Emanuel also executed an agreement at Merger close that ensured he would receive significant additional tax savings payments under a Tax Receivable Agreement (previously defined as the "TRA") in place prior to Endeavor's 2021 IPO.

40. All told, Defendant Emanuel reaped enormous personal compensation under the Merger, including his lucrative side deals memorialized in the Emanuel Rollover Agreement, Emanuel Letter Agreement, and the TRA amendment that was not shared by unaffiliated Endeavor shareholders.

**b. Patrick Whitesell**

41. Defendant Patrick Whitesell ("Whitesell") was Executive Chairman of Endeavor from 2017 through the closing of the Merger and served as an Endeavor Board member since 2009. Whitesell and Emanuel were Co-CEOs of Endeavor from 2014 through Emanuel's appointment as Endeavor's CEO in 2017. Whitesell was also a member of the Endeavor Board and Executive Committee at the time of the Merger.

42. Prior to the Merger closing, Whitesell and his affiliated trust beneficially owned (i) 36,547,591 shares of Endeavor Class A common stock, (ii) 36,474,794 Endeavor Class X shares, and (iii) 36,474,794 Endeavor Class Y shares. These collective holdings gave Whitesell approximately 16% of the total Endeavor shareholder voting power at the time of the Merger. Defendant Whitesell also had substantial holdings of OpCo Membership Interests and OpCo Profits Units, which gave him additional equity ownership in Endeavor at the time of the Merger. Whitesell received approximately $100 million under the Merger through the exchange of his Endeavor Class A common stock for Merger Consideration.

43. Defendant Whitesell is also party to an agreement that allowed him to roll over a substantial portion of his equity holdings in Endeavor at the time of the Merger (the "Whitesell Rollover Agreement"). Under the Whitesell Rollover Agreement, and an amendment to that agreement executed just prior to the Merger closing, Defendant Whitesell rolled over OpCo Membership Interests and OpCo Profits Units with a stated value of $265.7 million.

44. Like Defendant Emanuel, Defendant Whitesell is party to a letter agreement with Endeavor and Silver Lake that was executed on April 2, 2024 (the "Whitesell Letter Agreement"). The Whitesell Letter Agreement gave Defendant Whitesell significant additional personal benefits and compensation under the Merger. Among other benefits, this included his appointment as a director of New Endeavor, receipt of lucrative royalty payments from the talent agency business of Endeavor affiliate, WME, and a significant equity investment from Silver Lake in a new media and entertainment business Whitesell planned to form.

45. Defendant Whitesell also benefited from the pre-closing amendment to the TRA that entitled him to additional payments for future tax savings realized by Endeavor.

**c. Mark Shapiro**

46. Defendant Mark Shapiro ("Shapiro") was Endeavor's President and Chief Operating Officer ("COO") from April 2023 through the Merger's closing. Shapiro is also President and COO of TKO and became a TKO director in September 2023.

47. Prior to the Merger closing, Shapiro beneficially owned (i) 1,548,258 shares of Endeavor Class A common stock, and (ii) 88,764 shares of Endeavor Class X stock. As part of the Merger, Shapiro rolled over Endeavor equity interests with a stated value of $37.1 million under a separate rollover agreement with Silver Lake (the "Shapiro Rollover Agreement").

48. Under the Merger, Endeavor, Endeavor OpCo and Silver Lake executed amendments to Defendant Shapiro's employment agreement that provided him with lucrative additional benefits. Among other benefits, this included his appointment as President of New Endeavor, an annual base salary of $7 million, and a $15 million bonus for each year that he works as New Endeavor's President. Shapiro was also entitled to receive up to $100 million in bonuses tied to the sale

or disposition of Endeavor's businesses (other than TKO and WME) executed after the Merger Agreement was signed.

49. Like Emanuel and Whitesell, Defendant Shapiro also benefited from the pre-closing amendment to the TRA that entitled him to additional payments for future tax savings realized by Endeavor.

50. Collectively, Defendants Emanuel, Whitesell and Shapiro are defined herein as the "Officer Defendants."

**4. The Board Defendants**

**a. Egon Durban**

51. Defendant Durban was Chairman of the Endeavor Board at the time of the Merger, a position he held since 2014. Durban was one of Silver Lake's designees to the Endeavor Board and also served on Endeavor's Executive Committee at the time of the Merger. Durban has been Co-CEO of Silver Lake since 2019 and is one of its founding principals.

**b. Stephen Evans**

52. Defendant Evans was a member of the Endeavor Board at the time of the Merger, a position he held since 2014. Evans also served on Endeavor's Executive Committee at the time of the Merger. Defendant Evans is a managing director of Silver Lake and was a Silver Lake designee to the Endeavor Board.

**c. Fawn Weaver**

53. Defendant Weaver was an Endeavor Board member from 2021 until the Merger closed and served as a member of the Board's Audit Committee. Weaver is also a client of WME in connection with her work as an author.

**5. The Special Committee Defendants**

**a. Ursula Burns**

54. Defendant Burns was an Endeavor Board member from 2021 until the Merger closed. Burns was appointed to the Endeavor Special Committee when it was formed in February 2024.

**b. Jacqueline Reses**

55. Defendant Reses was an Endeavor Board member from 2021 until the Merger closed and served as Chair of the Board's Audit Committee. Defendant Reses was appointed to the Endeavor Special Committee when it was formed in February 2024.

56. Defendants Burns and Reses are defined herein as the "Special Committee Defendants." Defendants Emanuel, Whitesell, Durban, Evans, Weaver, Reses and Burns are defined herein as the "Board Defendants." Collectively, the Officer Defendants, Board Defendants and Special Committee Defendants are defined herein as the "Individual Defendants."

**C. Relevant Non-Parties**

57. **Endeavor Operating Company, LLC** (previously defined as "Endeavor OpCo") is a Delaware LLC formed in 2013 and was a holding company for Endeavor's various operating subsidiaries at the time of the Merger, including the UFC. Endeavor OpCo is an indirect subsidiary of Endeavor and the Company's principal asset is its ownership interest in Endeavor OpCo. During the Class Period, Endeavor OpCo was controlled by Silver Lake and Defendants Emanuel and Whitesell.

58. **TKO Group Holdings, Inc.** (previously defined as "TKO") is a publicly traded Delaware corporation headquartered in New York City. Endeavor owned approximately 61% of TKO's common stock at the time of the Merger close, and the remaining 39% traded publicly on the NYSE under the ticker symbol

"TKO." TKO was formed through the September 2023 merger of WWE with Endeavor's UFC assets. In February 2025, Endeavor acquired substantial additional TKO equity through Endeavor's sale of the Sports Assets to TKO in exchange for 26.1 million common units of TKO Operating Company, LLC ("TKO OpCo"), valued at $3.25 billion.

59. **Centerview Partners LLC** (previously defined as "Centerview") is a Delaware Limited Liability Company headquartered in New York City with additional offices in San Francisco, California. Centerview served as the financial advisor to the Special Committee and issued the Fairness Opinion on the Merger.

## IV. OVERVIEW OF THE FRAUD

### A. Endeavor is Formed and Controlled by Emanuel, Whitesell and Silver Lake

60. Defendant Emanuel co-founded the Endeavor Talent Agency ("Endeavor Talent") in 1995, which represented a growing roster of clients in television. Defendant Whitesell joined Endeavor Talent in 2001 as the company grew to represent actors and directors in the feature film industry. Endeavor Talent and William Morris Agency, Inc. merged in 2009 to form William Morris Endeavor Entertainment, LLC (previously defined as "WME"). Defendants Emanuel and Whitesell became Co-CEOs of WME thereafter.

61. In 2012, Silver Lake made its first investment in what would become Endeavor by acquiring a 31.25% stake in WME for $250 million. Through this initial investment, Silver Lake was able to appoint Defendant Durban to WME's executive committee, together with Defendants Emanuel and Whitesell. Emanuel, Whitesell and Durban controlled WME through this executive committee.

62. Endeavor continued to expand its holdings in the media, sports, and fashion sectors. In 2014, WME and Silver Lake acquired IMG Worldwide Holdings, Inc. ("IMG"), a holding company with global assets in sports,

entertainment and fashion. Endeavor OpCo was formed in connection with the acquisition of IMG. Endeavor OpCo held the assets and business units of WME and IMG.

63. Endeavor conducted an IPO in 2021 and its Class A common stock began trading on the NYSE. Through the IPO, Endeavor issued 21.3 million shares of Class A common stock at $24 per share to raise $511.2 million for the Company. Endeavor also issued Class X and Class Y common stock in the IPO, neither of which is publicly traded. Endeavor's Class X and Y common stock have no economic rights but are entitled to 1 vote (Class X) and 20 votes (Class Y) per share on Company matters that require shareholder votes.

64. After the IPO closed, Silver Lake, Emanuel, and Whitesell controlled Endeavor through their combined ownership of approximately 89.5% of the voting power of Endeavor's Class A, Class X, and Class Y common stock.

65. Endeavor was organized in an "Up-C" corporate structure following the IPO, which combined the publicly traded Endeavor with Endeavor OpCo as its operating subsidiary. Endeavor OpCo was Endeavor's principal corporate asset and controlled the Company's numerous operating subsidiaries. The Up-C corporate structure resulted in a complex set of Endeavor entities that issued equity interests other than Endeavor common stock. These Endeavor equity interests included OpCo Membership Interests and OpCo Profits Units, a substantial portion of which were also held by Silver Lake, Emanuel, Whitesell, Shapiro and other Endeavor executives. Endeavor (and its public shareholders) owned 72% of Endeavor OpCo through the Company's various holdings.

66. Following Endeavor's IPO, Defendants Emanuel and Whitesell were entitled to nominate two directors to Endeavor's Board and they nominated themselves. Silver Lake was also given the right to nominate two directors and it nominated Defendants Durban and Evans to the Board. In addition, Silver Lake

was empowered to appoint Durban and Evans to the Executive Committee of Endeavor's Board. Defendants Emanuel and Whitesell appointed themselves as the other two members of the four-member Executive Committee.

67. Under the Endeavor Charter in place at the time of the Merger, major corporate transactions such as mergers and acquisitions of Company assets required approval of the full, four-member Executive Committee as the "Governing Body" of Endeavor. Through their substantial equity ownership and membership on the Board and Executive Committee, Defendants Emanuel, Whitesell, Durban and Evans controlled Endeavor at the time of the Merger.

**B. The TRA Provides Significant Tax Benefits to the Officer Defendants**

68. As part of Endeavor's IPO, a Tax Receivable Agreement (previously defined as the "TRA") was executed on April 28, 2021 with certain individuals and entities that held equity interests in Endeavor prior to the IPO. Numerous individuals and entities, including Silver Lake and Defendants Emanuel, Whitesell, and Shapiro were parties to the TRA.

69. The TRA entitled its beneficiaries to cash payments based on any federal, state or local tax savings realized by Endeavor in a given year. Endeavor's tax savings are based on increases, or step-ups, in the value assigned to the net assets of Endeavor OpCo. This step-up in tax basis allowed Endeavor to claim a lower tax rate for any value appreciation in Endeavor OpCo assets over time, or conversely, higher tax deductions for the depreciation of Endeavor OpCo assets over time. Such tax savings were then passed on to Endeavor (including Endeavor Class A shareholders by extension) and the TRA parties.

70. Under the TRA, Endeavor was required to pay the Officer Defendants, Silver Lake and the other parties to the TRA, 85% of the tax savings Endeavor

realized in a given taxable year. Endeavor and its shareholders retained the remaining 15% of those tax benefits.

71. The potential amounts payable to the TRA parties are significant. At the time of the IPO, Endeavor estimated that annual tax savings payments to the TRA parties would range between $104.3 million to $201.3 million per year through 2036. This would total $2.324 billion in tax savings payments to the TRA parties through 2036.

**C. Endeavor Acquires OpenBet and Forms TKO**

72. Endeavor continued its business expansion after the IPO. On September 30, 2022, Endeavor closed on its $800 million acquisition of OpenBet, a content, platform, and service provider to the lucrative sports betting industry. OpenBet's customer base includes DraftKings, FanDuel, SkyBet and others in the global online gaming market. Endeavor's OpenBet acquisition complemented its pre-existing ownership of IMG Arena, a company that delivers livestreaming video and data feeds of sporting events to global sportsbooks. Together, OpenBet and IMG Arena formed Endeavor's Sports Data & Technology ("SD&T") operating segment.

73. Endeavor's growth through acquisition continued in 2023. On April 3, 2023, Endeavor and WWE announced an agreement to form TKO, a new, publicly listed company consisting of the UFC and WWE enterprises. Upon the September 2023 closing of the transaction that created TKO, Endeavor held a 51% controlling interest in TKO, and the existing WWE shareholders, including WWE Executive Chairman, Vince McMahon, held a 49% interest in the new company.

74. Defendant Emanuel was named CEO of TKO, while he continued his role as CEO of Endeavor. Under the TKO transaction, Defendant Shapiro was also appointed as President and COO of TKO. Both Emanuel and Shapiro were also appointed to the TKO board of directors.

75. At the time the Endeavor-Silver Lake Merger Agreement was signed, Centerview valued Endeavor's majority stake in TKO at approximately $5.6 billion, and its TKO stake accounted for the majority of Endeavor's overall value. As detailed further below, TKO's stock price experienced a significant surge between the time the Merger was signed in April 2024 and the time it closed in March 2025, which substantially increased the value of Endeavor's TKO holding. This post-signing increase in Endeavor's most valuable asset was never reflected or accounted for in Centerview's Fairness Opinion or in Defendants' statements to public shareholders during the Class Period.

**D. The Executive Committee Begins a Strategic Review With Silver Lake**

76. Defendants timed the take-private acquisition to a temporary trough driven by transient factors—including industry strikes and market dislocations—and pegged purported premiums to an atypical five-day "unaffected" period capturing an all-time low.

77. On July 11, 2023, the Executive Committee called a meeting with Defendant Shapiro, other members of Company management, and attorneys at Latham & Watkins LLP, outside counsel to the Company, to discuss a strategic review of Endeavor's wide-ranging business assets. The strategic review was led and managed by the Executive Committee from the outset.

78. At this meeting, the Executive Committee directed Company management to prepare "Strategic Review Workstreams" that included an analysis of the growth potential for Endeavor's business units on a standalone basis, as well as potential alternatives to unlock stockholder value across each business unit (*i.e.*, separate asset sales or a merger transaction).

79. Endeavor later asked Silver Lake if it was willing to assign certain of its employees to assist with the work involved in developing the Strategic Review

Workstreams demanded by Defendants Emanuel, Whitesell, Durban, and Evans. Silver Lake provided three of its employees to assist with this process from July 2023 through October 2023, during which time they were privy to the intricate operational and financial details of Endeavor's sprawling business lines.

80. On October 23, 2023, the Executive Committee decided, without input from the full Board, to announce that Endeavor was evaluating strategic alternatives for the Company. On October 25, 2023, Endeavor filed an SEC Form 8-K and press release announcing the commencement of a "formal review to evaluate strategic alternatives for the Company." The press release made no mention of the fact that the Executive Committee and Silver Lake had already been conducting an exhaustive review of the current and projected financial performance of Endeavor's core business units for months.

81. Recognizing its overall significance to Endeavor's value and financial performance, the press release further noted that "the Company will not consider the sale or disposition of the Company's interest in TKO Group Holdings, Inc." as part of the strategic review.

82. Silver Lake announced on the same day that it was "currently working toward making a proposal to take Endeavor private." The press release did not disclose that Silver Lake had already effectively conducted extensive due diligence on Endeavor during the prior three months and was well-positioned to leverage this inside knowledge about the Company in the forthcoming merger negotiations. Silver Lake knew far more than the public markets about the Company in all respects, including the near- and long-term prospects of its most important asset: its controlling stake of TKO. In particular, Silver Lake and the Officer Defendants knew Endeavor was worth far more than the value implied by its share price, which was held down by a conglomerate discount (that could be eliminated through asset sales), a controlled company discount, and other temporary overhangs that would

soon dissipate. Thus, Silver Lake was able to exploit its informational advantage to time its acquisition at a trough in the Company's market valuation.

83. Silver Lake stated that it was not interested in selling its significant equity ownership in Endeavor to any third-party, or entertaining bids for Endeavor assets, thereby foreclosing a true strategic review of any alternative transaction other than a "take-private" of Endeavor by Silver Lake.

### E. The Officer Defendants Negotiate Enormous Compensation Packages Before the Formation of a Special Committee

84. Instead of first forming a special committee following the Endeavor and Silver Lake announcements, the parties prioritized the negotiation of employment agreements with New Endeavor for Defendants Emanuel, Whitesell and Shapiro, as well as the rollover of their Endeavor equity into the post-Merger company. Such discussions also occurred before any negotiation on price terms for the Merger.

85. Throughout November and December 2023, Silver Lake, Emanuel, Whitesell, Shapiro, and their respective outside legal counsel discussed and negotiated their post-transaction employment agreements and equity rollovers. These negotiations were conducted outside the presence of the full Board and without the existence of a special committee to protect the interests of unaffiliated Endeavor shareholders.

86. Although their employment and Rollover Agreements were not executed until the Merger was signed in April 2024, Silver Lake, Emanuel, Whitesell and Shapiro effectively agreed to all core terms by December 2023. These Officer Defendants and Silver Lake prepared term sheets reflecting their post-Merger employment and rollover arrangements. As detailed further below, Defendants Emanuel, Whitesell and Shapiro ultimately rolled over a substantial

portion of their Endeavor equity into New Endeavor. Unaffiliated shareholders were never given the opportunity to roll over their Class A shares.

87. The Officer Defendants also negotiated side letter agreements with Silver Lake, which further enriched them and ensured their ongoing leadership and control over New Endeavor. The Emanuel Letter Agreement provided for his appointment as CEO and Board member of New Endeavor, and his appointment as Executive Chairman of WME. Among other compensation, Emanuel also received lucrative equity awards in New Endeavor, as well as quarterly royalty payments from the net cash profits of WME's agency representation business.

88. The Whitesell Letter Agreement appointed him as a director of New Endeavor, and the opportunity to be appointed Chairman of WME's governing body at the request of Endeavor or Silver Lake. It further provided him with substantial personal compensation, including a prorated portion of his $5.7 million annual bonus for 2023, as well as the right to royalty and commission payments from certain of WME's net profits. Under the Whitesell Letter Agreement, he was also entitled to receive a $250 million equity investment from Silver Lake in a new media and entertainment business Whitesell was planning to found.

89. Defendant Shapiro's employment agreement was also amended under the Merger to appoint him as President of New Endeavor for four years (the "Amended Shapiro Employment Agreement"). Among other personal compensation, Shapiro received a base salary increase to $7 million, a guaranteed annual bonus of $15 million for each year he serves as President of New Endeavor, a $15 million transaction bonus in connection with consummation of the Merger, and receipt of 1% of the issued and outstanding equity interests in New Endeavor.

90. As detailed further below, the Officer Defendants also received significant additional compensation through an amendment to the TRA that was executed just prior to the Merger closing in March 2025. Defendants Emanuel and

Shapiro were also entitled to bonuses ranging from $25 to $100 million tied to the sale or disposition of Endeavor's businesses (other than TKO and WME) executed after the Merger Agreement was signed (the "Asset Sales Bonuses").

91. Collectively, these lucrative side deals further incentivized the Officer Defendants to push for a quick negotiation and agreement on Merger terms.

**F. Endeavor Belatedly Forms a Special Committee**

92. Despite Silver Lake's clearly stated intention in October 2023 to take Endeavor private, the Executive Committee delayed for months the formation of a special committee to evaluate and negotiate a transaction on behalf of unaffiliated Endeavor shareholders.

93. On February 23, 2024, the Executive Committee (*i.e.*, Defendants Emanuel, Whitesell, Durban, and Evans) finally adopted resolutions to form the Special Committee consisting of Defendants Reses and Burns. The formation of the Special Committee occurred almost four months ***after*** Endeavor announced a "formal review" of "strategic alternatives" for the Company and Silver Lake announced its clear intention to take Endeavor private.

94. The resolutions establishing the Special Committee restricted the Committee's ability even to communicate with third parties that expressed interest in the Company or alternative transactions, let alone solicit or entertain competing proposals for all or parts of the Company's assets. The authorizing resolutions stated, expressly, that:

[redacted]

[redacted]

95. These constraints were imposed while Silver Lake publicly signaled that it would not sell to a third party or entertain bids for Endeavor's assets, thereby foreclosing alternatives and reinforcing the futility of outreach. The effect was to preclude any go-shop, any market check, or even basic third-party engagement, while Defendants continued to describe the Committee as "independent" and to present its recommendation as the product of a robust process.

96. The Special Committee's authority itself was only negotiated up to a bare right to say "no," and even that limited right was secured at the insistence of the Special Committee's counsel (Cravath) against [redacted] The Committee was not authorized to run, and did not run, any process to identify, solicit, or evaluate alternative transactions; nor did it obtain or insist on any "majority-of-the-minority" vote, price collar, contingent value right, or other market-facing protections consistent with an arm's-length process. Instead, Defendants rushed the Committee through a four-day, holiday-compressed negotiation to agree to price by April 2, 2024, under repeated threats that delay would cause "significant disruption" and other purported risks, while refusing a majority-of-the-minority condition and declining basic price protection devices.

97. On February 26, 2024, the term sheets memorializing the material elements of the Officer Defendants' enormous Merger-related compensation packages were sent to the Special Committee's outside counsel at Cravath Swaine & Moore LLP. As noted above, those term sheets had been negotiated with Silver Lake over the course of the prior several months, and without input from the Special Committee or any accounting for the interests of minority shareholders.

Silver Lake and Endeavor management met on March 4, 2024, to discuss Endeavor's final financial projections (the "Final Projections") that were used to justify the ultimate Merger Consideration offered by Endeavor. A "Variance Analysis" reflecting the difference between the Final Projections and earlier original projections was also discussed at this meeting. The Final Projections were materially lower than the original projections, reflecting $1.2 billion less revenue from 2024 through 2028, and $498 million less in adjusted EBITDA for the same period. Following this meeting, the Executive Committee approved the Final Projections and they were provided, together with the Variance Analysis, to the Special Committee and Centerview. [redacted]

98. The Special Committee had its first meeting on March 8, 2024—over four months ***after*** Silver Lake announced its clear intention to acquire Endeavor. This first Special Committee meeting also occurred at least two months ***after*** the core terms of the Officer Defendants' lucrative compensation packages and employment agreements had been determined. Endeavor's lower Final Projections were also approved by the Executive Committee without any input from the Special Committee. Accordingly, all of the fundamental elements of the Merger had effectively been decided before the Special Committee ever even met.

### G. Emanuel, Durban and Silver Lake Pressure the Special Committee to Approve the Merger on an Accelerated Timeline

99. Silver Lake and insider directors orchestrated and executed an unrelenting pressure campaign during the Special Committee's deliberations, including repeated direct calls to Special Committee members and their banker during Special Committee meetings, coupled with artificial, expiring offers over Easter weekend. These tactics deprived the Special Committee of any meaningful opportunity to conduct diligence or engage alternatives and further underscore that the Special Committee's authority was illusory. Internally, the Special Committee recognized that [redacted]

100. During its first meeting on March 8, 2024, the Special Committee discussed [redacted] Silver Lake dictated an April 1 deadline (Easter Monday), which served to accelerate price negotiations to the benefit of Silver Lake and the Officer Defendants.

101. The March 8 Special Committee meeting minutes revealed that [redacted] The minutes further stated that [redacted]

102. This stated rationale was disingenuous given that Silver Lake had already publicly announced its clear intention to take Endeavor private months earlier on October 25, 2023. Moreover, a mere one week before the March 8 Special Committee meeting, Defendants Emanuel and Whitesell had already amended their respective SEC Schedule 13D filings to disclose that they were "engaging in, and intend to continue engaging in, communications, discussions and negotiations with the Silver Lake Entities regarding each of their potential support for a Take-private[.]"

103. After exchanging drafts of the Merger Agreement with Silver Lake, the Special Committee met on March 21 and 25, 2024. Following the March 25 meeting, Defendants Emanuel and Durban heightened their undisclosed pressure campaign to force the Special Committee to make a quick recommendation for a Silver Lake acquisition. Both did so despite the fact that Silver Lake had yet to make a per-share price proposal for Endeavor.

104. On March 12, 2024, the Special Committee retained Centerview as its financial advisor on the Merger. The Special Committee met with Centerview representatives on March 29, 2024 (Good Friday) at 5:00 p.m. At this meeting, the Special Committee discussed Silver Lake's proposal to address [redacted] The Special Committee noted that the closing of the Merger [redacted] In order to press for an expedited Merger approval, and as detailed further below, Emanuel and Endeavor ultimately agreed to a management buyout of OpenBet and IMG Arena by Emanuel, who already owned the gaming licenses.

105. To put further pressure on the Special Committee, Defendant Durban [redacted]

[redacted]

106. Reflecting the fact that Silver Lake was pressing an imminent price offer, the Special Committee met again on March 29 (Good Friday) at 10:00 p.m. During this meeting, Centerview presented its analysis of Endeavor's standalone value [redacted] Centerview's DCF analysis showed a standalone value range of $27.60 to $36.25 per Endeavor share—a range well above the final Merger Consideration of $27.50 per share.

107. Having already locked in the key components of the Officer Defendants' Merger-related compensation packages, Silver Lake made its first price offer on the evening of March 29. Just before midnight on March 29, Silver Lake offered $24.50 per share for Endeavor (the "March 29 Proposal"). Notably, and undisclosed in the Information Statement or Defendants' other Class Period statements, Silver Lake further pressured the Special Committee by telling them it wanted to [redacted] which was ***Easter Sunday***.

108. The Special Committee met the following morning on Saturday March 30, 2024, to discuss Silver Lake's March 29 Offer. Centerview representatives presented at this meeting and informed the Special Committee that [redacted]

109. The Special Committee instructed Centerview to reject the March 29 Proposal and counter with a proposal for $31.50 per share. In response, Silver Lake

sent a revised counterproposal of $25.75 per share, which it insisted was above Endeavor's purported fair value of [redacted] based on Silver Lake's separate DCF analysis (the "March 30 Proposal").

110. [redacted]

## Premia in Select Precedent Minority "Squeeze Out" Transactions

**Selected Precedent Minority "Squeeze Out" Transactions[1]**

| Date | Target | Acquiror | % of Equity Owned | Implied Enterprise Value | Initial Bid Premium to: Unaff. Price[2] | Initial Bid Premium to: 30-Day VWAP[3] | Initial to Final Bid % Increase | Final Bid Premium to: Unaff. Price[4] | Final Bid Premium to: 30-Day VWAP[3] |
|---|---|---|---|---|---|---|---|---|---|
| Feb-24 | Agiliti | THL Partners | 72% | $2.5 | 22%[5] | 19%[5] | 11%[5] | 30% | 37% |
| Feb-24 | HireRight | General Atlantic & Stone Point | 75% | 1.7 | 27% | 30% | 13% | 43% | 47% |
| Aug-23 | SciPlay | Light & Wonder | 83% | 2.5 | 29% | 17% | 15% | 47% | 34% |
| Dec-22 | Weber | BDT Capital | 72% | 3.7 | 24% | (4%) | 29% | 60% | 24% |
| Jun-22 | Convey Health | TPG Capital | 75% | 1.1 | 66% | 46% | 17% | 143% | 99% |
| Nov-20 | Urovant Sciences | Sumitovant Bio | 72% | 0.7 | 55% | 46% | 30% | 96% | 92% |
| Aug-20 | Akcea Thera. | Ionis Pharma | 76% | 1.5 | 42% | 33% | 13% | 59% | 56% |
| Aug-20 | Hudson | Dufry AG | 57% | 1.1 | 24% | 12% | 23% | 50% | 64% |
| Feb-20 | AVX | KYOCERA | 72% | 2.9 | 30% | 26% | 12% | 45% | 40% |
| Jun-18 | Foundation Medicine | Roche | 57% | 5.3 | 30% | 49% | 3% | 29% | 47% |
| Nov-16 | Synutra | Investor Group | 64% | 0.8 | 54% | 26% | 2% | 58% | 29% |
| Sep-16 | Federal-Mogul | Icahn | 82% | 2.1 | 41% | 61% | 43% | 101% | 130% |
| Mar-16 | Crown Media | Hallmark | 90% | 4.4 | 2% | 13% | 0% | 2%[6] | 13% |
| Sep-13 | Cornerstone Thera. | Chiesi Farmaceutici | 58% | 0.3 | 22% | 20% | 45% | 78% | 74% |
| Mar-13 | Sauer-Danfoss | Danfoss | 76% | 2.6 | 24% | 24% | 19% | 49% | 48% |
| **25th Percentile** | | | **68%** | | **24%** | **18%** | **11%** | **44%** | **36%** |
| **Median** | | | **72%** | | **29%** | **26%** | **15%** | **50%** | **47%** |
| **75th Percentile** | | | **76%** | | **41%** | **39%** | **26%** | **69%** | **69%** |

[redacted]

[redacted]

111. Consistent with its pressure campaign, Silver Lake also told the Special Committee on March 30 that it required an agreement on price [redacted] The Special Committee nonetheless decided at its March 30 meeting to reject Silver Lake's March 30 Proposal.

112. The Special Committee met again at 9:00 a.m. the following morning, Easter Sunday, once again reflecting the unreasonable time crunch imposed by Silver Lake. At the March 31 meeting, the Special Committee instructed Centerview to convey a counteroffer of $30.50 per share.

113. Blair Effron of Centerview communicated this counteroffer to Defendant Durban later on March 31. Continuing his pressure on the Special Committee, Durban told Effron [redacted] Durban's statement was communicated to the Special Committee later in the morning of March 31.

114. Durban's timing message was reiterated by Silver Lake's Chief Legal Officer, Karen King, in an email sent to the Special Committee members on the afternoon of March 31. King's email emphasized that [redacted]

115. In response to Silver Lake's pressure tactics, the Special Committee met again later that day. Both Reses and Burns recounted separate calls they each received from Defendants Emanuel and Shapiro [redacted]

[redacted] The Special Committee instructed Centerview to counter with a price of $29 to $29.50 per share.

116. The Special Committee picked up their discussion at 2:15 p.m. that same afternoon of March 31. [redacted] In an effort to double-team the Special Committee and its financial advisors, [redacted]

117. Defendant Reses [redacted] Defendant Emanuel [redacted] The Special Committee interpreted [redacted]

118. The Special Committee met again at 5:40 p.m. on March 31. At the meeting, Centerview's Effron informed the Special Committee about [redacted] Durban warned that Silver Lake supposedly did not have authority to go above a $27.50 per share purchase price [redacted]. To further turn the screws on the Special Committee, Durban once again warned that [redacted]

119. The Special Committee met in the morning on April 1, 2024. Further demonstrating Silver Lake's pressure campaign, Special Committee members [redacted]

120. In response, the Special Committee expressed [redacted] The minutes from this April 1 meeting reflect that [redacted]

121. Specifically, and as stated in their meeting minutes, the Special Committee was worried about the [redacted] The Special Committee was also concerned that if they did not agree on a Merger price under [redacted] As detailed below, these risks and their impact on the Special Committee's decision to approve the Merger on a compressed timeline were never disclosed to minority shareholders.

122. The Special Committee and Silver Lake continued to negotiate on a Merger price throughout the day on April 1, 2024. Later on April 1, Silver Lake submitted a supposedly "best and final" offer to acquire Endeavor for $27.50 per

share (the "April 1 Proposal"), plus a commitment by Endeavor to pay quarterly dividends between the signing of the Merger Agreement and closing in a per-share amount of $0.06. Silver Lake notably refused to condition the Merger on a vote by the "majority of the minority" shareholders—a stance the Special Committee ultimately agreed to. Nor did Defendants require any Merger price protections, such as a cost collar or a contingent value right.

123. The Special Committee reconvened at 6:10 p.m. to discuss Silver Lake's professed "best and final" April 1 Proposal. Finally bowing to the pressure, the Special Committee agreed on April 2 to accept Silver Lake's $27.50 per share Merger Consideration and to recommend the Merger to the Executive Committee. Defendants never disclosed the coercive tactics used by Silver Lake and Emanuel to force a Special Committee approval by April 2, 2024.

124. The Merger Agreement and related transaction documents were executed later on April 2, 2024. Silver Lake delivered a written consent approving the Merger Agreement and related transaction documents to Endeavor that same day.

125. Also on April 2, 2024, Centerview issued its Fairness Opinion on the Merger, which included "***the other transactions contemplated by the [Merger] Agreement***." The Fairness Opinion stated "that the [Merger] Consideration to be paid to the holders of Shares (other than Excluded Shares) pursuant to the [Merger] Agreement is ***fair, from a financial point of view***, to such holders." As detailed further below, Centerview's fairness analysis implicitly valued the Sports Assets at

***$2.56 billion***[4] and implicitly valued OpenBet at ***$306 million***.[5] At the time of signing, Centerview's DCF analysis valued Endeavor's majority stake in TKO (its largest asset) at a midpoint of ***$5.6 billion***.

126. Silver Lake and Defendant Durban also filed an amendment to their Schedule 13D on April 2, reflecting their acquisition of all remaining equity in Endeavor through the Merger.

127. The compressed timetable, refusal to condition the transaction on a "majority-of-the-minority" vote, and absence of any price-protection devices were accompanied by the Special Committee's agreement not to pursue or entertain competing proposals. Silver Lake had already declared it would not sell to a third party or entertain bids for Endeavor's assets, eliminating viable alternatives. Having disabled any potential market check or go-shop, Defendants nonetheless presented the Special Committee as "independent" and the process as fair, omitting that the Special Committee's mandate and conduct excluded even basic outreach to potential bidders for all or parts of the enterprise.

**H. The Merger Agreement Expressly Provided for the Post-Signing Sale of Endeavor Assets**

128. As a fundamental component of the Merger, Silver Lake negotiated for the ability to have Endeavor sell-off its business assets, except for TKO and WME's agency representation business, in the period after the Merger Agreement was

---

[4] Centerview's March 21, 2024 presentation to the Special Committee [redacted] h business's respective segment to that business's 2024 projected adjusted EBITDA yields a combined $2.56 billion implied value for the Sports Assets.

[5] According to the Final Projections, OpenBet would have [redacted] adjusted EBITDA. Applying the [redacted] midpoint of Centerview the applicable Sports Data & Tech[redacted]ogy sector implies that the Merger ascribed a $306 million value to OpenBet.

signed. Specifically, Section 7.16 of the Merger Agreement, titled "Asset Sales" (emphasis in original) provided that:

> At [Silver Lake's] request, [Endeavor] agree[s] to, and to cause the [Endeavor] Subsidiaries and their and the [Endeavor] Subsidiaries' respective Representatives to, ***use their reasonable best efforts to facilitate, negotiate and consummate the sale, transfer, divestiture or other disposition*** (each, a "Company Sale") of such [Endeavor] Subsidiaries, business organizations, divisions, business units or assets of [Endeavor] or the [Endeavor] Subsidiaries (whether by a sale of equity interests or assets, merger or otherwise), in each case as identified by [Silver Lake] from time to time (but excluding (i) TKO and any of its Subsidiaries and (ii) the agency representation business of [WME] and its Subsidiaries).

The provision further required that any such post-Merger Endeavor asset sale would be "conditioned upon consummation of the Merger[] . . ." The inclusion of these express terms in the Merger Agreement plainly demonstrated that Defendants planned to sell Endeavor businesses in the post-Merger signing period and considered such sales to be a key component of the Merger itself. Accordingly, such post-Merger signing asset sales necessarily should have been accounted for in any fairness evaluation of the Merger.

129. The Merger's supporting agreements further demonstrated that the post-signing sale of Endeavor business assets was expressly contemplated as part of the overall transaction negotiated between Defendants and Silver Lake. As noted above, Section 3 of the Emanuel Letter Agreement, titled "**Asset Sale Bonus**" (emphasis in original), provided that Defendant Emanuel would receive a ***$25 million*** bonus for "the sale or disposition (in one or a series of transactions) of all

of, or all except a de minimis portion of, [Endeavor's operating businesses]," other than TKO and WME, in the post-Merger signing period.

130. Similarly, Section 3.7 of the Amended Shapiro Employment Agreement provided Defendant Shapiro with escalating bonuses based on the consideration Endeavor received for post-Merger signing asset sales. All told, Shapiro was entitled to receive up to ***$100 million*** in bonuses for post-signing asset sales with a cumulative consideration amount equal to or exceeding $6.1 billion.

131. These enormous Asset Sales Bonuses tied to the sale of Endeavor businesses clearly incentivized Defendants Emanuel and Shapiro to execute as many asset sales as possible in the post-Merger signing period. While Emanuel and Shapiro ultimately waived these Asset Sales Bonuses at Merger closing, their inclusion in the core Merger documents reflects that such asset sales were expressly contemplated as part of the overall Merger and necessarily should have been incorporated into and accounted for in Defendants' fairness statements concerning the transaction. Defendants failed to do so in connection with the post-signing sale of the Sports Assets and OpenBet, as detailed further below.

### I. Endeavor Files An Information Statement That Fails to Account for the OpenBet and Sports Assets Sales and A Massive Increase in TKO's Stock Price

132. On January 15, 2025, Defendants filed the Information Statement and Schedule 13E-3 materials that repeated Merger fairness and best-interests conclusions tied to the April 2, 2024 Special Committee process, summarized Centerview's analysis using market data through March 28, 2024, and selectively incorporated later transaction and financial information. Plaintiff does not contend that the timing of the Fairness Opinion, standing alone, rendered it false. Rather, the Class Period disclosures were misleading because Defendants used outdated financial analyses as the basis for their current statements about the value delivered

to unaffiliated shareholders while omitting specific, known developments that materially changed the value allocation and the information available to investors deciding whether to sell or seek appraisal.

133. Having chosen to repeat the fairness conclusions and disclose selected post-signing events, Defendants had to avoid presenting a materially incomplete picture. The omitted information included: (a) a common-equivalent bridge translating the TKO value appreciation, the Sports Assets sale, OpenBet transaction evidence, and the TRA allocation into an Endeavor per-share value; (b) the effect of the absence of a collar or contingent value right on the allocation of TKO upside; (c) the fact that the Special Committee's compressed process and restrictions on alternatives bore directly on whether $27.50 was a negotiated value floor; and (d) the magnitude of the insider TRA benefit. Rule 13e-3 and Item 1014 provide context demonstrating the materiality of these factors.

134. As one example, Silver Lake requested that Endeavor sell its Sports Assets (*i.e.*, Professional Bull Riders, On Location, and IMG Media) to TKO pursuant to the "Asset Sales" provision of the Merger Agreement. On October 23, 2024, Endeavor sold the Sports Assets to TKO for $3.25 billion in TKO equity. Specifically, through the sale of the Sports Assets, Endeavor received 26,139,590 TKO common units (*i.e.*, units in the TKO subsidiary, TKO Operating Company, LLC) having an aggregate market value of $3.25 billion ($124.33 per unit) at the time. Under this transaction, Endeavor also subscribed to an equivalent number of shares of TKO Class B common stock, which had voting rights but no economic rights in TKO. The Sports Assets sale closed on February 28, 2025.

135. Defendants failed to inform shareholders in the Information Statement, or elsewhere, that the $3.25 billion acquisition price for Endeavor's Sports Assets was [redacted] higher than Centerview's $2.56 billion implied valuation of those assets. This material omission contradicted Defendants' Class Period Merger

fairness statements, which did not account for Endeavor's higher valuation as reflected in the Sports Assets sale.

136. In addition to failing to disclose the discrepancy between Centerview's valuation of those assets versus the acquisition price, Defendants failed to disclose how the transaction changed the valuation of Endeavor based on Endeavor's two-bucket structure. When the transaction was effectuated, these assets were removed from the ex-TKO bucket and moved into the TKO bucket. Defendants continued to use the Centerview Fairness Opinion to support their claims about the fairness of the transaction even though this transaction materially altered the stated basis of the Centerview opinion.

137. Endeavor's primary asset, its majority stake in TKO, also dramatically increased in value after Centerview issued its Fairness Opinion on April 2, 2024. As of the day prior to the Fairness Opinion, TKO's publicly traded stock price was $86.18 per share. By the time the Merger closed, TKO's share price had ballooned to $152.91 per share and Endeavor's TKO stake alone[6] was worth approximately $13.3 billion—[redacted]—even before accounting for a premium reflecting Endeavor's control of TKO. Defendants did not provide an updated valuation reflecting TKO's changed enterprise value, updated comparables, or a bridge to translate the earlier financial results to an updated valuation.

138. Consistent with the above Merger provisions and at Silver Lake's request, Endeavor began exploring the sale of OpenBet and IMG Arena as soon as the Merger Agreement was signed. Both companies comprised Endeavor's SD&T business segment and engaged in the online sports betting industry.

---

[6] Endeavor's majority ownership stake in TKO had increased since the signing of the Merger Agreement because of the Sports Assets transaction, the purchase of TKO interests from WWE founder Vince McMahon and open-market purchases by Endeavor.

139. In late April 2024, Silver Lake requested that Endeavor explore a sale of its OpenBet and IMG Arena businesses, pursuant to the "Asset Sales" provision of the Merger Agreement. In early May 2024, Endeavor engaged with 41 potential bidders for OpenBet and/or IMG Arena through the Company's financial advisors. Of the 41 potential bidders that were contacted, 19 executed confidentiality agreements with Endeavor to allow for transaction discussions. In June 2024, Endeavor received OpenBet acquisition offers from two of these bidders. Endeavor management held discussions with these bidders from June to October 2024.

140. Unbeknownst to Endeavor's unaffiliated shareholders, the two unidentified OpenBet bidders offered [redacted] Their respective bid amounts were not disclosed in the Information Statement or in other public statements by Defendants.

141. Silver Lake, Emanuel, and Whitesell wanted Endeavor to complete its sale of OpenBet and IMG Arena prior to the expected close of the Merger in March 2025. To expedite the sale, Endeavor management decided that "the only path to potentially closing a sale of the [SD&T] segment [*i.e.*, OpenBet and IMG Arena] by March 2025 is a sale to [Emanuel]."

142. On November 11, 2024, Endeavor and Emanuel executed a transaction agreement for Emanuel to acquire OpenBet and IMG Arena (the "OB/Arena Transaction Agreement"). As consideration, the agreement provided that Emanuel would (i) pay $100 million in cash, and (ii) would execute an unsecured promissory note with a make-whole value of $350 million, equating to a total purchase price of $450 million. This was done at Silver Lake's request and pursuant to Section 7.16 of the Merger Agreement.

143. Under the OB/Arena Transaction Agreement, Emanuel and IMG Arena were expected to consummate a secondary sale of IMG to a third-party in a separate transaction. This in fact occurred when IMG Arena was sold to Sportradar

Group AG in March 2025. ***As a result, the stated $450 million purchase price was, in reality, for Emanuel's acquisition of OpenBet only***.

144. As Silver Lake demanded, the OpenBet transaction closed on March 24, 2025—the same day the Endeavor-Silver Lake Merger closed. Defendants did not disclose in the Information Statement, or elsewhere, that Silver Lake's rush to sell Endeavor's gaming assets before the Merger closed, resulted in Emanuel's buyout of OpenBet for approximately [redacted] than Defendants' $306 million internal valuation of that same business.

145. Nor did Defendants disclose that Emanuel's buyout was approximately [redacted] (*i.e.*, $450 million paid by Emanuel [redacted].

146. This discrepancy was not disclosed in the Information Statement. Nor did Defendants describe in the Information Statement how the removal of this business from the ex-TKO bucket changed the basis of Centerview's valuation.

**J. Defendants' Omissions Caused a Measurable Deflation in Endeavor's Stock Price**

147. Plaintiff can quantify the Endeavor value concealed from the market and unaffiliated Class A shareholders using approximately 472.7 million shares as the denominator, which is larger than the 307,864,479 Class A shares outstanding as of September 30, 2024 and understates each per-share adjustment.

148. ***First***, TKO appreciation, had it not been omitted, would have supplied at least [redacted] of additional parent-level value by January 15, 2025. Centerview's analysis valued Endeavor's "Owned TKO" stake at approximately $5.6 billion, while TKO's public market price implied a value of approximately $9.5 billion. Dividing the [redacted] by 472.7 million common-

equivalent shares yields approximately [redacted] per Endeavor share. Affidavit of Michael L. Hartzmark, Ph.D. ("Hartzmark Aff.") ¶ 30. This calculation uses the January 15 value of Endeavor's TKO stake, when Plaintiff's decision to sell was pending. The more than [redacted] by the time the Merger closed provides additional corroboration that Defendants understated Endeavor's value.

149. ***Second***, the Sports Assets transaction supplied at least [redacted] above the $2.56 billion implied value used in Centerview's analysis, because Endeavor agreed to sell those assets to TKO for $3.25 billion. On the same denominator, that difference equals approximately [redacted] per Endeavor share. *Id.* This calculation counts only the [redacted] excess and therefore avoids double counting the value transferred to TKO.

150. ***Third***, the OpenBet transaction, had it not been omitted, would have supplied additional value. Centerview's implied value was approximately $306 million; two third-party bids were [redacted], implying an incremental [redacted]. Emanuel's $450 million purchase price supplied a separate [redacted] *Id.* Plaintiff uses the lower third-party spread for the conservative appraisal floor and the [redacted] benchmark for the full transaction calculation.

151. ***Fourth***, the TRA amendment preserved for insiders an estimated 85% share of tax benefits worth [redacted] in present value, while the public-company portion was valued at only $104 million to $110 million. The insider portion equals approximately [redacted] per Endeavor share on the same denominator. *Id.* Plaintiff counts only the insider portion as value diverted from unaffiliated holders and does not add the 15% value already reflected as retained by the public-company equity.

152. The full conservative calculation therefore adds approximately [redacted] per Endeavor share to the $27.50 cash price: [redacted] from the TKO appreciation, [redacted] from the Sports Assets sale, [redacted] from OpenBet evidence, and [redacted] from the insider TRA benefit. Including the $0.24 of transaction dividends, the resulting adjusted value is approximately [redacted] per share—well above both Plaintiff's $30.91 sale price and its $31.15 sale price. These deflationary damages are bolstered by the omission of the pressure campaign on the Special Committee. The calculation does not apply a control premium or assign value to any additional business upside, and treats the transaction evidence as incremental only to the extent it exceeded the values embedded in Centerview's analysis.

153. The appraisal theory is independently concrete and conservative. Starting with Centerview's disclosed DCF low end of $27.58, recognizing only 25% of the TKO appreciation [redacted] per share), using only the lower third-party OpenBet spread ([redacted]), adding the Sports Assets excess value ([redacted]), and adding the low end of the insider TRA value ([redacted]), produces a low-end value of at least [redacted] per share before any dividend. This floor excludes any control premium, any value from the higher OpenBet purchase price, any additional TKO stake acquired before closing, and any value from other Endeavor businesses. It therefore exceeds $27.50, $30.91, and $31.15 without requiring any prediction as to a particular appraisal award.

154. These calculations are pleaded as valuation evidence and a measure of the loss caused by the omitted information. They solely reflect the public information known to shareholders at this time and will likely be adjusted based upon discovery in the case and additional expert opinions. They show that the Class's injury is not the speculative difference between an unknown "true value" and the Merger Consideration. The injury is the documented gap between the price

falsely represented as the complete available value for unaffiliated holders and the true value supported by the Company's own DCF, public-market TKO data, completed asset transactions, third-party bids, and the quantified insider TRA allocation.

### K. The Rollover Agreements and TRA are Amended and Substantial Tax Savings are Diverted Away from Unaffiliated Shareholders

155. On March 18 and March 22, 2025, respectively, Defendants Whitesell and Emanuel executed amendments to their Rollover Agreements allowing them to roll over additional Endeavor equity into the new venture. Defendants Emanuel, Whitesell and Shapiro ultimately rolled over a substantial portion of their Endeavor equity into New Endeavor. As set forth below, the massive rollover of their respective Endeavor OpCo Membership Interests and OpCo Profits Units was valued at hundreds of millions of dollars even when pegged to Merger Consideration:

| **Shareholder** | **Stated Value[7] of Rolled Over Equity** |
|---|---|
| Ariel Emanuel (Endeavor CEO) | Rolled Over OpCo Membership Interests: 9,106,781<br>Rolled Over OpCo Profits Units: 7,234,407<br>Total Stated Value of Rolled Over Equity:<br>**$290.27 million** |
| Patrick Whitesell (Endeavor Executive Chairman) | Rolled Over OpCo Membership Interests: 8,214,055<br>Rolled Over OpCo Profits Units: 7,234,407<br>Total Stated Value of Rolled Over Equity:<br>**$265.7 million** |

[7] All disclosed values equal the $27.50 per share Merger Consideration minus the per share hurdle price of each share times the number of shares. The actual value of the rolled over Endeavor equity was significantly higher as discussed in Sections V.B. and VIII.

| Shareholder | Stated Value[7] of Rolled Over Equity |
|---|---|
| Mark Shapiro (President & COO) | Rolled Over OpCo Membership Interests: 1,352,290<br>Rolled Over OpCo Profits Units: 0<br>Total Stated Value of Rolled Over Equity:<br>**$37.1 million** |
| **TOTAL STATED VALUE** | **$593.07 million** |

156. Due to the dramatic increase in the value of Endeavor's TKO stock and the post-Merger signing asset sales, the true value of these rollovers was significantly higher than the Merger Consideration they were valued at in the Information Statement and Schedule 13E-3 transaction statement. The Officer Defendants' decision to roll over more of their Endeavor equity reflected an acknowledgment that the Merger Consideration was inadequate. Indeed, Defendants Emanuel and Whitesell only cashed out $173.8 million and $100 million in Endeavor stock, respectively, under the Merger and rolled over the balance of their equity interests into New Endeavor.

157. In addition, on March 23, 2025, Endeavor, Silver Lake, and the Officer Defendants executed an amendment to the TRA to ensure that their transfer or sale of Endeavor OpCo equity for cash, *i.e.*, Merger Consideration, or transfers of their rollover units after Merger closing would be treated as covered exchanges under the TRA. This change qualified these and other TRA parties to an 85% share of tax benefits realized by Endeavor in a given tax year for the newly covered Endeavor OpCo equity exchanges.

158. As noted above, the TRA executed in 2021 entitled its beneficiaries (including the Officer Defendants and Silver Lake) to cash payments based on any federal, state or local tax savings realized by Endeavor in a given year. The TRA

required Endeavor to pay the TRA parties, including Emanuel, Whitesell, Shapiro and Silver Lake, 85% of the tax savings Endeavor realized each year. Endeavor and its shareholders retained the remaining 15% of those tax benefits.

159. At the time of the IPO, Endeavor acknowledged that future TRA payments owed to the TRA parties would be significant. In its IPO prospectus, Endeavor "estimate[d] that payments to [the TRA beneficiaries] under the [TRA] would aggregate to approximately ***$2,324.2 million*** over the next 15 years, and for yearly payments over that time to range between approximately $104.3 million to $201.3 million per year, based on the [IPO] price of $24.00."[8]

160. The Merger Agreement contained a provision concerning the redemption and exchange of Endeavor OpCo equity for Merger Consideration. Section 3.03(a), titled "Conversion of OpCo Membership Interest," provided that:

> Each common unit of OpCo issued and outstanding immediately prior to the [Merger] (each an "OpCo Membership Interest" . . .), other than any . . . Rollover [OpCo] Units, shall be cancelled and shall cease to exist and shall be converted automatically into the right to receive $27.50 in cash per [OpCo Unit] . . .

Section 3.03(b) of the Merger Agreement contained a similar provision for the conversion of OpCo Profits Units for cash under the Merger.

161. Endeavor OpCo units that were not rolled over and instead received Merger Consideration carried no entitlement to future tax-savings payments under the TRA. Defendants Emanuel and Whitesell did not roll over all of their Endeavor OpCo units in the Merger, which put their receipt of future TRA payments for this non-rolled-over Endeavor equity at risk. Accordingly, the Letter Agreements for Defendants Emanuel and Whitesell were amended to ensure they retained future

[8] Endeavor's 2024 10-K, dated February 27, 2025 (one month before the Merger closed), further stated that "[a]s of December 31, 2024, we had a TRA liability of ***$881.5 million*** recorded for all exchanges that have occurred as of this date."

payments under the TRA for all of their Endeavor OpCo units that were not rolled over.

162. Specifically, the Emanuel and Whitesell Letter Agreements contained provisions stating that:

> With respect to your Equity Interests in [Endeavor OpCo] that are not designated as Rollover Interests pursuant to the terms of the Rollover Agreement, the parties hereto agree that your disposition of such Equity Interests in Endeavor OpCo pursuant to the Merger Agreement shall be treated as a sale by you to [Endeavor] for cash. The transaction described in the immediately preceding sentence ***shall be treated as triggering economic entitlements for tax benefits in accordance with Section 7.17 of the Company Disclosure Letter***.

163. The referenced Company Disclosure Letter was not disclosed to unaffiliated Endeavor shareholders. It contained a provision that further committed the Merger parties to execute a TRA amendment to ensure TRA payments would continue for the non-rolled-over Endeavor OpCo units held by Emanuel, Whitesell and the other parties to the TRA, as follows:

> Promptly after the date hereof, ***the parties will cooperate and use reasonable best efforts to amend the Tax Receivable Agreement*** . . . to provide that transfers of equity interests in OpCo by the TRA Parties (as such term is used in the Tax Receivable Agreement) to the Company for cash undertaken in connection with the [Merger] Agreement or transfers of Rollover Units after the Closing ***will be treated as covered exchanges giving rise to entitlements under the Tax Receivable Agreement*** . . . .

The Information Statement included a similar representation.

164. On March 23, 2025, the day prior to the Merger closing, the TRA was amended to lock in these TRA payments for the Officer Defendants and the other TRA parties. Specifically, the TRA amendment expanded the definition of Endeavor OpCo unit exchanges that are covered by the TRA to include: [redacted] The TRA amendment also included [redacted]

165. Undisclosed to Endeavor's minority shareholders was the fact that the TRA amendment diverted significant value away from them and into the hands of the Officer Defendants and other TRA parties.

166. Centerview's final DCF analysis concluded that the discounted present value of the future TRA payments owed to Endeavor (*i.e.*, 15%) was between $0.31 and $0.33 per share. This equated to an aggregate amount of $104 million to $110 million in discounted present value under Centerview's analysis.

167. Based on this Centerview DCF, the remaining 85% of the tax savings payable to the Officer Defendants, Silver Lake and the other TRA parties was worth [redacted]. By including [redacted], the TRA amendment ensured that all of these amounts would go to the Officer Defendants, Silver Lake and other TRA parties—not to unaffiliated Endeavor shareholders.

168. Endeavor shareholders were never informed that they were being deprived of this value, all of which was diverted to the Officer Defendants, Silver Lake and the other TRA parties under the 11th-hour TRA amendment.

### L. The Merger Closes

169. Following Endeavor's post-signing asset sales and last-minute amendment to the TRA and Rollover Agreements, the Merger closed on March 24, 2025. The Special Committee was disbanded at the close, and Defendants Burns and Reses resigned from the Endeavor Board together with Defendant Weaver. Defendants Emanuel, Durban and Evans remained on the board of New Endeavor, and Defendant Shapiro was also appointed to the new board. Under their respective Rollover Agreements, the Officer Defendants also exercised their enormous Endeavor equity rollovers into New Endeavor.

170. Each share of Endeavor Class A common stock was cancelled and converted into the right to receive $27.50 in Merger Consideration. Other than the OpCo Membership Interests and OpCo Profits Units that were rolled over, such unitholders were also given the right to receive Merger Consideration.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

171. Throughout the Class Period, Defendants issued or caused to be issued public statements that were materially false or misleading and omitted material facts as detailed below in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### A. Defendants Falsely Asserted the Fairness and Value of the Merger[9]

172. In a section titled "Recommendation of the Executive Committee; Reasons for the Mergers" the Information Statement represented to shareholders that:

[9] Plaintiff retains the allegations concerning the Defendants' statements and facts concerning the fairness of the Merger and Merger Consideration out of an abundance of caution to preserve all of its rights, including its right to seek appellate review of the Court's rulings in this case. Plaintiff further retains the related factual allegations because they relate to and support all of Plaintiff's claims.

> At a meeting of the Executive Committee held on April 2, 2024, the Executive Committee, acting upon the recommendation of the Special Committee, considered and evaluated the Merger Agreement and the Transactions contemplated thereby, including the Mergers, and unanimously:
>
> - determined that the Merger Agreement and the Transactions, including the Mergers, ***are fair and in the best interests of***, the Company, its stockholders, including the ***Unaffiliated Stockholders*** . . .;
> - approved and ***declared the Merger Agreement and the Transactions advisable*** . . .

Information Statement at 64.

173. The same section further advised shareholders that the Executive Committee's approval of the Merger was based in part on:

> the Executive Committee's view that the $27.50 per share of Class A Common Stock in cash payable in the Merger[] was ***more favorable to all of the Company's stockholders*** on a risk-adjusted basis ***than the potential value that might result from other alternatives reasonably available to the Company, based upon the extensive knowledge of the members of the Executive Committee of the Company's business, assets, financial condition and results of operations***, its competitive position and historical and projected financial performance, and the belief that the Transactions represented an attractive and comparatively certain value for all of the Company's stockholders relative to the risk-adjusted prospects for the Company on a standalone basis.

*Id.* at 65.

174. The Information Statement further asserted that Defendants Emanuel and Whitesell "***believe that the Mergers (which are the Rule 13e-3 transactions for which a Schedule 13E-3 Transaction Statement will be filed with the SEC) are fair to the Unaffiliated Stockholders***" (*id*. at 102).

175. The Information Statement advised shareholders that the impetus for the Merger timing was a "risk that additional negotiations could cause Silver Lake to abandon the negotiations and the Potential Transaction altogether" because "the Reporting Persons had stated that they would make public disclosures on Schedule 13D/A the following day," (*id.* at 60), and "the expected timeline for receipt of required regulatory and/or antitrust approvals" which meant that "none of the Potential Gaming Counterparties were likely to be able to complete a Gaming Contract Sale prior to the Outside Date (if at all)," (*id.* at 63). It further disclosed that the Special Committee had assessed "other potential disruptions to the Company's operations, employees, clients and other stakeholders and the potential impact of financial results and stock price that could result from a failure to announce the Transactions on a timely basis or at all," (*id.* at 69).

176. The Information Statement also advised shareholders that Centerview's Fairness Opinion found that the Merger Consideration was "fair, from a financial point of view" to shareholders (*id.* at C-4, p. 4).

177. These fairness and valuation statements were stated in present tense terms (*e.g.*, "are fair") and cited and misleadingly used a Special Committee process, which, as explained below, was not independent and involved significant tampering from the conflicted insider Defendants.

178. Defendants knew these statements were false and misleading, and Defendants knew the Fairness Opinion was false and misleading based on what they knew about the Company, including its assets and future prospects, both at the time the Fairness Opinion was issued and later based on subsequent events. Defendants

used the Fairness Opinion anyway months after it had been issued to support their claim that the Merger Consideration was fair.

179. These fairness and valuation statements, as well as others, show how Defendants framed the $27.50 price as fair and complete, and why the Rollover Statements, TRA Statements, and Special Committee Statements were material. The omitted information, including the TKO appreciation, the Sports Assets sale, OpenBet transaction, and the TRA allocation, contradicted the supposed fairness and valuation of the Merger, the allocation of transaction consideration, and the independence of the process. The same facts also support the inference that the speakers knew or recklessly disregarded that the Information Statement and their opinion statements were materially misleading.

180. Further, Silver Lake timed the Merger to exploit its informational advantage and a trough in the Company's market valuation. Silver Lake knew far more than the public markets about the Company in all respects, including the near- and long-term prospects of TKO. In particular, Silver Lake and the Officer Defendants knew the Company was worth far more than the value implied by its share price, which was held down by a conglomerate discount (that could be eliminated through asset sales), a controlled company discount, and other temporary overhangs that would soon dissipate.

181. Even before the January 15, 2025 Information Statement, Defendants claimed that the Merger and Merger Consideration were "fair to and in the best interests" of the unaffiliated shareholders. Indeed, in the Recitals of the April 2, 2024 Merger Agreement itself, Defendants, including the Special Committee, Executive Committee, and Endeavor, stated that the Merger "are fair to and in the best interests of the Company and its stockholders, including the Public Stockholders." But Defendants knew and deliberately suppressed facts that contradicted these earlier fairness statements. For example, Centerview's Fairness

Opinion also reflected the unfairness of the transaction as it relied on a DCF which supported valuations far higher than the Merger Consideration. The DCF valued Endeavor shares between $27.58 and $36.23, with a $31.91 midpoint (or 16% higher than the Merger Consideration public stockholders received). The $27.50 Merger Consideration was below even the low end of Centerview's range, even as of April 2, 2024.

182. The DCF used an elevated discount rate range that biased the equity value downward. Given the Company's materially improved prospects and in light of the post-Merger agreement developments—including the marked appreciation of TKO and the value-accretive sales of major assets—maintaining a stale, "as of" March 28, 2024 discount rate range as of January 15, 2025 overstated risk and depressed the stated value.

183. Additionally, while presenting the Fairness Opinion to the Special Committee, Centerview informed the Special Committee that the Merger Consideration was below every analyst price target, which ranged from $28.00 to $36.00.

184. These statements were further materially false and misleading because between the April 2, 2024 Executive Committee meeting approving the Merger and the filing of the Information Statement on January 15, 2025, the underlying financials of the Company had significantly changed. Defendants knew or anticipated all of these significant changes before entering into the April 2, 2024 Merger Agreement. In fact, the Merger Agreement expressly contemplated and provided for the post-signing sale of Endeavor's business assets, and Defendants Emanuel and Shapiro were incentivized to do so in order to obtain enormous asset sales bonuses under their respective side agreements. *See* Section IV.H.

*First*, a significant post-Merger signing increase in the stock price of TKO, the Company's largest and most valuable asset, demonstrated that the Merger

Consideration was inadequate. [redacted]

185. When the Merger was signed on April 2, 2024, Centerview's DCF analysis valued Endeavor's TKO holdings at a midpoint of $5.6 billion. But this valuation was quickly superseded by a post-signing rise in TKO's stock price. TKO's publicly traded stock price was $86.18 per share on April 1, 2024. By the time Defendants filed the Information Statement on January 15, 2025, TKO's stock price had dramatically increased to $143.91, meaning Endeavor's TKO stake was worth approximately ***$9.5 billion***—[redacted] ***more than Centerview's valuation of Endeavor's TKO shares at Merger signing***.

186. Indeed, by the time the Merger closed on March 24, 2025, TKO's stock price had skyrocketed to $152.91 per share and Endeavor's TKO stake alone[10] was worth approximately ***$13.3 billion***—[redacted].

187. In connection with Defendants' disclosures about the TKO valuation, Defendants omitted: (i) a sensitivity analysis translating changes in TKO valuation inputs (*i.e.*, multiples and DCF assumptions) into an Endeavor per-share value; (ii) a forthright explanation for the absence of a price protection mechanism (like a cost collar or contingent value right) despite the TKO sensitivity and an explanation for why a $0.24 dividend was adequate; (iii) a candid discussion of foregone alternatives and how Defendants' structural choices affected the fairness of the Merger; and (iv) the implications of intervening developments for TKO's valuation

[10] As discussed above, Endeavor's TKO stake had increased since signing because of the Sports Assets transaction, the purchase of TKO interests from WWE founder Vince McMahon and open-market purchases. By the time the Merger closed, Endeavor owned 61% of TKO.

between the date the Fairness Opinion was issued and the date the Information Statement was disseminated in light of Endeavor's explicit "Owned TKO" valuation. These obligations of the Defendants continued until the date the Merger closed.

188. *Second*, as noted above, shortly after signing the Merger Agreement, Silver Lake requested that Endeavor sell its Sports Assets and its entire SD&T division (consisting of IMG Arena and OpenBet) pursuant to rights it had reserved for itself under the express provisions of the Merger Agreement.

189. The Company and Centerview had implicitly valued the Sports Assets at $2.56 billion. Yet, Endeavor set [redacted] just two months after the Merger Agreement was signed. These June 2024 projections forecast [redacted] Moreover, in October 2024, Endeavor sold the Sports Assets to TKO for $3.25 billion in [redacted] when the Merger Agreement was signed.

190. Similarly, as of the signing of the Merger Agreement, the Company and Centerview implicitly valued OpenBet at $306 million, but in the following months the market revealed that this asset was worth approximately 30-45% more. In fact, in June 2024, two bidders offered to acquire OpenBet for [redacted] Defendants never disclosed these superior bid amounts for OpenBet. Nor did they disclose that Emanuel ultimately bought OpenBet for approximately [redacted] than Centerview and Defendants' implicit valuation of that business (*i.e.*, Emanuel's $450 million purchase price vs. the $306 million implicit value of OpenBet).

191. Together, the Sports Assets and OpenBet sales revealed approximately [redacted] of Company value that had not been accounted for when the Information Statement was filed or when the Merger closed.

192. Defendants further failed to disclose that Silver Lake had a preexisting plan to sell off the separate non-core assets of Endeavor at prices substantially higher than the values attributed to them in the Fairness Opinion. Silver Lake thereby appropriated the value of the assets from shareholders.

193. Between the two asset sales and the exponential increase in value of TKO in the post-signing period, Defendants knew or recklessly disregarded that they were citing to and misleadingly using data that undervalued Endeavor's assets by [redacted] when the Information Statement was filed (*i.e.,* approximately [redacted]).

194. Despite this knowledge, Defendants falsely represented in the Information Statement sent to unaffiliated shareholders that as of April 2, 2024, the Merger was "***fair and in the best interests of, the Company [and] its stockholders***;" the Merger was "***advisable***;" and the Merger Consideration "was ***more favorable*** to all of the Company's stockholders on a risk-adjusted basis than the potential value that might result from other alternatives reasonably available to the Company." These statements were never updated or corrected to address the material facts above, which plainly demonstrated that Endeavor's value was higher than the amount stated in the Fairness Opinion.

195. Similarly, Defendants' statements regarding Centerview's Fairness Opinion were materially false and misleading. Specifically, the Information Statement represented that on April 2, 2024, Centerview issued the Fairness Opinion reflecting its conclusion that "the [Merger] Consideration to be paid to the

holders of Shares (other than Excluded Shares) pursuant to the [Merger] Agreement ***is fair, from a financial point of view,*** to such holders."

196. This statement was materially false and misleading because, as discussed above, Centerview's fairness analysis implicitly valued the Sports Assets at just $2.56 billion, yet in October 2024, Endeavor sold the Sports Assets to TKO for $3.25 billion in stock. Centerview's fairness analysis also implicitly valued OpenBet at $306 million, yet months later two bidders each offered to buy the asset for [redacted], and Emanuel eventually bought OpenBet for $450 million. Together, the Sports Assets and OpenBet sales revealed severe undervaluation errors in Centerview's Fairness Opinion of approximately [redacted]. Defendants knew or anticipated these developments even as of April 2, 2024.

197. Given the express provisions of the Merger Agreement, Centerview's fairness analysis necessarily should have included an evaluation of all post-signing asset sales by Endeavor. In fact, Centerview's Fairness Opinion expressly stated that it was opining on the Merger Agreement, which included "***the other transactions contemplated by the Agreement***." By definition, this included any post-signing asset sales by Endeavor. But Defendants failed to get an updated fairness assessment from Centerview that would have reflected Endeavor's undervaluation as demonstrated by such sales.

198. Centerview's sum-of-the-parts presentation ultimately aggregated the Company's non-TKO businesses into an "Ex-TKO" figure, which obscured potentially higher standalone values for distinct segments when combined into a single Ex-TKO output. [redacted] Defendants' repeated assertions of "fairness," framed as opinions, were misleading under *Omnicare* because Defendants did not actually

hold those beliefs, the opinions implied untrue embedded facts about the scope and currency of Centerview's analysis, and Defendants omitted material facts—post-signing asset sales, TKO's revaluation, and advisor conflicts—necessary to prevent their opinions from misleading reasonable investors.

199. Defendants considered the post-signing sale of Endeavor businesses to be a key component of the Merger itself. Specifically, section 7.16 of the Merger Agreement expressly provided for Endeavor's sale of all its business assets, except for TKO and WME's agency representation business. And soon after the Merger Agreement was signed, Defendants arranged for the multi-billion-dollar sales of OpenBet and the Sports Assets in related-party transactions with Emanuel and TKO.

200. Defendants did not believe the Merger was "fair, from a financial point of view" to unaffiliated shareholders given the material omission of these sales from Centerview's Fairness Opinion. Defendants did not believe that the Merger or Merger Consideration were fair even as of April 2, 2024. As noted above, these asset sales demonstrated a significant undervaluation of both Endeavor and the Merger Consideration offered to such shareholders. Defendants' failure to incorporate the asset sales—or even to disclose their effect—rendered their Merger fairness statements materially false and misleading.

201. Rule 13e-3 of the Exchange Act provides important disclosure context for this theory. This Rule requires an issuer to update its disclosures regarding a take-private transaction whenever there is a material development or change in circumstances regarding the transaction, especially concerning the financial fairness of the transaction. *See* 17 C.F.R. § 240.13e-3(d) ("The issuer or affiliate engaging in a Rule 13e-3 transaction must file with the Commission: . . . (2) An amendment to Schedule 13E-3 reporting promptly any material changes in the information set forth in the schedule previously filed."). Those requirements further

support Plaintiff's allegations that the omitted valuation, allocation, and process facts were material and the current Information Statement and Schedule 13E-3 disclosures were misleading under Section 10(b).

202. The omissions here did not merely relate to changes in market conditions. They included a [redacted] in the value of Endeavor's principal asset (TKO), a [redacted] in Company value evidenced by the Sports Assets sale, OpenBet transaction showing additional value, and a [redacted] insider TRA benefit. Those developments mattered because Defendants continued to use the earlier fairness framework while omitting how the developments changed the value received by unaffiliated Class A shareholders and the choice between selling and preserving appraisal rights.

203. Accepted valuation methods such as discounted cash flow and trading comparables, properly applied, reinforce that the $27.50 cash-out was unfair, including as of dissemination of the Information Statement. Centerview's own DCF range exceeded the Merger Consideration, and the calculations alleged above translate the relevant asset and insider-value evidence into a per-share amount above Plaintiff's sale prices. These facts support falsity, materiality, and loss causation under Section 10(b).

204. Defendants repeatedly refiled or incorporated the April 2, 2024 Fairness Opinion in the Schedule 13E-3 materials (filed on August 5, 2024; September 23, 2024; October 11, 2024; December 20, 2024; January 15, 2025; and March 24, 2025) and the January 15, 2025 Information Statement. Defendants repeatedly used the outdated analysis, knowing it was wrong from the start, as the basis for current disclosures while omitting the material changes and value-allocation facts described above.

205. Defendants' Schedule 13E-3 materials (filed on August 5, 2024; September 23, 2024; October 11, 2024; December 20, 2024; January 15, 2025; and

March 24, 2025) also contained sections referencing material updates, supplements, and addenda, none of which included the [redacted] increase in the value of TKO, a [redacted] in Company value evidenced by the Sports Assets sale, OpenBet transaction evidence showing additional value, and a [redacted] insider TRA benefit. These continued omissions regarding Endeavor's valuation, allocation, and process facts were material and misleading under Section 10(b) and continued to frame the Merger as fair to the unaffiliated shareholders.

206. Defendants filed the Information Statement knowing that the assumptions underlying the attached Fairness Opinion were inaccurate.

207. These continued omissions show that Defendants continued to present a materially incomplete valuation and process narrative after choosing to speak about fairness in current shareholder materials. The actionable omissions and misstatements are the Rollover, TRA, and Special Committee disclosures, together with the related valuation facts and their effect on Endeavor's market price and the lost appraisal alternative.

208. For clarity, Defendants' statements about the fairness of the Merger and Merger Consideration were false and misleading in at least three respects. First, Defendants misrepresented that they believed the Merger and Merger Consideration were fair as of the date of the Information Statement, even though they knew they were not. Second, they used the Centerview Fairness Opinion in a manner that was deceptive because they knew it was not just old, but that its foundation had been undermined by subsequent undisclosed facts. Third, Centerview's opinion and Defendants' statements of the fairness of the Merger and Merger Consideration on April 2, 2024, were false and misleading when issued because Defendants and Centerview knew and deliberately suppressed facts at the time the opinion and fairness statements were originally issued that contradicted both the opinion and Defendants' statements.

### B. Defendants Concealed the Value of the Officer Defendants' Equity Rollovers

209. Defendants failed to adequately disclose the Officer Defendants' earnings under the Merger by misleadingly valuing their Endeavor equity rollover positions at the Merger Consideration when those positions were significantly more valuable.

210. Defendants used the $27.50 Merger Consideration rate and related hurdle-price calculations to communicate the value of insider equity while using the same transaction materials to present $27.50 as the complete value of the public Class A shares. That was misleading because the OpCo Membership Interests, OpCo Profits Units, and related HoldCo interests were economically linked to the same enterprise value and were treated as common-equivalent interests in the transaction materials. Defendants omitted that the same asset values used to determine the common-equivalent value of those interests had materially increased and were above the value implied by the public cash price.

211. The Information Statement represented that Defendant Shapiro held the following rollover interest in the transaction:

> a number of equity interests in [Endeavor] OpCo and/or in the Company held by him and his permitted transferees that are outstanding and vested Shares without any restrictions on such Shares, OpCo Membership Interest or OpCo Profits Unit with a value equal to $37,187,970 (based on the applicable Merger Consideration).

Information Statement at 167.

212. The Shapiro Rollover Statement appeared in the January 15, 2025 Information Statement, before Plaintiff's January 23 and 24 sales. It stated that Shapiro's OpCo and related equity interests had a value based on the $27.50 Merger Consideration, without disclosing that those interests tracked the same common-

equivalent value supported by TKO's appreciation, the Sports Assets transaction, OpenBet sale, and the TRA allocation.

213. The Fifth Amendment to the Schedule 13E-3 transaction statement, which was filed by Defendants the day the Merger closed on March 24, 2025, indicated that the Whitesell Rollover Agreement was amended on March 18, 2025 to include the following total rollover interests:

**ROLLOVER INTERESTS**

| Entity | Rollover Interests[2] | Corresponding Value |
|---|---|---|
| Endeavor Executive HoldCo, LLC | 8,214,055 Common Units | $ 225,886,512.50 |
| Endeavor Executive II HoldCo, LLC | 1,274,518 Profits Units (hurdle $16.54) | $ 13,968,717.28 |
| OpCo | 5,959,889 Profits Units (hurdle $23.16) | $ 25,865,918.26 |

1 Capitalized terms used herein but not defined herein shall have the meanings ascribed to them in the Agreement.

2 As of the date of delivery of this Exhibit A, pursuant to Section 1.1 of the Agreement, Patrick Whitesell owns the interests that will constitute such Rollover Interests either directly or indirectly through Endeavor Executive Holdco, LLC or Endeavor Executive II Holdco, LLC.

214. The Fifth Amendment to the Schedule 13E-3 transaction statement further represented that the Emanuel Rollover Agreement was amended on March 22, 2025 to include the following total rollover interests:

| Entity | Rollover Interests | Corresponding Value |
|---|---|---|
| OpCo | 9,106,781 OpCo Membership Interests | $ 250,436,477.50 |
| OpCo | 5,959,889 OpCo Profits Units (hurdle $23.16) | $ 25,865,918.26 |
| OpCo | 1,274,518 OpCo Profits Units (hurdle $16.54) | $ 13,968,717.28 |

215. The Emanuel and Whitesell disclosures later confirmed the same valuation methodology and the same concealment of common-equivalent value. The later disclosures are evidence that Defendants' pre-sale presentation of insider equity at $27.50 was part of a continuing scheme and that the Shapiro Rollover Statement omitted information known to the transaction participants before Plaintiff sold. The later Emanuel and Whitesell Rollover Statements corroborate that the concealment of insider equity value continued through Merger closing.

216. These disclosures were materially false and misleading because the stated values of the Officer Defendants' rolled over equity represented $27.50 per rolled over Endeavor OpCo unit, minus the hurdle price, while omitting that a higher value was supported by materially higher enterprise-value inputs. The

omission caused the market to treat $27.50 as a complete and comparable per-share value for public Class A shareholders, rather than recognizing that insiders were retaining common-equivalent interests whose value was supported by the higher TKO, asset-sale, OpenBet, and TRA amounts quantified above. Had the omitted information been disclosed, the market price at which Plaintiff sold would have reflected a higher price per share.

217. The later valuation evidence confirms the magnitude of the omission. By the time the Information Statement was issued, the Officer Defendants' rolled over Endeavor OpCo units were worth [redacted] the values reflected in the transaction materials when adjusted for the asset sales and TKO's increased stock price. By the time the Officer Defendants amended their Rollover Agreements, their rolled over Endeavor OpCo units were worth [redacted] than Defendants represented at Merger closing, adjusting only for the same inputs.

**C. Defendants Failed to Disclose That OpenBet Was Undervalued**

218. Defendants wholly omitted that after the Merger was signed, two undisclosed bidders offered approximately [redacted] for OpenBet than the implicit valuation of that asset by Centerview and Defendants. Nor did they disclose that OpenBet was ultimately sold to Emanuel for approximately [redacted] than the implicit valuation of that company by Centerview and Defendants at Merger signing.

219. As noted above, the Merger Agreement gave Silver Lake the power to request the sale of all Endeavor business assets (other than TKO and WME) in the post-Merger signing period. Once the Merger Agreement was executed, Silver Lake requested a sale of the two core businesses in Endeavor's SD&T operating segment (*i.e.*, OpenBet and IMG Arena). This was part of Silver Lake's effort to quickly monetize valuable assets in Endeavor's portfolio before the Merger closed.

220. From May to October 2024, Endeavor engaged with numerous potential bidders for OpenBet and IMG Arena. Thirteen potential bidders emerged from this process and were sent letters outlining the future steps for submitting acquisition offers for OpenBet and IMG Arena.

221. Two undisclosed bidders subsequently made actual offers to acquire OpenBet and IMG. The identities of these two other bidders, and the fact that they offered [redacted], were omitted from Defendants' November 11, 2024 Form 8-K announcing the OpenBet sale. The Form 8-K only stated that "[p]ursuant to the [OB/Arena Transaction Agreement], [Emanuel] will acquire all outstanding equity interests in the Companies for consideration valued at approximately $450 million. . . ."

222. The Information Statement made further reference to the undisclosed OpenBet bidders, as follows:

> Starting on June 18, 2024, 13 of the Initial Potential Bidders for the Gaming Assets were sent process letters. Subsequently, Company management . . . ***separately received offers for the acquisition of OpenBet from two other Initial Potential Bidders*** . . .

Information Statement at 63. This statement was materially misleading because it omitted the material fact that the [redacted], respectively—nearly [redacted] than Defendants and Centerview valued that asset.

223. Defendants viewed a sale of OpenBet to these bidders to be infeasible given the delay caused by regulatory and antitrust approvals required for ownership of this business. Accordingly, in November 2024, Defendants decided to pursue a management buyout of OpenBet by Defendant Emanuel. Defendants misleadingly omitted from the Information Statement that Emanuel ultimately agreed to pay [redacted]

[redacted] for OpenBet than the implicit value they assigned to that business at Merger signing. In this regard, Defendants stated as follows:

> On November 11, 2024, at Silver Lake's request and pursuant to Section 7.16 of the Merger Agreement, [Endeavor] entered into a transaction agreement . . . with [Emanuel] and a member of OpenBet management, pursuant to which, among other things [Emanuel] agreed to acquire OpenBet and IMG Arena from [Endeavor] in exchange for consideration of approximately ***$450 million*** (subject to certain adjustments), consisting of (i) a $100 million cash payment and (ii) an unsecured promissory note with a make-whole value of ***approximately $350 million*** upon the occurrence of certain events . . .

*Id.* at 63–64.

224. The OpenBet transaction closed on March 24, 2025, the same day the Merger closed. Yet, unaffiliated shareholders were never informed that Defendant Emanuel acquired OpenBet for approximately [redacted] than the $306 million implicit value of OpenBet assigned by Centerview and Defendants at Merger signing.

### D. Defendants Failed to Disclose That the TRA Amendment Diverted Significant Value From Unaffiliated Shareholders

225. Defendants made materially false and misleading statements and omissions concerning the TRA because they disclosed that the parties would use reasonable best efforts to preserve TRA benefits, but omitted the amount and effect of that benefit on unaffiliated Class A shareholders. The theory is not that the market would have reacted to a later disclosure of a value-reducing tax burden by bidding Endeavor down. The theory is that Defendants' pre-sale disclosure made the $27.50 cash price appear to be the complete common-equivalent value while omitting that

insiders were contractually preserving an additional [redacted] of value—approximately [redacted]—for themselves.

226. Defendants' April 2, 2024 Form 8-K announcing the Merger attached copies of the Emanuel and Whitesell Letter Agreements, both of which contained substantially the same provision that purported to describe the TRA benefits for non-rolled-over Endeavor OpCo equity as follows:

> With respect to your Equity Interests in [Endeavor OpCo] that are not designated as Rollover Interests pursuant to the terms of the Rollover Agreement, the parties hereto [*i.e.*, Endeavor, Silver Lake and Emanuel/Whitesell] agree that your disposition of such Equity Interests in [Endeavor OpCo] pursuant to the Merger Agreement shall be treated as a sale by you to [Endeavor] for cash. The transaction described in the immediately preceding sentence ***shall be treated as triggering economic entitlements for tax benefits*** in accordance with Section 7.17 of the Company Disclosure Letter.

227. In a section of the Information Statement titled "Other Covenants and Agreements," Defendants stated that:

> the Parent Entities [Silver Lake] and the Company Entities [Endeavor] agree:
>
> to cooperate and use their respective reasonable best efforts to ***amend the Tax Receivable Agreement*** to ensure that the legal form of the Transactions does not adversely affect the benefits that would otherwise be received by the TRA Parties under the Tax Receivable Agreement.

Information Statement at 157.

228. This statement omitted the material fact that Centerview had quantified the TRA benefit and that the proposed amendment would preserve a substantial,

identifiable value stream for the Officer Defendants, Silver Lake, and the other TRA parties. It also omitted that this insider value was not being paid to, or shared ratably with, unaffiliated Class A shareholders and therefore was relevant to the amount of value that the $27.50 cash price left on the table.

229. Specifically, Centerview's April 2, 2024 DCF analysis found that the TRA parties' 85% interest in the Company's tax savings was worth [redacted]. By agreeing to preserve that value for the Officer Defendants, Silver Lake, and the other TRA parties, Defendants created a material insider side allocation that reduced the value being delivered to unaffiliated shareholders relative to the actual value of Endeavor. Disclosure would have caused the market to recognize that the public cash price was not the full per-share value being transferred in the transaction, thereby increasing the price at which public holders could sell or the value they would preserve by seeking appraisal.

230. The Information Statement and the April 2, 2024 agreements had already disclosed the parties' commitment to use reasonable best efforts to preserve the TRA benefits, but omitted their magnitude and unequal allocation.

**E. Defendants Failed to Disclose the Pressure Campaign By Emanuel and Silver Lake to Force a Merger Recommendation By the Special Committee**

231. The Information Statement's description of the Special Committee as "independent" was materially misleading because it omitted the structural and practical constraints that prevented the Committee from conducting a market check, soliciting or entertaining alternative proposals, or even communicating with interested third parties. At the same time, Silver Lake had publicly foreclosed any third-party sale, ensuring there were no viable alternatives for the Committee to pursue. Those facts were material to price, not merely process. The disclosure told

the market that $27.50 had been negotiated by a Special Committee acting for unaffiliated shareholders, while the omitted facts showed that no one had a meaningful opportunity to negotiate the most important term for those shareholders.

232. The Information Statement also omitted the sustained pressure campaign by Silver Lake and insiders that compressed negotiations into a four-day window over Easter weekend with expiring offers, direct calls to Committee members and Centerview during meetings, and threats of "significant disruption" if price was not agreed by April 2. These facts were material because they reduced the expected value of continued negotiations, alternative transactions, and the appraisal decision. By omitting these facts while describing the process as independent and the price as more favorable than available alternatives, Defendants caused the market to understate the value of Endeavor Class A shares. The calculations alleged above quantify the resulting loss.

233. The Information Statement's description of the Special Committee's first meeting on March 8, 2024, was devoid of any facts indicating that [redacted]

234. Defendants' description of the Special Committee's March 8 meeting simply stated that:

> On March 8, 2024, the Special Committee convened a meeting via videoconference with representatives of Centerview and Cravath in attendance . . . The representatives of Centerview provided the Special Committee with an overview of Centerview's preliminary findings with respect to the Company. The representatives of Centerview also discussed certain financial information and performance metrics of the

> Company and provided an overview of certain key outstanding questions ***and a potential overall transaction timeline***.

Information Statement at 56.

235. This statement was misleading because it concealed that Silver Lake imposed an aggressive transaction timeline to meet its purported need to file an amended Schedule 13D disclosing its impending offer to acquire Endeavor. As reflected in the minutes for the March 8 meeting, the Special Committee [redacted] Endeavor's minority shareholders were unaware that Silver Lake was pressing the Special Committee for a quick agreement on a Merger price, which gave the Special Committee no meaningful time to negotiate this key term for the benefit of such shareholders.

236. The Information Statement's description of the parties' negotiations on March 29, 2024 was also misleading. In describing the Special Committee's first meeting on March 29, Defendants stated that:

> On March 29, 2024, the Special Committee met via videoconference with representatives of Centerview and Cravath to discuss the status of negotiations and key terms of the Merger Agreement, ***including Silver Lake's proposal regarding regulatory approvals necessary to close the Transactions and potential alternative approaches***.

Information Statement at 58.

237. Nowhere in such description was it disclosed that [redacted] the March 29 Special Committee meeting [redacted] Nor

was it disclosed that on this call, [redacted] over the upcoming Easter Weekend.

238. Silver Lake's ongoing pressure to get Special Committee approval on the Merger Consideration was also omitted from Defendants' description of Silver Lake's March 29 Offer. The Information Statement described the March 29 Offer as follows:

> Later on March 29, 2024, Silver Lake submitted a proposal to the Company to acquire 100% of the outstanding equity interests of the Company (other than equity interests to be rolled over by Silver Lake or Company management), at a price per share of $24.50 payable in cash (the "March 29 Proposal") . . .

*Id.* at 59.

239. This statement was misleading because it entirely omitted that Silver Lake's March 29 Offer was [redacted] Specifically, Silver Lake expressly told the Special Committee that it wanted to [redacted] Endeavor's unaffiliated shareholders were never informed that Silver Lake was imposing an artificial time crunch on the Special Committee.

240. The same is true with respect to Defendants' description of Silver Lake's subsequent March 30 Proposal that was sent to the Special Committee after it rejected the March 29 Proposal. The Information Statement provided the following generic description of Silver Lake's March 30 Proposal:

> Later on March 30, 2024, Silver Lake submitted a revised proposal to the Company to acquire 100% of the outstanding equity interests of

> the Company (other than equity interests to be rolled over by Silver Lake or Company management), increasing the proposed price per share from $24.50 to $25.75 in cash (the "March 30 Proposal").

*Id.*

241. This description was misleading because it failed to disclose that Silver Lake [redacted]. Not disclosed to unaffiliated shareholders was the fact that Silver Lake told the Special Committee it [redacted] for the Merger and Merger parties.

242. The Information Statement purported to describe the ongoing negotiations between Silver Lake, the Special Committee, and Centerview on March 31, 2024, including the Special Committee's $30.50 per share counteroffer on that date, as follows:

> Subsequently, representatives of Centerview presented the Special Committee's counterproposal to Mr. Durban, who responded by indicating that he had conferred with Silver Lake's proposed preferred equity and other financing sources and believed that Silver Lake could increase its proposed purchase price-per share from $25.75 (as reflected in the March 30 Proposal) to $27.00.

*Id.* at 60.

243. This statement was misleading as it omitted that Defendant Durban further pressured Centerview's Blair Effron in connection with these competing proposals by stating [redacted]

[redacted]

244. This supposed urgency to agree on Merger Consideration was reiterated in a March 31 email to the Special Committee from Silver Lake's Chief Legal Officer, Karen King. In the email, [redacted] None of these facts were disclosed in the Merger press release, Information Statement or Defendants' other public statements concerning the Merger.

245. The pressure campaign by Silver Lake and Emanuel had its intended effect on the Special Committee, yet Defendants continued to mask the Special Committee's stated rationale for agreeing on the critical price term on a compressed schedule over Easter Weekend. In this regard, the Information Statement asserts that during the Special Committee's final deliberations on April 1, 2024, Committee members were concerned about the "***risk that additional negotiations could cause Silver Lake to abandon the negotiations and the [Merger] altogether***."

246. Not disclosed was the Special Committee's real concern, as stated in its April 1 meeting minutes. Specifically, the undisclosed strong-arm tactics [redacted] This concern, which was never disclosed to public shareholders, forced the Special Committee to agree to the Merger Consideration under an unreasonably accelerated schedule and caused the market to assign too little value to the possibility that a properly negotiated price or appraisal recovery would exceed $27.50 and the sale prices Plaintiff received.

## VI. ALLEGATIONS OF SCIENTER

247. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein. Endeavor, the Officer Defendants, Board Defendants, and Special Committee Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Endeavor during the Class Period and detailed in Section V above were materially false and misleading. These Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws. The inference is bolstered by each Defendant's specific access to the Final Projections, valuation analyses, insider agreements, process communications, and transaction disclosures.

248. Defendants participated in the fraudulent scheme alleged herein by virtue of their knowledge of information reflecting the true state of affairs regarding Endeavor and the process leading to the Merger, their control over, receipt and/or modification of Endeavor's materially misleading statements and omissions of material fact, and/or their senior positions with the Company, which made them privy to confidential information concerning Endeavor and the Merger which contradicted Defendants' statements during the Class Period.

249. In their roles as directors and officers of the Company during the Class Period, the Officer Defendants, Board Defendants and Special Committee Defendants directly participated in the management of Endeavor's operations and, because of their senior positions at Endeavor, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Endeavor's SEC filings, press releases and Information Statement issued to unaffiliated shareholders in connection with the Merger.

Additionally, the Officer Defendants' desire to increase the size of their rollovers as set forth in Defendants' Schedule 13E-3 Amendment No. 5 demonstrates their recognition that the cash consideration offered to public shareholders was unfair.

250. [redacted]

251. Further, Defendants' scienter is supported by their failure to include procedural protections for unaffiliated shareholders, including (i) Defendants' agreement to forgo a "majority of the minority" vote on the Merger, (ii) their deliberate rejection of price protection devices (*i.e.,* a collar or contingent value right) despite known TKO sensitivity; (iii) the acceptance of only token dividends for Company shareholders; (iv) the constraints on any alternatives Defendants considered to the transaction; (v) the Officer Defendants' rollovers and side benefits; and (vi) Defendants' present-tense fairness assertions at the dissemination of the Information Statement paired with omissions of material contemporaneous facts contradicting such assertions.

252. Endeavor's Executive Committee, officers, directors, and Special Committee members approved, controlled, or materially participated in the Information Statement, Schedule 13E-3 materials, and the underlying transaction disclosures. Endeavor acted with scienter because the scienter of the Officer Defendants, Board Defendants and Special Committee Defendants is imputed to the Company. Each of those Defendants spoke on behalf of and controlled the false

and misleading materials disseminated to unaffiliated shareholders concerning the Merger.

## VII. APPLICATION OF PRESUMPTION OF RELIANCE

253. At all relevant times, the market for Endeavor Class A common stock was efficient for the following reasons, among others:

a) Endeavor Class A common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) Endeavor had more than 472.7 million shares of Class A common stock outstanding as of the April 2, 2024 announcement of the Merger that were eligible for trading on the NYSE;[11]

c) As a regulated issuer, Endeavor filed periodic public reports with the SEC;

d) Endeavor regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

e) Unexpected material news about Endeavor was rapidly reflected in and incorporated into the price for Endeavor Class A common stock during the Class Period.

254. As a result of the foregoing, the market for Endeavor common stock promptly digested current information regarding Endeavor and the Merger from publicly available sources and reflected such information in the price of Endeavor common stock. Under these circumstances, all sellers of Endeavor common stock

[11] Based upon the Merger Announcement dated April 2, 2024 using the $13 billion equity value and $27.50 per share Merger Consideration.

during the Class Period suffered similar injury through their sales of Endeavor common stock at artificially deflated prices, and a presumption of reliance applies.

255. A presumption of reliance is also appropriate in this Action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in primary part, on Defendants' omissions of material facts.

256. Plaintiff sold rather than retaining its Endeavor shares for appraisal because the public disclosure and market price represented that the Merger process and $27.50 Merger Consideration were reliable measures of value. Had the omitted valuation, allocation, and process facts been disclosed, Plaintiff would have retained the shares and pursued appraisal or would have sold only at a price reflecting the higher value.

## VIII. LOSS CAUSATION

257. During the Class Period, as detailed herein, Defendants' misstatements and omissions concealed the higher, true value of Endeavor's shares and operated to keep the market price below the value that the public disclosures would have produced if complete. In a controller-led going-private transaction, the omission of information showing Endeavor's true value and the representations that the Special Committee had negotiated a fair price constrained the market's valuation of the public shares. Those facts support a price-impact inference that is not based on an unidentified "true value." The relevant loss is the measurable difference between the prices at which Plaintiff sold and the higher value supported by these calculations.

258. Plaintiff and the Class suffered economic loss proximately caused by each misstatement and omission. Defendants misrepresented and omitted material information necessary for the market to accurately determine the true or "but-for"

value of Endeavor's Class A common shares, as well as the true or "but-for" value of making an informed decision about exercising shareholder appraisal rights.

259. Defendants' misstatements concerning the Merger caused the market to treat the Merger Consideration as being based on these inaccurate statements, rather than the actual enterprise value of Endeavor because Defendants omitted material information necessary to accurately determine the value of the Endeavor shares. *See* Hartzmark Aff. ¶¶ 28-29. The market-facing developments identified above supplied measurable value evidence: TKO rose from $86.18 to $143.91 per share, the Sports Assets were sold for $3.25 billion against a $2.56 billion implied value, OpenBet attracted [redacted] and a $450 million purchase price, and the insider TRA allocation was quantified at [redacted]

260. All told, the undervaluation of these assets resulted in an artificial deflation of at least [redacted] per Endeavor share: [redacted] from the TKO appreciation, [redacted] from the Sports Assets sale, [redacted] from OpenBet evidence, and [redacted] from the insider TRA benefit. Including the [redacted] of transaction dividends, the resulting adjusted value is approximately [redacted] per share—well above Plaintiff's [redacted] sale price and its [redacted] sale price.

261. The Rollover Statements caused the market to treat common-equivalent insider equity as worth no more than the $27.50 Merger Consideration, even though the same enterprise-value inputs supported a higher value. Because those interests were equivalent to Endeavor common stock for valuation purposes, the omission of the higher enterprise-value inputs affected the price of the public Class A shares. *See id.* ¶¶ 30-31. Had the true value of the rollovers been made public, it would have offered an important signal of insider's opinions that the Merger Consideration was too low relative to the value of the Company.

262. Defendants' Rollover Statements instead caused the market to value the Merger Consideration based on a Company valuation that was inaccurate, rather than on Endeavor's correct, "but-for" enterprise value. Shareholders therefore sold their Class A shares at artificially deflated prices and incurred losses upon the sale. The expected value of exercising shareholder appraisal rights was artificially deflated for the same reasons.

263. The Shapiro Rollover Statement was public before Plaintiff sold and directly connected the reported value of OpCo and HoldCo interests to the $27.50 cash price. The later Emanuel and Whitesell statements corroborate that the same value understatement continued through closing.

264. The OpenBet Statements caused the market to treat the Merger Consideration as being based on the actual enterprise value of Endeavor because Defendants omitted material information necessary to accurately determine the value of the Endeavor shares. *See id.* ¶¶ 32-33. Despite what Defendants disclosed, OpenBet attracted [redacted] and a $450 million purchase price, yet was internally valued by Defendants at $306 million. The undervaluation of this asset caused an artificial deflation of at least [redacted] per share of Endeavor Class A common stock.

265. Had the market been informed of this undervaluation, the new information would have been impounded into the price of Endeavor common stock, causing it to be correspondingly higher. Shareholders therefore sold their Class A shares at artificially deflated prices and incurred losses upon the sale. The expected value of exercising shareholder appraisal rights was artificially deflated for the same reasons.

266. The TRA Statements caused the market to omit an additional [redacted] in insider allocation from the value being compared with the public cash price. The pre-sale TRA disclosures affirmatively represented that

the parties would preserve TRA benefits but omitted their magnitude and unequal allocation. The price effect therefore runs upward. Disclosure would have shown that $27.50 was not the full value transferred in the Merger and would have increased the market price and the value of retaining shares for appraisal. *See id.* ¶¶ 34-35. Defendants' failure to disclose that the TRA Amendment redirected up to [redacted] to the TRA parties and away from public shareholders caused an artificial deflation of at least [redacted] per share of Endeavor Class A common stock.

267. Had the market been informed of the redirected TRA benefits, this new information would have been impounded into the price of Endeavor common stock, causing it to be correspondingly higher. Shareholders therefore sold their Class A shares at artificially deflated prices and incurred losses upon the sale. The expected value of exercising shareholder appraisal rights was artificially deflated for the same reasons.

268. The Special Committee Statements caused the market to assign too little value to continued negotiations, alternative value, and the decision to retain shares for appraisal by portraying a pressured, restricted process as independent. This signaled to the market that there was insufficient value to justify continued negotiations, an alternative value for Endeavor, or a retention of shares for appraisal. The omitted pressure campaign and restricted mandate were material because they bore directly on whether the $27.50 price was a reliable, negotiated value or merely the product of a process that had no meaningful ability to obtain more. Thus, these statements are important signals to market participants. *See id.* ¶ 36. Disclosure would have increased the market's assessment of the value of continued negotiations, alternative value, and appraisal, and therefore would have increased the price at which Plaintiff could sell and the value Plaintiff would preserve by retaining the shares for appraisal. *See id.*

269. Each category therefore contributed to the same measurable market-price deflation and to Plaintiff's decision to sell rather than preserve its appraisal rights.

270. The calculation of damages for violations of Section 10(b) of the Exchange Act alleged in this action flowing from the alleged misstatements and omissions can be computed on a class-wide basis using a broadly accepted methodology that would be common to all Section 10(b) Class members for both the deflation in the share price and the lack of sufficient information for non-insider investors to make an informed decision regarding the exercise of their appraisal rights. *See* Hartzmark Aff. ¶ 37.

271. The calculation of deflationary damages on a class-wide basis is subject to a common methodology (such as a deflationary ribbon) to a reasonable degree of economic and financial certainty. *See id.* ¶¶ 38-42. Moreover, had the truth about the alleged misrepresentations and/or omissions been revealed at any point during the Class Period, the market price (at the time of the revelation) would have quickly adjusted to incorporate the new value-relevant information and thus would have reflected a higher market price for Endeavor common stock. *See id.* ¶ 38.

272. The loss of appraisal rights is also concrete. The damages flowing from the lost appraisal rights are not speculative, are causally related to the misrepresentations and omissions, and may be calculated to a reasonable degree of economic and financial certainty by well-accepted financial and economic models, such as discounted cash flows (DCF), comparable companies, or comparable transactions analysis, using inputs from Endeavor and its Board's internal materials and modeling, among other things. *See id.* ¶¶ 43-44. The fair value of Endeavor stock will be common to all class members and applied on a class-wide basis. *See id.* ¶ 44.

273. Plaintiff sold shares and thereby lost the statutory opportunity to demand appraisal. The omitted facts would have changed Plaintiff's sell-versus-appraisal decision because the conservative appraisal floor alleged above was at least [redacted] per share before any dividend, exceeding $27.50, $30.91, and $31.15. Plaintiff therefore seeks the value of the appraisal opportunity lost through an actual sale, measured by the documented value gap and subject to proof at trial.

274. Class A shareholders who sold their shares in the open market were entitled to rely on the integrity of the market and the price set by the market as an accurate measure of the stock's value. The market price, however, was artificially depressed due to the false and misleading statements made by the Defendants about the Company and the Merger. Selling shareholders suffered a loss by selling their shares at deflated prices (*i.e.,* less than they were worth) because (i) the market price at which they sold was less than what the price would have been in the absence of the misstatements and omissions and (ii) they lost the right to seek appraisal and obtain a greater value for their shares.

275. Plaintiff and the Class suffered economic loss proximately caused by Defendants' misconduct. But for Defendants' materially misleading statements and omissions, Plaintiff and the Class would have preserved and exercised their appraisal rights and obtained higher value in appraisal; instead, they sold at prices rendered artificially low by Defendants' misrepresentations, thereby forfeiting appraisal and the higher recovery it would have yielded. The Information Statement and Schedule 13E-3 were essential links in accomplishing the Merger. The economic harm was a foreseeable consequence of Defendants' concealment of material valuation information bearing on the decision whether to sell or preserve appraisal rights, and that concealed risk materialized when Class members sold their shares for less than they would have received in appraisal. Defendants' material misstatements and omissions of material fact caused Plaintiff and the Class to forfeit

their right to seek appraisal of the fair value of their Endeavor common stock under Section 262 of the Delaware General Corporation Law and they were damaged thereby.

276. In the alternative, Plaintiff and the Class suffered economic loss based upon Defendants' scheme to deceive investors. Defendants' materially false and misleading statements and omissions of material facts operated as a fraud or deceit on Plaintiff and the Class, and induced Plaintiff and the Class to sell Endeavor shares at prices that were below the actual value of those securities. Plaintiff and the Class suffered economic harm as a result of their sales of Endeavor common stock during the Class Period.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

277. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this First Amended Complaint. To the extent certain statements alleged to be materially false or misleading may be characterized as forward-looking, the statutory safe harbor does not apply to statements made in connection with the Merger as a take-private transaction. *See* 15 U.S.C. § 78u-5(b)(1)(e).

278. In any event, the statements alleged to be materially false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

279. To the extent the statutory safe harbor applies to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge or recklessly disregarded that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pled because, at the time each of those statements was made, Defendants knew or recklessly disregarded the statement was false, and the statement was authorized and/or approved by the Individual Defendants who knew or recklessly disregarded that such statement was false when made.

## X. CLASS ACTION ALLEGATIONS

280. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all sellers of Endeavor Class A common stock from January 15, 2025 through March 24, 2025 (the "Class"). Excluded from the Class are Defendants, the officers and directors of Endeavor, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

281. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Endeavor Class A common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there could be hundreds or thousands of members in the proposed Class. Record owners and members of the Class may be identified from records maintained by Endeavor or its transfer agent or the depository bank for the Class A stock and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

282. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' materially false and misleading statements, omissions of material facts, and conduct in violation of federal law that is asserted herein.

283. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

284. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) Whether the Exchange Act was violated by Defendants as alleged herein;

b) Whether statements made by Defendants misrepresented material facts about the Merger as well as the business, operations and valuation of Endeavor;

c) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

d) Whether the price of Endeavor common stock was artificially deflated during the Class Period;

e) Whether Defendants' material misstatements and omissions of material fact caused members of the Class to sustain damages; and

f) The extent of damages sustained by Class members and the proper measure of damages.

285. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

## XI. CLAIMS FOR RELIEF

## COUNT I

**For Violation of § 10(b) of the Exchange Act and SEC Rule 10b-5(a)-(c)**

**Against All Defendants**

286. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

287. This Count is asserted on behalf of all members of the Class against Endeavor, Silver Lake, the Officer Defendants, Board Defendants, and Special Committee Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5(a)-(c).

288. During the Class Period, Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class Members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to sell Endeavor Class A common stock at artificially deflated prices into the open market and forfeited their appraisal rights during the Class Period.

289. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of Endeavor Class A common stock in an effort to maintain artificially deflated market prices for Endeavor Class A common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

290. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to disseminate the misleading statements and conceal material information about the Company, its operations and prospects, as well as material information concerning the Merger.

291. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

292. In their roles as senior executives of Endeavor during the Class Period, the Officer Defendants directly participated in the management of Endeavor's operations and, because of their positions at Endeavor, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Endeavor's Class Period misstatements and omissions in connection with the Merger. The Information Statement was in fact signed by Defendant Emanuel as CEO of Endeavor and was issued by order of the Executive Committee.

293. Additionally, as members of the Board, Special Committee, and Executive Committee, each of these Individual Defendants was involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements about the Merger during the Class Period and/or possessed the power and authority to approve and control the contents of Endeavor's Information Statement and other public statements concerning the Merger made during the Class Period. Each of these Individual Defendants authorized the dissemination of the Information Statement, the use of their names in the

Information Statement, and were involved in the sale process leading up to the signing of the Merger Agreement. Thus, all Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

294. Further, because Defendants chose to speak in present tense about "fairness" and "best interests" at dissemination, they made half-truths that omitted material contemporaneous facts needed to render the Rollover, TRA, and Special Committee statements not misleading at the time they were made. Rule 13e-3 and Schedule 13E-3 provide disclosure context for the materiality of those omissions.

295. Defendants' omissions and false and misleading statements issued during the Class Period are material in that a reasonable Endeavor shareholder would view a full and accurate disclosure as significantly altering the total mix of information made available by Defendants and in other information reasonably available to Endeavor shareholders.

296. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

297. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of § 20(a) of the Exchange Act

### Against Silver Lake and the Individual Defendants

298. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

299. This Count is asserted on behalf of all members of the Class against Silver Lake and the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

300. By reason of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of, direct control of, and/or supervisory involvement in Endeavor's day-to-day operations during the Class Period, the Officer Defendants had the power to, and did, control and influence the decision-making of the Company and the conduct of Endeavor's business, including the wrongful conduct complained of herein. The Officer Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Plaintiff alleges to be materially false and misleading. Moreover, the Individual Defendants had a duty to disseminate accurate and truthful information regarding the Merger and Endeavor's valuation, and to correct any previously issued statements that had become untrue so that the market price of Endeavor securities would be based upon truthful and accurate information.

301. As a direct and proximate cause of the Individual Defendants' wrongful conduct as set forth herein, Plaintiff and other members of the Class suffered compensatory damages during the Class Period.

302. By virtue of their positions as controlling persons of Endeavor and as a result of their own aforementioned conduct, Silver Lake and the Individual Defendants, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.[12]

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a) Declaring this Action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

[12] Pursuant to the Court's June 30, 2026 Order, Plaintiff does not assert its claim under Exchange Act Section 13(e) and SEC Rule 13e-3. Plaintiff includes this statement out of an abundance of caution to preserve all of its rights, including its right to seek appellate review of the Court's rulings in this case.

b) Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and expert witness fees and other costs; and

d) Awarding such other relief as deemed appropriate by the Court.

DATED: October 9, 2026

By: /s/ *Krysta Kauble Pachman*

Marc M. Seltzer
Krysta Kauble Pachman
Jordan Rux
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150
mseltzer@susmangodfrey.com
kpachman@susmangodfrey.com
jrux@susmangodfrey.com

*Counsel for Plaintiff*

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice* forthcoming)
Robert N. Cappucci (*pro hac vice forthcoming*)
Jonathan H. Beemer (*pro hac vice* forthcoming)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com

-and-

Andrew J. Entwistle (*pro hac vice forthcoming*)
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel.: (512) 710-5960
aentwistle@entwistle-law.com

*Counsel for Plaintiff*

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury of all of the claims asserted in this complaint so triable.

Dated: October 9, 2026

Marc M. Seltzer
Krysta Kauble Pachman
Jordan Rux
**SUSMAN GODFREY L.L.P.**

Vincent R. Cappucci
**ENTWISTLE & CAPPUCCI LLP**

By: /s/ *Krysta Kauble Pachman*
Krysta Kauble Pachman

Counsel for Plaintiff

## Certificate of Service

I hereby certify this 9th day of October, 2026, that I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification to attorneys of record.

DATED: October 9, 2026

*<u>/s/ Krysta Kauble Pachman</u>*
Krysta Kauble Pachman

**CERTIFICATION**

I, Jonathon Hickey, on behalf of AltShares Event-Driven ETF, ("AltShares"), hereby certify, as to the claims asserted under the federal securities laws in the First Amended Class Action Complaint (the "Amended Complaint"), that:

1. I am the Senior Managing Partner of Water Island Capital, LLC, the investment advisor to AltShares. I have reviewed the Amended Complaint in this action and have authorized its filing by our chosen counsel.

2. AltShares did not purchase, hold, or sell the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. AltShares is willing to serve as Lead Plaintiff in this action and recognizes its duty as such to act on behalf of class members in monitoring and directing the action, and, if necessary, testifying at deposition and trial.

4. AltShares will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

5. AltShares has not served or sought to serve as a representative party for a class in any other action filed under the federal securities laws within the three-year period prior to the date of this Certification except in: *In re Revance Therapeutics, Inc. Sec. Litig.*, No. 25-cv-00018-EJR (M.D. Tenn. Mar. 4, 2025); *In re EngageSmart, Inc. Sec. Litig.*, No. 24-cv-1083-SB (D. Del. Dec. 9, 2024); *In re Focus Financial Partners Inc. Sec. Litig.*, No. 23-cv-1466-MN (D. Del. Mar. 4, 2024); and *In re The Toronto-Dominion Bank/First Horizon Corp. Sec. Litig.*, No. 1:23-cv-02763-RMB/AMD (D.N.J. July 31, 2023) (moved for lead plaintiff appointment only).

6. AltShares' transactions during the relevant period in Endeavor Group Holdings, Inc. securities that are the subject of this action are reflected in Schedule A hereto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9 day of October 2026

AltShares Event-Driven ETF
By: Jonathon Hickey
Senior Managing Partner of Water Island Capital, LLC, investment advisor to AltShares Event-Driven ETF

**Schedule A**

**Transactions through March 24, 2025**
**Endeavor Group Holdings, Inc. Common Stock (Ticker: 29260Y109)**

| Fund | Trade Date | Transaction Type | Shares | Price | Transaction Total |
|---|---|---|---|---|---|
| AltShares Event-Driven ETF | 8/2/2024 | Purchase | 2,000 | $ 27.25 | $ 54,500.00 |
| AltShares Event-Driven ETF | 8/5/2024 | Purchase | 500 | $ 27.10 | $ 13,550.00 |
| AltShares Event-Driven ETF | 1/23/2025 | Sale | 1,250 | $ 30.91 | $ 38,637.50 |
| AltShares Event-Driven ETF | 1/24/2025 | Sale | 1,250 | $ 31.15 | $ 38,937.50 |